UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————

TOMAS ZAVALIDROGA, individually and as Power
of Attorney, Medical proxy, Trustee and Next Friend
of MARGARET ZAVALIDROGA,

                                        Plaintiff,

                                                            6:19-cv-1412
v.                                                          (GTS/TWD)

SAMUEL HESTER, et al.,

                                        Defendants.
———————————————————————————

APPEARANCES:

TOMAS ZAVALIDROGA
Plaintiff, *pro se*
Rt. 28 PO General Delivery
Old Forge, NY 13420


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge


## ORDER AND REPORT-RECOMMENDATION

The Clerk has sent to the Court for initial review the *pro se* complaint of Plaintiff Tomas

Zavalidroga ("Plaintiff" or "Zavalidroga") together with a motion to proceed *in forma pauperis*

("IFP")  (Dkt. Nos. 1, 2.)  As noted herein, the Court grants Plaintiff's IFP motion, necessitating

further review relative to whether the pleading meets 28 U.S.C. 1915(e)'s sufficiency standards.

For the reasons discussed below, the Court finds Plaintiff's complaint (Dkt. No. 1) fails to state a

claim on which relief may be granted, and, therefore, recommends Plaintiff's complaint be *sua*

*sponte* dismissed in its entirety pursuant to 28 U.S.C. § 1915(e).

## I.      BACKGROUND

On November 15, 2019, Plaintiff filed a civil complaint against Defendants Samuel

Hester, Daniel Christmas, Nick Polce, Ted Houseman, Corey E. Kelly, Theresa Girouard,

William P. Schmitt, and Heritage Home-The Grand (collectively, "Defendants") seeking to

"redress the loss of constitutionally-protected liberty and property interests as a result of the

conspiratorial actions of the Defendants and their privies."  (Dkt. No. 1 at 1.[1])

By Order filed November 19, 2019, it was determined that this case is directly related to

case 6:19-cv-1304 (GTS/TWD), which was voluntarily discontinued by Plaintiff on October 25,

2019, without prejudice pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure.

(Dkt. No. 4.)  Therefore, in the interest of judicial economy, this case was reassigned to Chief

Judge Glenn T. Suddaby and the undersigned.  (*Id.*)  A copy of the Text Order was mailed to

Plaintiff at his address on file.  (*See id.*)

On December 19, 2019, before the Court issued its Order on Plaintiff's IFP motion,

Plaintiff filed a Notice of Appeal of the November 19, 2019, Order reassigning the case.  (Dkt.

No. 5.)  By Notice dated December 23, 2019, the United States Court of Appeals for the Second

Circuit advised:

> An appeal in the above-referenced case has been docketed in the
> Court of Appeals.  According to the district court docket sheet or
> other available information, appellant has moved for leave to
> proceed *in forma pauperis* in district court on November 15, 2019
> and that motion is pending.  The appeal may not move forward
> until the motion is determined.  Please direct the motion to the
> appropriate judge for determination.  Upon the grant or denial of
> the motion, please enter the order and transmit it to the Court of
> Appeals.

---

[1]  Page references to documents identified by docket number refer to the numbers
assigned by the CM/ECF docketing system maintained by the Clerk's Office.

(Dkt. No. 7.)  On January 13, 2020, Judge Suddaby issued a Text Order directing Plaintiff to show cause in writing, within fourteen (14) days, as to why his complaint should not be *sua sponte* dismissed without prejudice under Fed. R. Civ. P. 41(b) and Local Rule 41.2(a),(b), for failure to prosecute and comply with Local Rule 10.1(c)(2).  (Dkt. No. 9.[2])

## II.    IPF MOTION

As noted above, Plaintiff's IFP motion is pending before the undersigned.  A court may grant IFP status if a party "is unable to pay" the standard fee for commencing an action.  28 U.S.C. § 1915(a)(1).  After reviewing Plaintiff's IFP motion, the Court finds Plaintiff meets this standard.  Therefore, Plaintiff's motion to proceed IFP (Dkt. No. 2) is granted.

## III.    SUFFICIENCY OF THE COMPLAINT

### A.    Standard of Review

28 U.S.C. §1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  "An action is frivolous when either: (1) the factual contentions are clearly baseless, such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory."  *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citation omitted).  Although extreme caution should be exercised in ordering *sua*

---

[2]  The District Court noted Plaintiff's failure to immediately notify the Court of any change in his address has unduly delayed both his appeal to the Second Circuit and this action. (Dkt. No. 9; *see also* Dkt. No. 8.)

*sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed.  *See, e.g.*, *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation."  *Id.*

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994), *cert. denied*, 513 U.S. 836 (1994) (citation omitted).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Similarly, allegations that "are so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal.  *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

A *pro se* litigant's pleadings are held to a less strict standard than attorney-drafted pleadings.  *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008) ("Even in the formal litigation context, *pro se* litigants are held to a lesser pleading standard than other parties."); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).  Because Plaintiff is proceeding *pro se*, the Court construes the pleadings "to raise the strongest arguments that they suggest."  *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (per curiam) (internal quotation marks omitted).  However, this "does not exempt a [*pro se* litigant] from compliance with relevant rules of procedural and substantive law."  *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983).

Generally, a *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 79 (2d Cir. 1999) (citation and internal quotation marks omitted); *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

### B.    Summary of the Complaint

According to Plaintiff, "the roots of this action extend back to April 1999, when James Kelley, grandfather of Corey E. Kelley, began encroaching on the lake property now owned by Zavalidroga."  (Dkt. No. 1 at ¶ 4.)  Plaintiff, through a series of lawsuits, Zavalidroga "demonstrated the Kelley family's pattern of illegal activity and connection to organized crime." (*Id*. at ¶ 5.)  Dan Christmas, a local property developer and Director of Christmas & Associates, is a "direct relative" of the Kelley family.  (*Id*.)

In the early 2000s, Plaintiff's mother, Margaret Zavalidroga ("Margaret"), designated Plaintiff executor of her will and granted him full Power-of-Attorney over her affairs. (*Id*. at ¶ 6.) In 2006, Plaintiff and Margaret listed for sale the "Forward Road, Annsville property" (the "Zavalidroga property"). (*Id*. at ¶ 7.) Nick Polce, the Director of Gateway Properties, made multiple offers to purchase the Zavalidroga property. (*Id*.) According to Plaintiff, "Gateway Properties is known to be one of the many 'front' land companies set up by Dan Christmas[.]" (*Id*.) In the past, Dan Christmas and Christmas & Associates were accused of fraudulent land sales, permit fraud, money laundering, and conspiracy. (*Id*. at ¶ 8.)

In 2012, Margaret granted Plaintiff "Medical Proxy Powers over her" and, in 2013, she conveyed "rights to all timber on all property that was under her ownership" to Plaintiff. (*Id*. at ¶ 6.) In June 2014, Margaret conveyed the "real property she owned" to Plaintiff. (*Id*.)

Then, in July 2014, Margaret was "abducted from her house and was found by police several days later in nearby woods." (*Id*. at ¶ 9.) Plaintiff was falsely accused of being involved in her disappearance and subsequently prosecuted. (*Id*.) "This prosecution was later used as a pretext to begin a fraudulent Guardianship proceeding against Margaret Zavalidroga, which resulted in both Zavalidrogas losing substantial rights and property." (*Id*.) Defendants "had prior knowledge of the 2014 attacks on the Zavalidrogas and knew that these unlawful acts would be used to deprive the Zavalidrogas of their property." (*Id*. at ¶ 10.)

Between 2014 and 2016, Plaintiff "suffered a series of false arrests," which were "orchestrated in furtherance of the scheme to deprive him of his possessions and real property." (*Id*. at ¶ 11.) Specifically, in September 2014, during an "illegal hearing without any valid justification," Theresa Girouard was "named state-appointed Guardian over the person and property of Margaret Zavalidroga, and under color of law, Orders were rendered which

purported to negate all contracts between Thomas and Margaret Zavalidroga." (*Id*. at ¶ 12.) During the ensuing years of this "illegal Guardianship," Theresa Girouard payed herself "exorbitant fees from the assets of both Margaret and Thomas Zavalidroga." (*Id*. at ¶ 13.) Theresa Girouard "then set out to methodically loot, destroy or devalue any property she could not harvest to her own benefit or to the benefit of her privies." (*Id*.)

Additionally, "[i]n violation of the Federal 1987 Nursing Home Reform Act and the Federal False Claim Act, Girouard, Heritage Home-The Grand and various medical-provider confederates placed Margaret Zavalidroga in an unnecessarily restrictive environment and severely limited outside contact with Zavalidroga, mainly as a means of covering up their malfeasance and also as a means to prevent Margaret Zavalidroga from testifying as a witness." (*Id*. at ¶ 14.) Margaret was "unnecessarily administered heavy doses of mind altering drugs immediately upon entering the Guardianship in order to justify the sham Guardianship and false confinement." (*Id*.) "In addition to causing great physical damage to Zavalidroga, her unnecessary and fraudulent confinement resulted in hundreds of thousands of dollars of loss by the state and Federal governments." (*Id*.)

In 2015, at the request of Theresa Girouard, the State Court and police "illegally barred" Plaintiff from his property. (*Id*. at ¶ 15.) Theresa Girouard "unlawfully allowed" Nick Polce to gain control of Plaintiff's real estate and timber resources. (*Id*.) "Thousands of dollars of [Plaintiff's] possessions and equipment were seized by the Defendants at this time and remain unaccounted for." (*Id*.) By 2017, Theresa Girouard and Nick Polce "allowed the property to deteriorate and lose value." (*Id*. at ¶ 16.) William Schmitt, an attorney, was hired by Defendants to oversee the "fraudulent transfer" of the Zavalidroga property into the hands of the Defendants' "confederates." (*Id*.)

Between 2015 and 2019, Nick Polce, Samuel Hester, and Theresa Girouard "knew the Guardianship was also being used as means to launder outside funds of unknown source, mainly through the sham 'auctioning' of the Plaintiff's timber resources." (*Id*. at ¶ 16.) Further, and unbeknownst to Plaintiff, Theresa Girouard, William Schmitt, and Nick Polce "began secret land transfer to their privies in 2018, selling parcels which were appraised for hundreds of thousands of dollars for paltry sums amounting to one tenth their actual worth." (*Id*. at ¶ 17.)

Specifically, Theresa Girouard, William Schmitt, and Nick Polce created "fraudulent deeds" and "transferred several of the Zavalidroga parcels" to Ted Houseman and Corey Kelley "with the words 'on behalf of Tomas Zavalidroga.'" (*Id*. at ¶ 18.) Ted Houseman and Corey Kelly "knew" of the "rightful ownership of the parcels and willingly engaged in a conspiracy to defraud." (*Id*.) Dan Christmas "was also directly involved in the fraudulent land transfers through his control over the shell company, Gateway Properties, and his dealings with Nick Polce." (*Id*.) Moreover, Ted Houseman and Corey Kelly "either stole or destroyed thousands of dollars of equipment and property at [Plaintiff's] homestead between 2016-2019." (*Id*.)

Given this factual backdrop, the complaint seeks monetary, injunctive, and declaratory relief, and asserts seven causes of action: (1) under 42 U.S.C. §§ 1981, 1983, and 1985 for alleged deprivations of his federal rights, property interests, and discrimination; (2) under the Fourteenth Amendment to the U.S. Constitution for alleged deprivations of due process and significant liberty and property interests; (3) under "state law statutes" for false imprisonment, trespass, and conversion of property; (4) under the International Covenant on Civil and Political Rights ("ICCPR") for alleged violations of "international human rights of the Plaintiff and his privies;" (5) under the False Claim Act ("FCA") and the Federal Nursing Home Reform Act of 1987 ("FNHRA") for alleged violation of the "interests of the Plaintiff and his privies and the

interests of the Federal government;" (6) under the Racketeer Influenced and Corrupt

Organizations Act ("RICO") for alleged violations of "this section of Federal law;" and (7) under

the Fifth Amendment (Takings Clause) to the U.S. Constitution for alleged deprivations of

"property rights."  (*Id*. at ¶¶ 19-25.)  For a complete statement, reference is made to the

complaint.  (Dkt. No. 1.)

      **C.**     **Analysis**

      As an initial matter, the Court notes Plaintiff has brought many actions in this District, all

of which have been dismissed pursuant to § 1915, Fed. R. Civ. P. 12(b)(6), Fed R. Civ. P. 12(c),

Fed. R. Civ. P. 41(b), Fed. R. Civ. P. 41(b), Local Rule 41.2(a),(b), and Local Rule 10.1(c)(2).

*See Zavalidroga v. Cote*, No. 6:09-CV-225 (DNH/ATB) (closed 1/19/10);[3] *Zavalidroga v.*

*Oneida County Sheriff's Dep't*, No. 6:11-CV-277 (NAM/DEP) (closed 6/17/14);[4] *Zavalidroga v.*

*Cuomo*, No. 6:11-CV-831 (NAM/ATB) (closed 8/1/12);[5] *Zavalidroga v. Oneida Cty. Dep't of*

*Adult Protective Svcs.*, No. 14-CV-1273 (GTS/TWD) (closed 12/18/15);[6] *Zavalidroga v.*

---

[3] Plaintiff and Margaret attempted to appeal the District Court's dismissal of this complaint, but the Second Circuit affirmed the dismissal and denied the appeal on November 24, 2010. *Zavalidroga v. Cote*, No. 6:09-CV-225 (DNH/ATB) (Dkt. Nos. 77, 79).

[4] Plaintiff and Margaret also appealed the district court's dismissal of this action. *Zavalidroga v. Oneida Cty. Sheriff's Dep't*, No. 6:11-CV-277 (NAM/DEP) (Dkt. No. 158). The Second Circuit denied IFP and plaintiffs' request for injunctive relief, finding that the appeal "lacks an arguable basis either in law or in fact." *Id*. (Dkt. No. 165).

[5] Plaintiff made attempts to reopen and/or appeal the dismissal of this action. *Zavalidroga v. Cuomo*, No. 6:11-CV-831 (NAM/ATB) (Dkt. No. 31.) The District Court denied reopening (Dkt. No. 35), and the Second Circuit denied and dismissed Plaintiff's appeal on February 12, 2015. *Id*. (Dkt. Nos. 43, 44).

[6] Plaintiff and Margaret appealed this case to the Second Circuit. *Zavalidroga v. Oneida Cty. Dep't of Adult Protective Svcs.*, No. 14-CV-1273 (GTS/TWD) (Dkt. No. 29). On May 26, 2016, the Second Circuit denied a motion for appointment of counsel and dismissed the Plaintiffs' notice of appeal. *Id*. (Dkt. No. 32). On October 13, 2016, Plaintiff filed a motion to amend, which was denied on October 18, 2016. *Id*. (Dkt. Nos. 35, 36).

*Girouard*, No. 6:17-cv-0682 (BKS/ATB) (closed 10/24/17);[7] *Zavalidroga v. Madison County*,

No. 5:17-CV-117 (DNH/TWD) (closed 3/21/19).[8]

This most recent complaint is an account and restatement of many of the claims that

Plaintiff has brought in the past with some minor modifications and different defendants.

Indeed, Plaintiff has been complaining for years about Margaret's care and about the results of

Judge Hester's finding regarding her competency, the transfer of her property, and the

disposition of the property by her court-appointed guardian, Theresa Girouard. *See, e.g.*,

*Zavalidroga v. Oneida Cty. Dep't of Adult Protect. Servs.*, No. 6:14-cv-1273 (GTS/TWD) (Dkt.

Nos. 23, 24) (dismissing lawsuit, in which Plaintiff alleged a conspiracy under 42 U.S.C. §§

1981, 1983, and 1985 to nullify the power of attorney Margaret had given him and to undo

transfers of Margaret's real property to Plaintiff, on *Younger* abstention grounds because there

was a pending state court action regarding the guardianship over Margaret and control over her

affairs and real property, including property Plaintiff had transferred to himself using his power

of attorney); *Zavalidroga v. Madison County, et al.*, No. 5:17-cv-0117 (DNH/TWD) (Dkt. Nos.

14, 17) (dismissing civil rights action, where Plaintiff alleged, *inter alia*, a "long-standing civil

rights conspiracy . . . relating to the unlawful nullification of the contracts between" Plaintiff and

Margaret, "the conversion of their real property and assests (sic) and Margaret['s] forced

---

[7]  Plaintiff appealed the District Court's dismissal of this action.  *Zavalidroga v. Girouard*, No. 6:17-cv-0682 (BKS/ATB) (Dkt. No. 14).  The Second Circuit deemed the case in default for failure to pay the filing fee and/or failing to move in the Second Circuit for IFP status. *Id*. (Dkt. Nos. 30.)

[8]  Plaintiff's complaint was dismissed in its entirety except as to certain claims arising out of confinement in the Madison County Jail.  *Zavalidroga v. Madison County*, No. 5:17-CV-117 (DNH/TWD) (Dkt. No. 14, 17).  Plaintiff appealed to the Second Circuit.  *Id*. (Dkt. No. 19.)  On November 21, 2017, the Second Circuit dismissed Plaintiff's notice of appeal.  *Id*. (Dkt. No. 31.) On March 22, 2019, the complaint was dismissed in its entirety pursuant to Local Rule 41.2 (a) and (B) and 10.1(c)(2) and judgment was entered in favor of the defendants.  *Id*. (Dkt. Nos. 32, 33.)

confinement and detention at a nursing facility); *Zavalidroga v. Girouard*, No. 6:17-CV-0682 (BKS/ATB) (Dkt. Nos. 4, 9) (dismissing Plaintiff's claims brought pursuant to 42 U.S.C. §§ 1981, 1983, and 1985, allegedly for deprivation of property interests, federal interests, "discrimination in general" and pursuant to the ICCPR with prejudice and dismissing Plaintiff's claims regarding the alleged February 9, 2016, false arrest and malicious prosecution without prejudice); *Zavalidroga v. Christmas, et al.*, 6:19-cv-1304 (GTS/TWD) (Dkt. Nos. 5, 6) (voluntarily dismissing an almost identical complaint).

In this action, Plaintiff seemingly picks up where he left off in *Zavalidroga v. Girouard*, *supra*, and largely complains about the most recent "fraudulent" transfers of Margaret's property to private individuals by Theresa Girouard in 2018 and the implications thereof.  (*See generally* Dkt. No. 1.)

### 1.    Plaintiff's Claims Asserted on Margaret's Behalf

Although the "Introduction" paragraph of the complaint states "[t]his is a civil rights Complaint . . . brought by Plaintiff, Tomas Zavalidroga, appearing *pro se*," the caption of the complaint indicates Plaintiff is bringing this action "individually and as Power of Attorney, Medical Proxy, Trustee and Next friend of Margaret Zavalidroga."  (Dkt. No. 1.)  Margaret is also listed as a party to this action.  (*Id*. at ¶ 2.)  However, Margaret has not signed the complaint, nor has she filed a motion to proceed IFP.

Plaintiff has been repeatedly told that he cannot represent the interests of anyone but himself, and he may not bring an action as "Power of Attorney" for Margaret without obtaining an attorney.  *See Zavalidroga v. Girouard*, No. 6:17-cv-0682 (BKS/ATB) (Dkt. No. 4 at 9-11);

*Zavalidroga v. Oneida Cty.*, No. 14-cv-1273 (GTS/TWD) (Dkt. Nos. 6, 23).[9]  The law has not

changed in this regard.  It is well-settled that a person who has not been admitted to practice law

may not represent anyone other than himself.  *Lattanzio v. COMTA*, 481 F.3d 137, 139-40 (2d

Cir. 2007); *Guest v. Hansen*, 603 F.3d 15, 20 (2d Cir. 2010); *see also* 28 U.S.C. § 1654.  Plaintiff

may only bring claims that relate to his own interests or his own injuries.  Therefore, the Court

does not construe the complaint as asserting any claims on Margaret's behalf.

Accordingly, it is recommended, that to the extent the complaint relates to Margaret

Zavalidroga, the complaint be dismissed in its entirety without prejudice.

### 2.      Section 1983

Section 1983 provides plaintiffs with a cause of action against government officials who,

acting under the color of government authority, have subjected a plaintiff to "deprivation of any

rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42

U.S.C. § 1983; *see also Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir.

2001).  Section 1983 is "not itself a source of substantive rights, but a method for vindicating

federal rights elsewhere conferred by those parts of the United States Constitution and federal

---

[9]  In *Zavalidroga v. Girouard*, *supra*, Magistrate Judge Baxter further stated, "[Thomas
Zavalidroga ("TZ")] is confused.  He claims that he may bring this action because he is
[Margaret Zavalidroga's ("MZ")] power of attorney.  First, it is clear from this complaint, and
from the other complaints that plaintiff TZ has filed, that he is no longer MZ's power of attorney
as the result of a state court order.  In any event, even if TZ were 'power of attorney' for MZ, he
could only bring an action as power of attorney if he had a licensed attorney representing him."
*Zavalidroga v. Girouard*, No. 6:17-cv-0682 (BKS/ATB) (Dkt. No. 4 at 9-11).  In *Zavalidroga v.
Oneida Cty.*, *supra*, the complaint alleged that the defendants had commenced a state court
action to nullify the durable power of attorney given to Tomas by Margaret.  *See Zavalidroga v.
Oneida Cty.*, No. 14-cv-1273 (GTS/TWD) (Dkt. No. 6 at 2 n.1.)  The undersigned noted, "It
appears from an October 23, 2014, article in the Oneida Daily Dispatch newspaper that the Hon.
Samuel Hester, New York State Supreme Court, Oneida County, stripped Tomas of his power of
attorney over Margaret following a two-day hearing held around the time the complaint was filed
in this action.  *See* www.oneidadispatch.com/general-news/20141023/zavalidroga-stripped-of-
power-of-attorney-status-for-mother (last visited on January 21, 2015)."  *Id.*

statutes that it describes." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979)).

To establish a Section 1983 claim, a plaintiff must demonstrate two elements: "(1) 'the act complained of was committed by a person acting under color of state law'; and (2) 'this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Greenwich Citizens Comm. v. Counties of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 29-30 (2d Cir. 1996) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). The Court construes the complaint as alleging claims against Defendants under Section 1983 for violation of the Takings Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment.[10] (Dkt. No. 1 at ¶¶ 19, 20, 23.)

### a.   Judicial Immunity

Plaintiff has once again named Samuel Hester as a Defendant, even though he has been repeatedly told that judges, and Judge Hester specifically, are entitled to absolute immunity for actions relating to the exercise of their judicial functions. *See Zavalidroga v. Madison Cty.*, No. 5:17-CV-0117 (DNH/TWD) (Dkt. No. 14 at 15-16); *Zavalidroga v. Girouard*, No. 6:17-CV-0682 (BKS/ATB) (Dkt. Nos. 4 at 14-19; 9 at 4) (dismissing complaint as against Judge Hester with prejudice).

---

[10] The Takings Clause of the Fifth Amendment states that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. To state a claim for a violation of the Takings Clause, a plaintiff must allege facts plausibly suggesting: "(1) a property interest (2) that has been taken under color of state law (3) without just compensation." *Waltz v. Board of Educ. of Hoosick Falls Cent. School Dist.*, No. 1:12-CV-0507 (GTS/CFH), 2013 WL 4811958, at *6 (N.D.N.Y. Sept. 10, 2013) (citations omitted). The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "[T]o state a claim for violation of one's rights under the Due Process Clause, a plaintiff must first allege that he or she possesses a liberty or property interest protected by the Constitution or federal statutes." *Id.* at *7 (citations omitted).

It is well-settled that "officials acting in a judicial capacity are entitled to absolute immunity against [Section] 1983 actions, and this immunity acts as a complete shield to claims for money damages." *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999) (per curium); *see also Mireles v. Waco*, 502 U.S. 9, 9-10 (1991). Injunctive relief against judges is also barred "unless a declaratory decree was violated or declaratory relief was unavailable." *Bobrowski v. Yonkers Courthouse*, 777 F. Supp. 2d 692, 711 (S.D.N.Y. 2011) (citing, *inter alia*, *Montero*, 171 F.3d at 761). Although fairness and injustice may result on occasion, a judicial officer must be free to act on his or her own convictions in exercising the authority vested in him or her, "without apprehension of personal consequences. . . ." *Id.* (citing, *inter alia*, *Mireles*, 502 U.S. at 10). A judge will not be deprived of immunity because the action he took was in error or was done maliciously. *Stump v. Sparkman*, 435 U.S. 349, 357 (1978).

Whether an act by a judge is a "judicial one" relates to the "nature of the act itself" – whether it is a function that is necessarily performed by a judge. *Bobrowski*, 777 F. Supp. 2d at 712 (citing *Stump v. Sparkman*, 435 U.S. at 362). The parties must have dealt with the judge in his or her "judicial capacity." *Id.* The court acts in "absence of all jurisdiction" when "it does not have any statutory or constitutional power to adjudicate the case." *Id.* (citing *Gross v. Rell*, 585 F.3d 72, 84 (2d Cir. 2009)). The judge will not be deprived of absolute immunity if he or she takes action that is merely "in excess" of his or her authority. *Id.* (citing *Mireles*, 502 U.S. at 12-13).

In this case, Judge Hester's name only appears once in the body of the complaint, "Between the years 2015 and 2019, Polce, Hester, and Girouard also knew the Guardianship was also being used as a means to launder outside funds of unknown source, mainly through the sham 'auctioning' of the Plaintiff's timber resources." (Dkt. No. 1 at ¶ 16.) However, Plaintiff

also complains about "an illegal hearing and without any valid justification, Theresa Girouard, in Sept. 2014, was named state-appointed guardian over the person and property of Margaret Zavalidroga, and under color of law, Orders were rendered which purported to negate all contracts between Tomas and Margaret Zavalidroga." (*Id.* at ¶ 12.)  Thus, the Court construes Plaintiff's claims against Samuel Hester for action he took as a State Supreme Court Justice presiding over Margaret's guardship hearing and the implications thereof.  Although Plaintiff also asks for injunctive relief, he has not alleged that "a declaratory decree was violated or declaratory relief was unavailable."  *See Bobrowski*, 777 F. Supp. 2d at 711.

Accordingly, the Court recommends dismissing the complaint against Samuel Hester with prejudice based upon judicial immunity and for failure to state a claim on which relief may be granted.

### b.      *Quasi-Judicial Immunity*

Plaintiff has once again named Theresa Girouard as a Defendant, even though he was previously told that, as a court-appointed guardian, she is entitled to quasi-judicial immunity from suit, and that a court-appointed guardian does not act "under color of state law" for purposes of a Section 1983 action.  *See Zavalidroga v. Girouard*, No. 6:17-cv-0682 (BKS/ATB) (Dkt. Nos. 4 at 19-23; 9 at 4) (dismissing claims against Theresa Girouard with prejudice); *see also McKnight v. Middleton*, 699 F. Supp. 2d 507, 528 (E.D.N.Y. 2010), *aff'd*, 434 F. App'x 32 (2d Cir. 2011); *Yapi v. Kondratyeva*, 340 F. App'x 683, 684-85 (2d Cir. 2009) (law guardian entitled to quasi-judicial immunity when acting as an arm of the court); *see also Heinemann v. Patchey*, No. 3:16-CV-774, 2017 WL 1115203, at *3-4 (D. Conn. Mar. 24, 2017) (holding court-appointed administrators, guardians, or conservators for adults do not act under color of state law).

As was the case in *Zavalidroga v. Girouard*, *supra*, in the case at bar, Plaintiff makes many claims against Theresa Girouard, all involving the way she is handling Margaret's guardianship and how she is disposing of Margaret's property, which Plaintiff believes to be his property, based on "contracts" that he had with Margaret, apparently invalidated by Judge Hester.  (Dkt. No. 1 at ¶¶ 12-18.)

Consequently, the Court recommends dismissing the complaint against Theresa Girouard with prejudice because she is entitled to quasi-immunity from suit and for failure to state a claim on which relief may be granted.  Moreover, to the extent Plaintiff names Theresa Girouard in her "individual capacity," such claims also fail for the reasons explained below.

c.    *Private Parties*

"Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action."  *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 186 (2d Cir. 2005) (internal quotation marks omitted).  "A plaintiff pressing a claim of violation of his constitutional rights under [Section] 1983 is thus required to show state action." *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003).  State action requires "'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (emphasis omitted)).

"Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character that it can be regarded as governmental action." *Rendell-Baker v. Kohn*, 457 U.S. 830, 847 (1982) (internal quotation marks omitted).  However, a private entity does not become a state actor for purposes of Section 1983 merely on the basis of

"the private entity's creation, funding, licensing, or regulation by the government."  *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 112 (2d Cir. 2003).  Rather, "there must be such a close nexus between the [s]tate and the challenged action" that the state is "responsible for the specific conduct of which the plaintiff complains."  *Id*. at 111 (internal quotation marks omitted).

In this action, Plaintiff names Daniel Christmas—a director of a land acquisition consortium (Christmas & Associates Land Consortium), Nick Polce—a director of a land acquisition consortium (Gateway Properties), Ted Houseman—a resident of Oneida County, Corey E. Kelley—a resident of Oneida County, William P. Schmitt—an attorney residing in Oneida County, and Heritage Home-The Grand—a nursing facility, as Defendants.  (Dkt. No. 1 at ¶ 2.)  However, none of these individuals are state actors and the Heritage Home-The Grand is a private nursing facility.  Private conduct is simply beyond the reach of Section 1983 "'no matter how discriminatory or wrongful' that conduct may be."  *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).  In fact, Plaintiff was advised of the same in *Zavalidroga v. Girouard*, No. 6:17-cv-0682 (BKS/ATB) (Dkt. Nos. 4 at 23-26, 9 at 4), wherein the Court *sua sponte* dismissed Plaintiff's Section 1983 claims against Nick Polce and Heritage Nursing Home, among others, with prejudice on initial review.

As noted above, a private party may act under color of state law if he or she engages in conduct that constitutes willful participation in joint activity with the state.  *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (per curiam).  The nexus to the state must be so close as to be fairly treated as that of the state itself. *Tancredi v. Metro Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003) (citations omitted).  However, a "conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity."  *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324 (2d Cir.

2002); *see, e.g.*, *Jackson v. Cty. of Rockland*, 450 F. App'x 15, 19 (2d Cir. 2011) (citing *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (finding allegations of conspiracy "baseless" where the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators'")).  Rather, to support a claim against a private party on a [Section] 1983 conspiracy theory, a plaintiff must show "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  *Id.*

Here, Plaintiff's allegations are insufficient to plead that the actions of these private individuals and nursing home are attributable to the government, and conclusory allegations of a "conspiracy" with a state actor, who is immune from suit, are insufficient.

Additionally, in order to find that any of these individuals acted "improperly" by, among other things, creating "fraudulent deeds" and "transferring" Plaintiff's property, the Court would necessarily call in to question Judge Hester's Orders, which is prohibited by the *Rooker Feldman* doctrine.[11]  This doctrine divests the federal court of jurisdiction to consider actions that seek to overturn state court judgments.  *Fernandez v. Turetsky*, No. 12-CV-4092, 2014 WL 5823116, at *3 (E.D.N.Y. Nov. 7, 2014) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).  The doctrine also bars the federal court from considering claims that are "inextricably intertwined" with a prior state court determination.  *Id.* (quoting *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 185 (2d Cir. 1999)).

Therefore, the Court recommends dismissing any claims under Section 1983 against Daniel Christmas, Nick Polce, Ted Houseman, Corey E. Kelley, William P. Schmitt, Theresa

---

[11]  *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

Girouard, and Heritage Home-The Grand for failure to state a claim on which relief can be granted.

### 3.     Sections 1981 and 1985

Section 1981 provides in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other."  42 U.S.C. § 1981(a).  Section 1981(c) provides that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and under color of state law."  *Id*. § 1981(c).

To establish a claim under Section 1981, a plaintiff must allege facts in support of the following elements: (1) a member of a minority race; (2) an attempt to discriminate against him on the basis of race by defendant; and (3) discrimination that concerned one or more of the activities enumerated in the statute.  *See Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993).

Section 1985 addresses in relevant part conspiracies to deprive "any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws." 42 U.S.C. 1985(3).  The elements of a conspiracy claim under Section 1985 are: (1) that the defendants had a racial or other class-based, invidiously discriminatory animus; (2) that such animus motivated the defendants to enter into a conspiracy; (3) to deprive plaintiff of a constitutional or other federal right; (4) that a defendant committed an overt act in furtherance of

that conspiracy; (5) resulting in injury to the plaintiff.  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267 (1993).

Here, as was the case in *Zavalidroga v. Madison Cty.*, No. 17-cv-0117 (DNH/TWD) (Dkt. No. 14 at 14-15) and *Zavalidroga v. Girouard*, No. 6:17-cv-0682 (BKS/ATB) (Dkt. No. 4 at 32-33), although Plaintiff purports to bring claims pursuant to Sections 1981 and 1985, he has failed to even allege that he is a member of a racial minority or that any of the Defendants discriminated against him on that basis.  (See generally Dkt. No. 1.)  Given the absence of factual allegations in the complaint that he was discriminated against on the basis of race or some other cognizable suspect class, the Court finds Plaintiff fails to state a claim under Sections 1981 and 1985.  *See Webster v. Fischer*, 694 F. Supp. 2d 163, 196 (N.D.N.Y. 2010) (dismissing § 1985(3) claim subject to dismissal when plaintiff fails to establish membership in a protected class), *aff'd* 398 F. App'x 683 (2d Cir. 2010).

Therefore, the Court recommends dismissing any claims under Section 1981 and Section 1985 for failure to state a claim on which relief may be granted.

### 4. ICCPR

Plaintiff claims Defendants "violated" the ICCPR.  (Dkt. No. 1 at ¶ 22).  The complaint states: "Under this international treaty concerning rights of the individual, the Plaintiff alleges that the actions and omissions of the Defendants under color of state law have violated the international human rights of the Plaintiff and his privities."  *Id.*  However, the Second Circuit has specifically found that the ICCPR does "not create independent rights that are cognizable in this court.  The ICCPR is not self-executing and therefore is not privately enforceable."  *Elie v. Holder*, 443 F. App'x 635, 638 (2d Cir. 2011) (citations omitted).  Thus, the complaint in this case may not be brought pursuant to the ICCPR, regardless of Plaintiff's allegations.  Plaintiff

was advised of the same in *Zavalidroga v. Girouard*, No. 6:17-cv-0682 (BKS/ATB) (Dkt. No. 4 at 33).

Therefore, the Court recommends that Plaintiff's claim under the ICCPR be dismissed with prejudice for failure to state a claim on which relief may be granted.

## 5. FCA and FNHRA

The complaint states, "Under these Federal Statutes, the Plaintiff alleges that the actions and omissions, under color of state law, have violated the interests of the Plaintiff and his privies and the interests of the Federal government."  (Dkt. No. 1 at ¶ 23.)  The Court addresses each statute in turn.

The FCA is "intended to recover damages from those who defraud the federal government," and "imposes liability on those who knowingly present, or cause to be presented, false or fraudulent claims for payment, or knowingly make, use, or cause to be used, false records or statements to get false claims paid or approved."  *United States v. Empire Educ. Corp.*, 959 F. Supp. 2d 248, 253 (N.D.N.Y. 2013) (citing 31 U.S.C. § 3729(a)(1)(A) & (B)).  "Private persons, known as relators, may file *qui tam* actions—actions on behalf of the government—for violations of § 3729.  *Id.* (citing 31 U.S.C. § 3730(c)(3); *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16 (2d Cir. 1990)).

However, "[t]he law in this Circuit is clear that *pro se* litigants may not pursue *qui tam* actions under the False Claims Act."  *Palmer v. Fannie Mae*, No. 14-CV-4083JFBAYS, 2016 WL 5338542, at *4 (E.D.N.Y. Sept. 23, 2016) (citing *U.S. ex rel. Mergent Servs. v. Flaherty*, 540 F.3d 89, 93 (2d Cir. 2008)).  Since Plaintiff is proceeding without representation, he cannot maintain a claim under the FCA.  *See id.* (dismissing a *qui tam* action brought by a *pro se* plaintiff).  Moreover, it is clear Plaintiff is litigating in his own interests and is not seeking to

vindicate any rights belonging to the federal government.  *See Byrd v. Mazzola Ins. Corp*, No. 6:17-CV-06178(MAT), 2017 WL 5508814, at *4 (W.D.N.Y. Apr. 5, 2017) ("Even if Plaintiff were seeking to vindicate a right belonging to a federal government agency, which she plainly is not, she could not maintain an FCA claim because she is unrepresented."); *see also Bowens v. Correctional Assoc. of New York*, No. 19-CV-1523 (PKC/CLP), 2019 WL 1586857, at *5 (E.D.N.Y. Apr. 12, 2019) ("[A] private party seeking to litigate FCA claims is not entitled to proceed *pro se* because that party is not litigating his or her own interest, but rather, the interest of the government.") (quoting *Mergent*, 540 F.3d at 93).

As to his claims brought pursuant to the FNHRA, the Second Circuit has stated that "the Nursing Home Reform Act's provisions do not confer a right of action on [a plaintiff] that can be enforced against a private nursing home[.]" *Prince v. Dicker*, 29 F. App'x 52, 54 (2d Cir. 2002) (summary order); *see also Pantalone ex rel. Pantalone v. Cty. of Fulton*, No. 6:10-CV-913 (DNH), 2011 WL 1457935, at *2 (N.D.N.Y. Apr. 15, 2011) ("It is undisputed that the FNHRA does not provide a private cause of action to be brought under the statute directly.").

Therefore, the Court recommends dismissing Plaintiff's claims under the FCA and the FNHRA with prejudice for failure to state a claim on which relief may be granted.

### 6.   RICO

Without any explanation at all, Plaintiff claims Defendants "violated" RICO.  (Dkt. No. 1 at ¶ 24.)  The RICO statute provides a private right of action to any person injured in his business or property by reason of a violation of Title 18 United States Code, section 1962 of the chapter. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 283 (2d Cir. 2006) (citing 18 U.S.C. § 1964(c)).  In order to establish a civil RICO claim, the plaintiff must plead the conduct of an enterprise through a pattern of racketeering activity that causes injury to business or property as a result of

the RICO violation.  *Lundy v. Catholic Health Systems of Long Island, Inc.*, 711 F.3d 106, 119

(2d Cir. 2013) (quoting *Anatian v. Coutts Bank (Switz.) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999)).

The pattern of racketeering activity must consist of two or more predicate acts of racketeering

listed in 18 U.S.C. § 1961(1), (5).  *Id.*; *see also Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d

Cir. 1983).  The RICO conduct must be both the proximate and but for cause of the plaintiff's

injury.  *Lerner*, 459 F.3d at 283.

The RICO statute provides only for injury to business or property.  The statute does not

provide recovery for physical or emotional injuries.  *Kesick v. Ulloa*, No. 1:10-CV- 1248, 2012

WL 2873364, at *9 (N.D.N.Y. July 12, 2012) (quoting *Williams v. Dow Chemical Co.*, 255 F.

Supp. 2d 219, 225 (S.D.N.Y. 2003)); *Moore v. Guesno*, 485 F. Supp. 2d 300, 305 (W.D.N.Y.

2007).  In addition, it is well-settled that civil RICO "is an unusually potent weapon—the

litigation equivalent of a thermonuclear device.  Because the mere assertion of a RICO claim . . .

has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should

strive to flush out frivolous RICO allegations at an early stage of the litigation."  *Gruber v.

Gilbertson*, No. 16-CV-9727, 2019 WL 4458956, at *5 (S.D.N.Y. Sept. 17, 2019) (quoting

*Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996)) (internal

quotations omitted).

Here, Plaintiff has failed to allege any facts whatsoever suggesting that Defendants

engaged in a pattern of racketeering activity or were involved in an enterprise which affects

interstate or foreign business or property.  Plaintiff's cursory references to "conspiracy," "fraud,"

"laundering," and "scheme" are insufficient.

Additionally, as stated above, the RICO conduct must be both the proximate and but for

cause of the plaintiff's injury.  The Supreme Court has held that the "proximate cause" required

for plaintiff to recover under the RICO statute requires a "direct relation" between the injury asserted and the conduct alleged. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992). The less direct an injury, the more difficult it would be to determine what portion of the damages were attributable to "the RICO violation as distinct from the independent factors." *Commercial Cleaning Svcs., LLC v. Colin Svc. Systs.*, *Inc.*, 271 F.3d 374, 381-82 (2d Cir. 2001) (citing *Homes*, 503 U.S. at 273.) A link that is "too remote, purely contingent, or indirect is insufficient." *Wang v. Yien-Koo-King*, No. 18 Civ. 8948, 2019 WL 1763230, at *6 (S.D.N.Y. Apr. 22, 2019) (quoting *Empire Merchants, LLC v. Reliable Churchill, LLLP*, 902 F.3d 132, 141 (2d Cir. 2018) (quoting *Hemi Grp., LLC v. City of New York*, 599 U.S. 1, 17 (2010))).

In this case, the complaint cannot remotely meet the proximate cause requirement. The problem in Plaintiff's claim is that the so-called "injury" to "his" "business" and/or "property" all seemingly derive from the 2014 State Court Order, discussed above, not from any alleged RICO conduct.

Therefore, the Court recommends dismissing Plaintiff's civil RICO claim for failure to state a claim on which relief may be granted.

### 7.    Supplemental Jurisdiction

Federal courts have supplemental jurisdiction over state-law claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Kolari v.  New York Presbyterian Hosp.*, 455 F.3d 118, 121-22 (2d Cir. 2006) (citing 28 U.S.C. § 1367(a)). Supplemental jurisdiction is discretionary, and the district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. *Id.* at 122 (citing 28 U.S.C. § 1367(c)(3)); *see also Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343,

350 (1988); *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182-84 (2d Cir. 2004) ("The exercise of supplemental jurisdiction is left to the discretion of the district court[.] If the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

In this case, the complaint purports to raise various state law claims, including false imprisonment, trespass, and conversion of property.  (Dkt. No. 1 at ¶¶ 11, 15-18, 21.)  The state law claims are intertwined with the federal claims.  However, inasmuch as the Court is recommending dismissal of all federal claims, the Court also recommends that the District Court decline to exercise supplemental jurisdiction over any of Plaintiff's purported state law causes of action.

## IV.   CONCLUSION

For the reasons discussed, Plaintiff's complaint does not make a short and plain statement showing that he is entitled to relief and, therefore, the Court recommends dismissing the complaint in its entirety pursuant to §1915.

As indicated above, generally before the Court dismisses a *pro se* complaint or any part of the complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once, however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *see, e.g.*, *Zavalidroga v. Cote*, 395 F. App'x 737, 740-41 (2d Cir. 2010) (summary order) (holding the district court did not err in dismissing the *pro se* complaint filed by Tomas Zavalidroga and Margaret Zavalidroga without leave to amend where leave to amend would be futile) (citing *Cuoco*, 222 F.3d at 112) ("Although a district court generally should not dismiss a *pro se* complaint without granting the plaintiff leave to amend, dismissal is appropriate if leave to amend would be futile.").

As previously summarized by Magistrate Judge Baxter in *Zavalidroga v. Girouard*, No. 6:17-cv-0682 (BKS/ATB) (Dkt. No. 4 at 34-35), Plaintiff has been complaining for years about these incidents, resulting from his conviction or his mother's care, or from the results of the state court's finding regarding her competency, the transfer of her property, and the disposition of that property by her court-appointed guardian.  Plaintiff has brought various actions against different defendants, some of which have been named in this action.  Each case has been dismissed on the pleadings, with one minor exception when Plaintiff actually sued over his conditions of confinement in *Zavalidroga v. Madison Cty.*, No. 5:17-cv-0117 (DNH/TWD), notwithstanding the opportunity for amendment.  (*See supra* notes 3-8 and accompanying text.[12])

Inasmuch as better pleading will not cure many of the defects identified above, the Court finds any amendment would be futile and, therefore, recommends the complaint be dismissed in its entirety without leave to amend.

**WHEREFORE**, based on the findings above, it is hereby

**ORDERED** that Plaintiff's IFP motion (Dkt. No. 2) is **GRANTED for purposes of filing only**; and it is further

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED in its entirety without leave to amend** pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with a copy of the unpublished decision cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

---

[12]  As set forth above, the complaint in *Zavalidroga v. Madison Cty.*, No. 5:17-cv-0117 (DNH/TWD) (Dkt. Nos. 32, 33) was ultimately dismissed in its entirety pursuant to Local Rule 41.2 (a) and (B) and 10.1(c)(2) and judgment was entered in favor of the defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[13]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: January 14, 2020
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[13]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

Case 6:19-cv-01412-GTS-TWD   Document 10   Filed 01/14/20   Page 28 of 91

Heinemann v. Patchey, Not Reported in Fed. Supp. (2017)
2017 WL 1115203

2017 WL 1115203
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

F. Parker HEINEMANN and Susan Voigt, Plaintiffs,
v.
Roseanne PATCHEY, Defendant.

No. 3:16-cv-774 (MPS)
|
Signed 03/24/2017

**Attorneys and Law Firms**

Kenneth J. McDonnell, Gould, Larson, Bennet, Wells &
McDonnell, Essex, CT, for Plaintiffs.

Maureen E. Burns, Pellegrino Law Firm, New Haven, CT, for
Defendant.

**RULING ON PRELIMINARY INJUNCTION**

Michael P. Shea, U.S.D.J.

**\*1** This case arises out of a dispute over the management
of the affairs of Plaintiff F. Parker Heinemann, a man in his
eighties in Old Saybrook, Connecticut. On April 13, 2016,
at the request of his wife and children, a court in Florida
declared Mr. Heinemann to be incompetent and appointed an
emergency temporary guardian for him, defendant Roseanne
Patchey. (ECF Nos. 10-2 at 2, 17-1 at 1, 17-2 at 5-6.) One day
later, on April 14, 2016, a court in Connecticut declared Mr.
Heinemann to be *competent*, and appointed his companion,
Plaintiff Susan Voigt, to be voluntary conservator of his
person and estate. (ECF No. 10-2 at 5-6.) On May 19, 2016,
Mr. Heinemann and Ms. Voigt initiated this federal action,
bringing Fourth and Fourteenth Amendment claims against
Ms. Patchey under 42 U.S.C. § 1983 ("Section 1983"). (ECF
No. 1.)

Plaintiffs seek a preliminary injunction to prevent Ms.
Patchey from bringing Mr. Heinemann to Florida and
interfering with his financial accounts. (ECF No. 10.) [1] As set
forth below, the preliminary injunction is DENIED, because
it appears that Ms. Patchey was not acting under color of state
law as required to sustain a Section 1983 claim. Plaintiffs have
therefore not shown a likelihood of success on the merits or
sufficiently serious questions going to the merits of the claim.

[1]   Ms. Patchey has also filed a motion to stay (ECF No. 15),
which I do not address in this ruling.

**I. Background**

*A. Initial State Court Proceedings*

On February 10, 2016, Mr. Heinemann's son filed an
application for involuntary guardianship in the Circuit Court
of Florida. *In Re: Frank Parker Heinemann*, Nos. 16-GA-41
and 16-GA-42 (Fla. Cir. Ct.); *see also* ECF Nos. 10-2 at
2, 17-1 at 1. The court held at least one hearing on the
application, at which Mr. Heinemann's wife and children were
present or represented. *Id.*

In March 2016, aware of the pending Florida action, Mr.
Heinemann's attorney, Howard Gould, filed a voluntary
application in Connecticut Probate Court to have Ms. Voigt
appointed as Mr. Heinemann's conservator of person and
estate. (ECF No. 10-2 at 1-2.) On March 23, 2016, the Probate
Court held a hearing on the application, which was opposed
by Mr. Heinemann's wife and children. (*Id.* at 5.)

On April 13, 2016, the Florida Circuit Court determined
that Mr. Heinemann was incompetent and appointed Ms.
Patchey to be his emergency temporary guardian under Fla.
Stat. § 744.3031. (ECF No. 17-2 at 5-6.) The letter of
emergency temporary guardianship stated that Ms. Patchey
had power "to contract; to sue or defend lawsuits; to
control and manage property and income from any source;
to apply for government benefits; to determine residence;
to consent to medical and mental health treatment...." (*Id.*
at 5.) The letter added that "[t]he emergency temporary
guardian is further authorized and directed to travel to
Connecticut to assist FRANK PARKER HEINEMANN in
his return to Florida. Pursuant to Fla. Stat. § 731.3031(5),
all interested persons are restrained from interfering with
the emergency temporary guardian in her efforts to return
FRANK PARKER HEINEMANN to Florida." (*Id.*) The
authority of the emergency temporary guardian appointment
was set to expire in ninety days. (*Id.* at 6.)

**\*2** On April 14, 2016, the Connecticut Probate Court
appointed Ms. Voigt the conservator of the person and
estate of Mr. Heinemann under Conn. Gen. Stat. § 45a-646,
with certain special conditions. (ECF No. 10-2 at 5-6.)
The court noted that the "case has a unique twist in that
there is a pending Petition for Guardianship concerning Mr.

Heinemann in the State of Florida," but found that it did
have jurisdiction. (*Id.* at 5.) The court also found that Mr.
Heinemann had "the requisite understanding necessary to
request a Conservator on a voluntary basis," and that "the
possibility of undue influence is muted" by the fact of Mr.
Heinemann's and Ms. Voigt's "unique relationship, in that
Mr. Heinemann remains married, but has been with Ms.
Voigt in some capacity, (friend, caretaker, companion) for
approximately thirty years." (*Id.* at 6.)

On May 4, 2016, Mr. Heinemann filed an initial appeal
of the Florida Circuit Court's appointment of Ms. Patchey
as temporary emergency guardian. The state court docket
reflects a "NOTICE OF APPEAL TO 2ND DCA ON NON-
FINAL ORDER RENDERED 4/13/2016." *In Re: Frank
Parker Heinemann*, Nos. 16-GA-41 and 16-GA-42 (Fla. Cir.
Ct.).

On May 11, 2016, Mr. Heinemann's wife filed an appeal of
the Connecticut Probate Court's appointment of Ms. Voigt as
conservator. *Denise Heinemann v. F. Parker Heinemann*, No.
MMX-CV-16-6015584-S (Conn. Super. Ct.); *see also* ECF
No. 28-1 at 4-8.

### B. This Federal Action

On May 19, 2016, Mr. Heinemann and Ms. Voigt filed this
lawsuit, bringing Fourth and Fourteenth Amendment claims
under Section 1983 against Ms. Patchey. (ECF No. 1.) In
the complaint, the plaintiffs alleged that Ms. Patchey, "acting
under color of law, has contacted local law enforcement
officials and requested assistance in forcibly abducting and
transporting the plaintiff, Heinemann, to Florida against
his will and contrary to the decree of the Connecticut
Probate Court." (*Id.* ¶ 7.) They also alleged that Ms. Patchey
had directed third party financial institutions to freeze Mr.
Heinemann's accounts. (*Id.* ¶¶ 8-9.)

On August 24, 2016, plaintiffs filed a motion for preliminary
injunction, asking me to enjoin Ms. Patchey from moving Mr.
Heinemann to Florida, order her to return any seized funds,
and order her to rescind any directives to third party financial
institutions regarding such funds. (ECF No. 10.) Attorney
Gould and Ms. Voigt submitted affidavits supporting that
motion.

Regarding transportation to Florida, Ms. Voigt stated that
Mr. Heinemann's last visit to Florida had left him "shaken,"

and "hesitant to visit his family in Florida again," because
Mr. Heinemann's family had him arrested, briefly detained
by local police, and involuntarily admitted to a psychiatric
facility. (ECF No. 10-3 ¶ 5.) Attorney Gould agreed that Mr.
Heinemann "does not want to be transported to Florida, and
is very fearful that the Florida order will be implemented
against his wishes." (ECF No. 10-2 at 2.) Neither affidavit
directly claimed that Ms. Patchey had taken actions to move
Mr. Heinemann to Florida, but Attorney Gould did assert that
Mr. Heinemann's "fear was heightened when he was advised
that 1) the Connecticut conservator had been contacted by
the Defendant to facilitate such arrangements; and 2) the Old
Saybrook Police had also been contacted to 'assist' in the
process." (*Id.* at 3.)

As for the financial issues, Attorney Gould explained that
local managers at Liberty Bank and Wells Fargo told him
that no one could access Mr. Heinemann's accounts because
"the Defendant asserted that the assets were under the control
of the Florida courts." (*Id.*) The Vanguard Group also stated
that no one could access Mr. Heinemann's account until the
conflict over who had legal authorization was resolved. (*Id.*
at 3-4.) According to Ms. Voigt, these financial restrictions
prevented her from paying the costs of Mr. Heinemann's
health care, namely a visiting nurse, a physical therapist, and
a home healthcare aide. (ECF No. 10-3 ¶ 6.)

### C. Current Status of State Court Proceedings

**\*3** After this case was filed, on August 24, 2016,
Liberty Bank initiated a separate action in Connecticut to
determine adverse claims to Mr. Heinemann's funds. *Liberty
Bank v. Susan Voigt and Roseanne Patchey*, No. MMX-
CV-16-6016170-S (Conn. Super. Ct.); *see also* ECF No. 28
at 2. On November 29, 2016, the Connecticut Superior Court
ordered Liberty Bank to "honor any and all requests from
Susan Voigt acting as fiduciary for Frank Parker Heinemann
for the withdrawal of funds held on Mr. Heinemann's behalf
at Liberty Bank." (ECF No. 28-3 at 1.)

While the appeal was pending in the Florida action, the
Circuit Court issued a stay of its order appointing Ms. Patchey
as emergency temporary guardian. *In Re: Frank Parker
Heinemann*, Nos. 16-GA-41 and 16-GA-42 (Fla. Cir. Ct.); *see
also* ECF Nos. 21 at 5, 28 at 2. Then, on March 9, 2017, the
Florida Second District Court of Appeals affirmed the Circuit
Court's decisions denying Mr. Heinemann's earlier motions to
dismiss and to terminate the emergency appointment. (ECF

Case 6:19-cv-01412-GTS-TWD   Document 10   Filed 01/14/20   Page 30 of 91

Heinemann v. Patchey, Not Reported in Fed. Supp. (2017)
2017 WL 1115203

Nos. 28 at 2, 28-2 at 1-3.) A hearing on whether the Circuit Court should terminate its current stay of Ms. Patchey's guardianship appointment is scheduled for April 5, 2017. (ECF No. 28 at 2.)

The Connecticut Superior Court has scheduled a hearing on the appeal of the Connecticut Probate Court's appointment of Ms. Voigt as conservator for June 16, 2017. (ECF No. 28 at 1-2.)

## II. Legal Standard

"[D]istrict courts may grant a preliminary injunction where a plaintiff demonstrates irreparable harm and meets one of two related standards: either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (citation and quotation marks omitted). District courts have wide discretion in determining whether to grant preliminary injunctive relief. *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 511 (2d Cir. 2005). "Such relief, however, is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Id.* at 510 (citation and quotation marks omitted). "Generally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute." *Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997).

## III. Discussion

Plaintiffs' motion for preliminary injunction fails because they have failed to demonstrate sufficiently serious questions going to the merits of their claim. [2] Specifically, it does not appear that Ms. Patchey, as an emergency temporary guardian appointed for Mr. Heinemann by the Florida court, acted under color of state law for purposes of Section 1983.

[2] I also ordered the parties to show cause why the case should not be dismissed for lack of subject matter jurisdiction under *Rooker-Feldman*, the doctrine that precludes district courts from hearing "suits that are, in substance, appeals from state-court judgments," *Hoblock v. Albany Cnty. Bd. of Elecs.*, 422 F.3d 77, 84 (2d Cir. 2005). (ECF No. 22.) For *Rooker-Feldman* to apply, "the state-court judgment must have been 'rendered

before the district court proceedings commenced'— i.e., *Rooker-Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation." *Id.* at 85. Here, the Florida state court litigation was ongoing at the time the plaintiffs filed this federal lawsuit: the Florida temporary emergency guardian appointment (termed a "non-final order" by the state court) was on appeal. Further, by its terms, the order expired in ninety days. (ECF No. 1-2 at 2.) *Rooker-Feldman* therefore does not bar the plaintiffs' claim. *See also Green v. Mattingly*, 585 F.3d 97, 103 (2d Cir. 2009) (temporary child custody order was not final for *Rooker-Feldman* purposes, although "[i]f, at the completion of her appeal [through higher state courts], plaintiff were to bring a § 1983 action in federal court seeking the return of her child.... the *Rooker–Feldman* doctrine would likely apply.")

**\*4** "In order to state a claim under § 1983, a plaintiff must allege that he was injured by either a state actor or a private party acting under color of state law." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002). To satisfy Section 1983's state action requirement, "the allegedly unconstitutional conduct must be fairly attributable to the state. Conduct that is ostensibly private can be fairly attributed to the state only if there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003) (internal citations and quotation marks omitted).

First, "it is well-established that court-appointed attorneys performing a lawyer's traditional functions as counsel to defendant do not act 'under color of state law' and therefore are not subject to suit under 42 U.S.C. § 1983." *Rodriguez v. Weprin*, 116 F.3d 62, 65–66 (2d Cir. 1997). *See also Polk County v. Dodson*, 454 U.S. 312, 325 (1981) (public defenders do not act under color of state law). Following the same logic, the Second Circuit has held that guardians appointed for children in family court proceedings do not act under color of state law and thus cannot be sued under Section 1983. *Milan v. Wertheimer*, 808 F.3d 961, 964 (2d Cir. 2015). The court reasoned that "the analogy of a law guardian to a public defender is apt. Although both are supplied and funded by the state, each acts according to the best interests of the client with no obligation to the mission of the state." *Id.* (quotation marks and citation omitted).

For the same reasons, court-appointed administrators, guardians, or conservators for adults—like Ms. Patchey in this case—do not act under color of state law. *See, e.g. Terry*

Case 6:19-cv-01412-GTS-TWD   Document 10   Filed 01/14/20   Page 31 of 91

Heinemann v. Patchey, Not Reported in Fed. Supp. (2017)

2017 WL 1115203

*v. Cty. of Suffolk, N.Y.*, 654 Fed.Appx. 5, 5-6 (2d Cir. 2016) (summary order) ("[G]uardian, who was appointed by a state court for an elderly woman," could not be sued under Section 1983, because he "was required by Mental Hygiene Law to act in the best interests of [the elderly woman] and is not a state actor."); *Mitchell v. Connecticut Region 14 Dist. Prob. Court*, 2015 WL 4094188, at *5 (D. Conn. July 7, 2015) ("Despite the fact that various defendants were alleged to have been appointed by the probate court as trustees or administrators of the living trust, this does not suffice to establish that their subsequent actions constituted state action for purposes of liability under Section 1983."); *Sasscer v. Barrios-Paoli*, 2008 WL 5215466, at *5 (S.D.N.Y. Dec. 8, 2008) ("Complaint alleges that [Defendants] were appointed as Plaintiff's guardians *ad litem* ... and that [they] violated due process when they filed 4 years of Plaintiff's tax returns ... But, guardians *ad litem*, although appointed by the court, exercise independent professional judgment in the interests of the clients they represent and are therefore not state actors for purposes of Section 1983." (quotation marks and alterations omitted)); *Rzayeva v. United States*, 492 F. Supp. 2d 60, 81 (D. Conn. 2007) ("Because a court-ordered conservator exercises independent professional judgment in the interest of his client, he cannot be considered a state actor.... The fact that an individual is appointed by the state and paid with state funds is insufficient to render an individual a state actor.").

Here, Ms. Patchey was an emergency temporary guardian appointed by the Florida Circuit Court, with a duty to "faithfully perform the duties of a guardian" for the period of her appointment. Fla. Stat. § 744.3031; ECF No. 17-2 at 5. *See also In re Guardianship of Beck*, 204 So. 3d 143, 148 (Fla. Dist. Ct. App. 2016) ("The fact that the statutory title ... is 'emergency temporary guardian' ... establish[es] that unless or until a plenary or limited guardianship is established or the emergency temporary guardianship expires, Ms. Yates is a guardian."). In Florida, guardians are required to "act as they feel the wards themselves would act. This ['substituted judgment'] standard places the guardian in the shoes of the ward when making decisions." *Rainey v. Guardianship of Mackey*, 773 So. 2d 118, 121-22 (Fla. Dist. Ct. App. 2000). As Mr. Heinemann's emergency temporary guardian, Ms. Patchey allegedly attempted to control his financial accounts and requested assistance from local law enforcement to move him to Florida. (ECF No. 1 ¶¶ 7-9.) [3] In taking those actions, although Ms. Patchey may have been "supplied and funded

by the state," her duty as emergency temporary guardian was to act on behalf of Mr. Heinemann, "with no obligation to the mission of the state." *Milan*, 808 F.3d at 964. [4]

[3]   I note that the affidavits attached to the motion for preliminary injunction do not directly state that Ms. Patchey in fact contacted local police, and nowhere do the plaintiffs claim that the police—who *are* state actors—took any action to assist Ms. Patchey.

[4]   Plaintiffs also argue that "[t]he basis of this litigation is the fact that the Defendant has exceeded and abused any authority the Florida court appointment may have granted her by acting outside the jurisdiction of Florida and inside the jurisdiction of Connecticut and other states." (ECF No. 24 at 3.) If true, this only confirms that Ms. Patchey was not acting under color of state law.

**\*5**   Therefore, it does not appear that Ms. Patchey acted or is acting under color of state law in her role as emergency temporary guardian, and Plaintiffs have failed to demonstrate either a likelihood of success of the merits or sufficiently serious questions going to the merits of their claims to make them fair grounds for litigation. *Otoe-Missouria*, 769 F.3d at 110. [5]

[5]   Having made this finding, I need not consider whether plaintiffs have shown they will suffer irreparable harm, though I note that both the Florida court's stay on Ms. Patchey's temporary emergency guardian appointment and the Connecticut court's decision to allow Ms. Voigt to withdraw Mr. Heinemann's funds from Liberty Bank weaken plaintiffs' arguments on that issue. I also need not reach Ms. Patchey's arguments regarding the applicability of the Anti-Injunction Act, 28 U.S.C. § 2283, or various abstention doctrines. (*See* ECF No. 25 at 4-6.)

### IV. Conclusion

For the foregoing reasons, the motion for preliminary injunction (ECF No. 10) is DENIED.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2017 WL 1115203

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 5823116
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Edwin FERNANDEZ, Plaintiff,

v.

Vicky TURETSKY, et al., Defendants.

No. 12–cv–4092 (SLT)(MDG).
|
Signed Nov. 5, 2014.
|
Filed Nov. 7, 2014.

## Attorneys and Law Firms

Edwin Fernandez, Staten Island, NY, pro se.

Kathleen Anne Mahoney, United States Attorneys Office, Elizabeth A. Forman, Attorney General of the State of New York, Gloria Mihee Yi, NYC Law Department, Omar Hani Tuffaha, New York City Law Department Office of the Corporation Counsel, New York, NY, for Defendants.

## MEMORANDUM & ORDER

TOWNES, District Judge.

**\*1** Plaintiff Edwin Fernandez, proceeding *pro se,* alleges that his constitutional right to due process was violated by (1) federal defendants: Vicki Turetsky and Joyce A. Thomas, respectively, the Commissioner and Regional Administrator of the U.S. Department of Health and Human Services, Office of Child Support Enforcement; (2) state defendants: Thomas H. Mattox and C. Duncan Kerr, respectively, the Commissioner and Deputy Tax Commissioner of the New York State Department of Taxation and Finance, Office of Child Support Enforcement; and three Tax Compliance Agents employed by the New York State Department of Taxation and Finance, Child Support Enforcement Section– Patty Whitford, Georgia Brown, and Margaret Ramsay; and (3) a municipal defendant: Robert Doar, a former Commissioner of the New York City Human Resources Administration. Plaintiff alleges that his vehicles and funds were seized, wages garnished, and tax refunds intercepted in order to collect child support arrears even though "Plaintiff was in compliance paying child support arrears." [Dkt. 4,

Amd. Compl. ¶ 26.] This action was reassigned to this Court on March 18, 2014, after Judge Mauskopf entered a recusal order on March 17, 2014. Currently before the Court is state defendants' ("Defendants") motion to dismiss for, *inter alia,* lack of subject matter jurisdiction. [1]

[1]  Defendants also seeks to dismiss pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure on the grounds that Plaintiff's claims are time-barred. This Court need not reach the issue because it lacks subject matter jurisdiction over the case.

## Legal Standard

Defendants move to dismiss on the grounds that this Court lacks subject matter jurisdiction. *Remy v. New York State Dep't of Taxation & Fin.,* 507 F. App'x 16, 18 (2d Cir.2013) ("A challenge under the *Rooker–Feldman* doctrine is for lack of subject matter jurisdiction.") (quoting *Moccio v. N.Y. State Office of Court Admin.,* 95 F.3d 195, 198 (2d Cir.1996)). "A case may properly be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) 'when the district court lacks the statutory or constitutional power to adjudicate it.' " *Sobel v. Prudenti,* 12 CV 3258 DRH WDW, 2014 WL 2750364, at \*10 (E.D.N.Y. June 18, 2014) (quoting *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000)). Unlike on a motion to dismiss for failure to state a claim under Rule 12(b)(6), a "plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." ' *Mac Pherson v. State St. Bank & Trust Co.,* 452 F.Supp.2d 133, 136 (E.D.N.Y.2006) *aff'd,* 273 F. App'x 61 (2008) (quoting *Makarova,* 201 F.3d at 113). In resolving a motion to dismiss under Rule 12(b)(1), the Court is not limited to the face of the complaint, but may also consider evidence such as affidavits submitted by the parties. *Robinson v. Government of Malaysia,* 269 F.3d 133, 141 (2d Cir.2001).

## Factual History

According to the factual recitation in the May 13, 2008 Decision and Order of the Honorable Francois A. Rivera, Justice of the Supreme Court of the State of New York, Kings County dismissing Plaintiff's CPLR Article 78 petition, Plaintiff's obligation to pay child support to his ex-wife, custodial parent of their child, arises out of a June 7, 1990 divorce decree. After Plaintiff did not comply with his child support obligations, in June 1999, his ex-wife requested that

the New York City Support Collection Unit assist her in enforcing Plaintiff's support obligations. Justice Rivera's May 13, 2008 Order finds that although the child support order was terminated *nunc pro tunc* to January 9, 2007, the day that the subject child turned 21 Plaintiff still owed outstanding support arrears. Subsequently, a Supreme Court of the State of New York, Kings County Family Court Support Magistrate, at an October 23, 2007 hearing, set Plaintiff's child support arrears at $33,468.80. Justice Rivera's Order rejects Plaintiff's contention "that he has paid the required child support and now that the child is emancipated, he no longer owes any money," because "[i]n actuality, though Mr. Fernandez's [*sic*] paid child support through an income execution of his wages, and the child in question is now emancipated, *he is still in arrears for prior child support payments that he never paid.*" (emphasis added). Accordingly, Justice Rivera dismissed Plaintiff's CPLR Article 78 petition.

**\*2** Plaintiff filed the instant lawsuit pursuant to 42 U.S.C. § 1983 against employees of federal, state, and municipal child support enforcement agencies alleging that, because his ongoing support obligations were terminated *nunc pro tunc* to January 9, 2007 when his child turned 21, he had no further support obligations and all subsequent child support collection efforts were unconstitutional. [2] In his papers, Plaintiff challenges the October 23, 2007 decision of a Family Court Support Magistrate setting Plaintiff's child support arrears at $33,468.80. Although he does not mention his unsuccessful CPLR Article 78 petition in his pleadings, he, in effect, asks this Court to reconsider Justice Rivera's May 13, 2008 Order finding that Plaintiff owed money under a valid child support arrears decree. Defendants have moved to dismiss Plaintiff's action for, *inter alia*, lack of subject matter jurisdiction based on the domestic relations exception to federal jurisdiction and the *Rooker–Feldman* doctrine.

[2]    *Pro se* complaints "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (internal quotation marks omitted).

### Discussion

#### A. *Domestic Relations Exception to Jurisdiction*
Defendants contend that this Court lacks subject matter jurisdiction over the action under the domestic relations exception to federal court jurisdiction. *See Ankenbrandt v. Richards,* 504 U.S. 689, 703, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992). The so-called "domestic relations exception" dates back to 1858, when the Supreme Court announced that federal courts have no jurisdiction over suits for divorce or the allowance of alimony. *Barber v. Barber,* 62 U.S. 582, 584, 21 How. 582, 16 L.Ed. 226 (1858); *Ankenbrandt,* 504 U.S. at 703 (explaining that exception "divests the federal courts of power to issue divorce, alimony, and child custody decrees.") Although courts frequently use broad language when characterizing the exception, the Supreme Court has clarified that, in actuality, the exception is narrow, and "encompasses *only* cases involving the issuance of a divorce, alimony, or child custody decree." *Ankenbrandt,* 504 U.S. at 704 (emphasis added). Thus, where a lawsuit "in no way seeks such a decree," the exception's invocation is inappropriate. *Id.; Williams v. Lambert,* 46 F.3d 1275, 1283 (2d Cir.1995) ("[T]he exception is very narrow."); *but see McKnight v. Middleton,* 699 F.Supp.2d 507, 516–17 (E.D.N.Y.2010) *affd,* 434 F. App'x 32 (2d Cir.2011) (observing that in *Schottel v. Kutyba,* 06–1577–CV, 2009 WL 230106 (2d Cir. Feb.2, 2009), the Second Circuit expanded the exception to claims that, in fact, challenge domestic relations decrees, even where they are recast as actions seeking monetary relief).

The domestic relations exception is rooted in an understanding that "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States." *In re Burrus,* 136 U.S. 586, 593–94, 10 S.Ct. 850, 34 L.Ed. 500 (1890). "[T]he exception is grounded, not in the Constitution, but as a matter of 'statutory construction' of the federal diversity statute." *Tilley v. Anixter Inc.,* 283 F.Supp.2d 729, 733–34 (D.Conn.2003) (citing *Ankenbrandt,* 504 U.S. at 703). Despite its origins in the federal diversity statute, courts in this district routinely apply the exception to cases brought under the federal courts' federal question jurisdiction. *See Mitchell–Angel v. Cronin,* 101 F.3d 108 (2d Cir.1996) ("District courts in this Circuit have held that the exception includes civil rights actions directed at challenging the results of domestic relations proceedings.") (citing *McArthur v. Bell,* 788 F.Supp. 706, 708 (E.D.N.Y.1992)); *see also Sobel,* 2014 WL 2750364, at \*11 (finding exception strips federal court of jurisdiction where "Plaintiff's complaint is, in effect, a civil rights action directed at challenging the results of domestic relations proceedings, and, in particular, a state court's decisions regarding child support."); *Sullivan v. Xu,* No. 10–CV–3626 (ENV), 2010 WL 3238979, at \*2 (E.D.N.Y. Aug.13, 2010) ("Although plaintiff invokes his constitutional rights, the substance of his claims concern state law domestic relations matters."). That said, the Second Circuit recently

noted in a summary order that the Circuit "expressly decline[s] to address whether the domestic relations exception to federal subject matter jurisdiction applies to federal question actions." *See Ashmore v. Prus,* 12–2760–CV, 2013 WL 362998, at *2 (2d Cir. Jan.31, 2013) (summary order); *see also Ahlawat v. State of Connecticut Superior Court,* 3:12–CV–1042 JBA, 2013 WL 3338572, at *1 n. 2 (D.Conn. July 2, 2013) (noting that "the Second Circuit has not resolved whether [the domestic relations] exception would provide a further bar to Plaintiff's federal question lawsuit.").

 **\*3** Here, if Plaintiff's claim is read to challenge the enforcement of a child support decree on the grounds it is erroneous, his lawsuit, even though framed as a civil rights action, would be barred by the domestic relations exception. However, reading *pro se* Plaintiff's complaint to "raise the strongest arguments that they suggest," *Triestman, 470 F.3d at 474,* Plaintiff's complaint can be read more narrowly-to seek monetary damages for violations of his due process rights that occurred during the enforcement of a *valid* child support decree. *Ankenbrandt, 504 U.S. at 704* (noting that the exception has no application where the lawsuit "in no way seeks [a domestic relation] decree"). Even so, some courts in this district have held that lawsuits seeking monetary relief for purportedly unlawful conduct undertaken to enforce valid support decrees are also barred by the domestic relations exception. *See Joseph v. Stewart,* 13–CV–1678 NGG LB, 2013 WL 3863915, at *2 (E.D.N.Y. July 24, 2013) (applying domestic relations exception where "Plaintiff challenges the enforcement and effect of his child support obligations, and although he invokes his constitutional rights, the essence of his allegations concern state law domestic relations matters.").[3] This Court need not resolve whether such a narrow challenge would be barred by the domestic relations exception because the Court lacks subject matter jurisdiction over this action under, *inter alia,*[4] the Rooker–Feldman doctrine.

[3]   But see *King v. Comm'r & New York City Police Dep't,* 60 F. App'x 873, 874–75 (2d Cir.2003) (summary order) ("The instant appeal is brought pursuant to the court's federal question jurisdiction, not its diversity jurisdiction. Nevertheless, the City argues that the domestic relations exception is not limited to diversity cases. Although this seems contrary to precedent, the city does cite language to support its argument. We need not examine this question, however, because even under the broadest interpretation of the exception, it applies only to cases that seek issuance or modification

of divorce, alimony, or child custody decrees. Appellant is not seeking a domestic relations award, and he is not asking that his parental rights be reinstated. Instead, his complaint seeks monetary damages. The domestic relations exception to federal jurisdiction is therefore irrelevant to this action.") (citation and parenthetical explanation omitted).

[4]   Even if this Court has jurisdiction, "[a] federal court presented with matrimonial issues or issues 'on the verge' of being matrimonial in nature should abstain from exercising jurisdiction so long as there is no obstacle to their full and fair determination in state courts." *Am. Airlines, Inc. v. Block,* 905 F.2d 12, 14 (2d Cir.1990).

**B. Rooker–Feldman Doctrine**

The so-called *Rooker–Feldman* doctrine divests federal courts of jurisdiction to consider suits which seek to overturn state court judgments. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). Additionally, the doctrine "bars federal courts from considering claims that are 'inextricably intertwined' with a prior state court determination." *Johnson v. Smithsonian Inst.,* 189 F.3d 180, 185 (2d Cir.1999) (citations and internal quotation marks omitted). In *Exxon Mobil,* the Supreme Court reined in the use of the doctrine, explaining that the doctrine "is confined to cases ... brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* In the wake of *Exxon Mobil,* the Second Circuit revisited its prior precedents and limited the application *of Rooker–Feldman* to cases satisfying four "requirements":

First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[ ] of injuries caused by [a] state-court judgment [.]" Third, the plaintiff must "invit[e] district court review and rejection of [that] judgment[ ]." Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced"-i.e., *Rooker–Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation. The first and fourth of these requirements may be loosely termed procedural; the second and third may be termed substantive.

 **\*4** *Hoblock v. Albany Cnty. Bd. of Elections,* 422 F.3d 77, 85 (2d Cir.2005) (quoting *Exxon Mobil,* 544 U.S. at 284); *see also McKit hen v. Brown,* 626 F.3d 143, 154 (2d Cir.2010).

Courts have repeatedly invoked the doctrine in cases, like the one currently before the Court, in which plaintiffs challenge family court decrees setting child support arrears. *See Sorenson v. Suffolk Cnty. Child Support Enforcement Bureau,* 07–CV–03755JFBAKT, 2009 WL 580426, at *6–7 (E.D.N.Y. Mar.5, 2009) (finding plaintiff, who previously unsuccessfully sought to have child support "arrears vacated ... in state court" cannot "utilize the federal courts to, in essence, challenge the existing judgment regarding child support arrears, or the County's enforcement of that judgment."); *Remy,* 507 F. App'x at 18–19 (finding that court was barred under *Rooker–Felman* from exercising jurisdiction over suit challenging "Family Court's arrears order[, where plaintiff] ... had a full and fair opportunity to litigate [the arrears order in state court]."); *Chestnut v. Gabler,* No. 06 Civ. 34E(F), 2007 WL 529556, at *3 (W.D.N.Y.Feb.13, 2007) ("Construed liberally, the complaint essentially alleges that plaintiff's constitutional rights were violated during the course of the Family Court proceedings and plaintiff now seeks, in part, to challenge in this Court the orders issued in those proceedings. To the extent plaintiff is asking this Court to review the proceedings before the Allegany County Family Court, said review by this Court is barred by the *Rooker–Feldman* doctrine and the complaint must be dismissed accordingly."). In *Sorenson,* the Court explained that although the plaintiff attempted to recast his claims as alleging "improper enforcement of the Family Court judgment rather than [challenging] the judgment itself[,] ... *Rooker–Feldman* also bars such claims because the enforcement is inextricably intertwined with the state court judgment." *Sorenson,* 2009 WL 580426, at *7 (collecting cases).

Plaintiff expressly asks this Court to review the October 23, 2007 family court order setting arrears on the grounds that the decision was erroneous because he had complied with all previous child support obligations and thus could not be liable for arrears. Under the *Rooker–Feldman* doctrine, this Court may not do so. As in *Sorenson,* to the extent Plaintiff recasts his claims as alleging improper enforcement of the child support arrears decree, under these circumstances, the enforcement of the arrears decree is inextricably intertwined with the validity of the decree, itself. Thus this Court is barred

under the *Rooker–Feldman* doctrine from reviewing the claim. Additionally, this Court is precluded from reviewing Plaintiff's claims for the separate reason that Plaintiff has already brought an Article 78 petition in state court raising these exact arguments. Thus, the instant lawsuit, in effect, challenges not only the October 23, 2007 arrears order, but also the May 13, 2008 decision of Justice Rivera dismissing the Article 78 petition. Plaintiff's attempts to appeal to this Court the decisions of the Family Court Support Magistrate and Justice Rivera are barred by the *Rooker–Feldman* doctrine. Accordingly, Defendant's motion to dismiss is granted.

**\*5** The above reasoning applies with equal force to Plaintiff's claims against the other defendants who allegedly enforced the child support arrears decree. Thus, this Court lacks subject matter jurisdiction to adjudicate Plaintiff's claims against all of the remaining defendants in the action. Given that this Court has determined that it lacks subject matter jurisdiction over the entire action, the Court, *sua sponte,* dismisses Plaintiff's claims against the remaining defendants and dismisses Plaintiff's complaint in its entirety. *Morris v. Rosen,* 12–3143–CV, —— F. App'x ——, 2014 WL 4233392, at *1 (2d Cir. Aug.28, 2014) (affirming district court's *sua sponte* dismissal of *pro se* plaintiff's complaint for lack of subject matter jurisdiction under the *Rooker–Feldman* doctrine.)

### Conclusion

For the foregoing reasons, the State Defendant's motion to dismiss is granted on the grounds that this Court lacks subject matter jurisdiction over the instant action under the *RookerFeldman* doctrine. For the same reasons, the Court *sua sponte* dismisses the action against all other defendants. The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.

### SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 5823116

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Palmer v. Fannie Mae, Not Reported in Fed. Supp. (2016)

Case 6:19-cv-01412-GTS-TWD   Document 10   Filed 01/14/20   Page 36 of 91

2016 WL 5338542

2016 WL 5338542
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Felicia PALMER, formerly known
as Felicia Dudley, Plaintiff,
v.
FANNIE MAE, also known as Federal
National Mortgage Association, Defendant.

14-CV-4083 (JFB)(AYS)
|
Signed 09/23/2016

**Attorneys and Law Firms**

Felicia Palmer, Amityville, NY, pro se.

Andrew C. Morganstern, Rosicki Rosicki & Associates, P.C., Plainview, NY, for Defendant.

ORDER

JOSEPH F. BIANCO, District Judge

**\*1** Plaintiff, Felicia Palmer ("plaintiff"), filed this *pro se* action against defendant Fannie Mae ("Fannie Mae" or "defendant"), alleging that defendant violated the Fair Housing Act (the "FHA"), Executive Order 11063, and the False Claims Act, and asserting a claim for fraudulent misrepresentation. Defendant moved to dismiss these claims.

Before the Court is a Report and Recommendation ("R & R") from Magistrate Judge Shields (ECF No. 56), as well as plaintiff's objections to the R & R (ECF No. 58) and defendant's response to those objections (ECF No. 59). The R&R recommends that this Court grant defendant's motion to dismiss in its entirety and deny leave to amend.

For the reasons that follow, having reviewed the entire R&R *de novo,* the Court adopts Magistrate Judge Shield's R & R, with the exception of the recommendation that plaintiff be denied leave to amend her claim under the FHA.

**I. PROCEDURAL HISTORY**

Plaintiff filed a complaint in this action on July 1, 2014, asserting that defendant discriminated against her under the FHA based upon her relationship with her fiancé by refusing to sell her the property at which they were living and to which defendant had obtained title through a foreclosure sale. Defendant moved to dismiss. On July 28, 2015, this Court granted defendant's motion because plaintiff could not establish that she was a member of a class entitled to protection under the FHA based upon her relationship with her fiancé. However, the Court granted plaintiff leave to replead to assert a valid claim under the FHA. Plaintiff filed an amended complaint on August 25, 2015, this time alleging that she was a member of a class protected by the FHA based upon the fact that she was pregnant and a parent of two children under the age of eighteen at the time of the conduct in question. The amended complaint also added three new claims, alleging violation of Executive Order 11063 and the False Claims Act and fraudulent misrepresentation. Defendant has again moved to dismiss these claims. On April 18, 2016, the Court referred the motion to dismiss to Magistrate Judge Shields for a Report and Recommendation. Magistrate Judge Shields issued the R & R on August 25, 2016, recommending that plaintiff's complaint be dismissed in its entirety and directing that any objections to the R & R were due within fourteen days. On September 6, 2016, plaintiff filed her objections ("objections"), and defendant responded to those objections on September 13, 2016. [1]

[1]  In its response to plaintiff's objections, Fannie Mae argues that plaintiff's objections were not timely filed within the fourteen-day window provided for in the R & R, presumably based on the fact that plaintiffs objections were not docketed on ECF until September 9, 2016. However, the specific language of the R & R only requires that the objections be *filed* in fourteen days, which they were. The time stamp on the objections indicates that they were filed in the Clerk's Office for the Eastern District of New York on September 6, 2016. Accordingly, the Court does not find them to be untimely.

**II. STANDARD OF REVIEW**

**\*2** A district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the Magistrate Judge. *See DeLuca v. Lord,* 858 F. Supp. 1330, 1345 (S.D.N.Y. 1994); *Walker v. Hood,* 679 F. Supp. 372, 374 (S.D.N.Y. 1988). As to those portions of a report to which no "specific written objection" is made, the Court may accept the findings contained therein, as long as the

Palmer v. Fannie Mae, Not Reported in Fed. Supp. (2016)

2016 WL 5338542

factual and legal bases supporting the findings are not clearly erroneous. *Santana v. United States,* 476 F. Supp. 2d 300, 302 (S.D.N.Y. 2007); *Greene v. WCI Holdings Corp.,* 956 F. Supp. 509, 513 (S.D.N.Y. 1997).* When "a party submits a timely objection to a report and recommendation, the district judge will review the parts of the report and recommendation to which the party objected under a *de novo* standard of review." *Jeffries v. Verizon,* 10-CV-2686 (JFB)(AKT), 2012 WL 4344188, at *1 (E.D.N.Y. Sept. 21,2012); *see also* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); Fed. R. Civ. P. 72(b)(3) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."). Plaintiff has objected to the R & R's conclusions regarding each claim. Accordingly, the Court will perform a *de novo* review of the entire motion to dismiss.

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir. 2005). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.' " *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC,* 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal,* setting forth a two-pronged approach for courts deciding a motion to dismiss. 556 U.S. 662 (2009). The Supreme Court instructed district courts to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679 (explaining that though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations"). Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise

to an entitlement to relief." *Id.* A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting and citing *Twombly,* 550 U.S. at 556-57 (internal citation omitted)).

The Court notes that in adjudicating a Rule 12(b)(6) motion, it is entitled to consider: "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *In re Merrill Lynch & Co.,* 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (internal citations omitted), *aff'd in part and reversed in part on other grounds sub nom. Lentell v. Merrill Lynch & Co.,* 396 F.3d 161 (2d Cir. 2005); *also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir. 1991) ("[T]he district court ... could have viewed [the documents] on the motion to dismiss because there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim."). [2]

[2]     The Court notes that, although claims of housing discrimination under the FHA are evaluated under the three-part burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed. 2d 668 (1973), *see Mitchell v. Shane,* 350 F.3d 39, 47 (2d Cir. 2003), at the motion to dismiss stage, a plaintiff is not obligated to establish a prima facie case of discrimination under *McDonnell Douglas. See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510, 122 S. Ct. 992, 152 L.Ed. 2d 1 (2002) ("The prima facie case under *McDonnell Douglas* ... is an evidentiary standard, not a pleading requirement.").

## III. DISCUSSION

**\*3** Defendant challenges the R & R on several grounds and contends that her claims are sufficiently pled to withstand the motion to dismiss. The Court has carefully considered

Palmer v. Fannie Mae, Not Reported in Fed. Supp. (2016)

Case 6:19-cv-01412-GTS-TWD   Document 10   Filed 01/14/20   Page 38 of 91

2016 WL 5338542

her objections and reviewed the R & R *de novo.* As detailed below, the Court concurs with Judge Shield's conclusion that plaintiff has failed to sufficiently plead the claims alleged in her amended complaint. Thus, the Court adopts Judge Shield's R & R, with the exception of the recommendation that plaintiff be denied leave to replead her FHA claim; this Court concludes that plaintiff should be permitted to replead this claim.

### A. Alleged Fair Housing Act Violation

The Fair Housing Act ("FHA") makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling, to any person because of race, color, religion, sex, familial status, or national origin." *42 U.S.C. § 3604(a).* Likewise, property owners and their agents may not "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling." *Id. § 3604(b).* The FHA defines familial status as:

> [O]ne or more individuals (who have not attained the age of 18 years) being domiciled with (1) a parent or another person having legal custody of such individual or individuals; or (2) the designee of such parent or other person having such custody, with the written permission of such parent or other person. The protections afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years.

*42 U.S.C. § 3605(k).*

To establish a prima facie case of discrimination under the FHA, plaintiff must allege that: (1) she is a member of a protected class; (2) she sought and was qualified to rent or purchase the housing; (3) she was rejected, and (4) the housing opportunity remained available to other renters or purchasers. *Mitchell, 350 F.3d at 47.* Further, plaintiff must offer "factual allegations that support a reasonable inference

that defendant[ ] w[as] motivated by discriminatory animus," in other words, that defendant took certain actions because of plaintiff's familial status. *Jordan v. Chase Manhattan Bank, 91 F. Supp. 3d 491, 505-06 (S.D.N.Y. 2015).*

Plaintiff states that she was pregnant at the time that she was negotiating with Fannie Mae and that she was living with her two children who were under the age of eighteen. Thus, she has adequately alleged that she was a member of a class protected by the FHA based upon her familial status at the time of the events in question. However, this Court agrees with the conclusion of the R & R that the complaint fails to state a claim for discrimination under the FHA because nowhere in the complaint does plaintiff actually allege that Fannie Mae discriminated against her *because of* her protected status, nor does she provide any factual basis for the claim that would allow the Court to assess whether such a claim is plausible. *See Wiltshire v. Dhanraj, 421 F. Supp. 2d 544, 552 (E.D.N.Y. 2005)* (dismissing complaint because the plaintiffs "ha[d] not articulated any action taken by [the defendants] *because of* plaintiffs' race, color, or national origin").

Plaintiff's opposition [3] does go somewhat further than her complaint by at least making the allegation that defendants discriminated against her based on familial status; however, it does so in only conclusory terms. She alleges: defendant "discriminat[ed] against me based on familial status (a pregnant woman with two minor children under 18 years of age) based on [the] terms [and] conditions of the sales price to purchase [the] property." (Pl.'s Opp'n to Mot. to Dismiss 4.) This kind of pleading that only conclusorily alleges that Fannie Mae was motivated by a discriminatory intent is insufficient to withstand a motion to dismiss. *See, e.g., Wilmer v. Albany Cty. Soc. Servs., No. 16-CV-905 (NAM) (CFH), 2016 WL 4398489, at *3 (N.D.N.Y. July 25, 2016)* (dismissing FHA claim because plaintiff offered only "bald allegations of discrimination on the basis of race or gender, without specific evidence to support that the [defendant's action] ... was motivated by, or caused by, plaintiff's [protected characteristics]"), *report and recommendation adopted, No. 116CV00905NAMCFH, 2016 WL 4386007 (N.D.N.Y. Aug. 17, 2016); Jones v. Cawley, No. 10-CV-0712, 2010 WL 4235400, at *5 (N.D.N.Y. Oct. 21, 2010)* (dismissing cause of action for discrimination under the FHA because the plaintiff failed to offer any factual allegations supporting his claim that the alleged harmful conduct was related to plaintiff's race); *Gorham-DiMaggio v. Countrywide Home Loans, Inc., 592 F. Supp. 2d 283, 290 (N.D.N.Y.*

Palmer v. Fannie Mae, Not Reported in Fed. Supp. (2016)
2016 WL 5338542

Case 6:19-cv-01412-GTS-TWD Document 10 Filed 01/14/20 Page 39 of 91

2008) (plaintiff could not make out a claim for violation of [§ 3605] by "offer[ing] only conclusory allegations to demonstrate that discriminatory measures were implemented *because* of her disability"), *aff'd*, 421 Fed.Appx. 97 (2d Cir. 2011); *Wiltshire,* 421 F. Supp. 2d at 555 (E.D.N.Y. 2005) ("[A] conclusory allegation that the Plaintiffs discriminated against the Defendants because they were 'minority buyers' is insufficient to state a cause of action under the FHA."). Because plaintiff does nothing to connect her familial status to defendant's allegedly wrongful refusal to sell her the home other than point out that she was pregnant and a parent of minor children at the time defendant rejected her purchase offer, [4] the Court concurs with the R & R's conclusion that plaintiff has failed to state a claim for violation of the FHA.

[3]     "Although a court generally may not look outside the pleadings when reviewing a 12(b)(6) motion to dismiss, because a *pro se* plaintiff's allegations must be construed liberally it is appropriate for a court to consider factual allegations made in a *pro se* plaintiff's opposition memorandum, as long as the allegations are consistent with the complaint." *Chukwueze v. NYCERS,* 891 F. Supp. 2d 443, 448 (S.D.N.Y. 2012).

[4]     Plaintiff's opposition references a newspaper article concerning maternity-related mortgage discrimination; however, the article discusses only the conduct of lenders and mortgage insurers and makes no reference to Fannie Mae, and thus, it appears inapposite to the instant case. (Opp'n 6.) In any event, plaintiff does not explain how the alleged practices referenced in the article relate to her situation.

### B. Alleged Violation of Executive Order 11063

**\*4** Executive Order 11063 provides that "the granting of Federal assistance f o r ... housing and related facilities from which Americans are excluded because of their race, color, creed, or national origin is unfair, unjust, and inconsistent with the public policy of the United States as manifested in its Constitution and laws," and therefore orders the that "all departments and agencies in the executive branch of the Federal Government" must:

> [T]ake all action necessary and appropriate to prevent discrimination because of race, color, creed, or national origin (a) in the sale, leasing, rental, or other disposition of residential property and related facilities [ ], or in the use or occupancy thereof, if such property and related facilities are ... (ii) provided in whole or in part with the aid of loans, advances, grants, or contributions hereafter agreed to be made by the Federal Government.

Exec. Order No. 11,063, 27 Fed. Reg. 11,527 (1962).

The R&R recommends that this claim be dismissed because plaintiff failed to allege that any of the financing to purchase the property at issue was obtained through federal funds. (R & R at 9-10.) Although the Court agrees that this claim must be dismissed on that ground, it also concludes that dismissal is warranted for the separate reason that the Executive Order plainly only prohibits discrimination on the basis of "race, color, creed, or national origin." Nowhere in her complaint does plaintiff allege that she was discriminated against based on her membership in any of these protected classes. Accordingly, she has failed to state a claim for violation of Executive Order 11063.

### C. Alleged False Claims Act Violations

The R&R correctly concluded that plaintiff's False Claims Act cause of action must be dismissed. The law in this Circuit is clear that *pro se* litigants may not pursue qui tam actions under the False Claims Act. *U.S. ex rel. Mergent Servs. v. Flaherty,* 540 F.3d 89, 93 (2d Cir. 2008). As plaintiff is not represented, she cannot maintain a claim under the Act.

In her opposition and her objections, she cites a provision of the Act that states that qui tam actions "may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting" and argues that the Court lacks authority to dismiss her False Claims Act claim because she has never seen any evidence that the Attorney General has consented to the dismissal of her claim. This argument fails. The Second Circuit has explained that this provision applies "only in cases where a plaintiff seeks voluntary dismissal of a claim or action brought under the False Claims Act, and not where the court orders dismissal." *Flaherty,* 540 F.3d at 91 (citing *Minotti v. Lensink,* 895 F.2d 100, 103 (2d Cir. 1990)). The latter scenario applies here, and

Palmer v. Fannie Mae, Not Reported in Fed. Supp. (2016)

Case 6:19-cv-01412-GTS-TWD   Document 10   Filed 01/14/20   Page 40 of 91

2016 WL 5338542

therefore the Court is not barred from dismissing plaintiff's complaint without the approval of the Attorney General.

### D. Claim for Fraudulent Misrepresentation

Under 28 U.S.C. § 1367, which governs a federal court's exercise of supplemental jurisdiction, "[t]he district court may decline to exercise supplemental jurisdiction over a claim ... [if] the district court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c) (3); see Spiegel v. Schulmann, 604 F.3d 72, 78 (2d Cir. 2010). Indeed, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors [of judicial economy, convenience, fairness, and comity] will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L.Ed. 2d 720 (1988); see Tops Markets, Inc. v. Quality Markets, Inc., 142 F. 3d 90, 103 (2d Cir. 1998) ("[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice.") (emphasis in original). Here, as plaintiff has failed to state a claim under federal law at this juncture, this Court agrees with Judge Shield's recommendation that, in the interests of judicial economy, convenience, fairness, and comity, this Court should decline to exercise supplemental jurisdiction over plaintiff's state law claim, and therefore, that this claim should be dismissed.

### IV. LEAVE TO AMEND

*5 Judge Shields recommended that plaintiff be denied leave to replead, concluding that better pleading would not cure the defects in plaintiff's complaint. This Court agrees that plaintiff's claims for violation of Executive Order 11063 and the False Claims Act are defective and cannot be cured by any amendment to the pleadings. However, the Court concludes that plaintiff should be permitted to amend her claim for violation of the FHA.

Leave to amend should be freely granted when justice so requires. Fed. R. Civ. P. 5(a)(2). "This relaxed standard applies with particular force to pro se litigants." Pangburn v. Culbertson, 200 F.3d 65, 70 (2d Cir, 1999). The Second Circuit has emphasized that a "court should not dismiss [a pro se complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (citations and internal quotation marks omitted); see also Chavis v. Chappius; 618 F.3d 162, 170 (2d Cir. 2010). "Further, if the court dismisses the complaint for failure to comply with Rule 8, it should generally give the plaintiff leave to amend. This is especially true when the complaint states a claim that is on its face nonfrivolous." Simmons v. Abruzzo, 49 F.3d 83, 86-87 (2d Cir. 1995).

Although plaintiff has already been permitted to replead the FHA claim following the dismissal of her original complaint; her FHA claim in her original complaint proceeded on a different theory (discrimination based upon her relationship with her fiancé) than the one proffered in the amended complaint (pregnancy and familial status discrimination). Thus, the court concludes that, in the interest of justice, especially in light of plaintiff's pro se status, plaintiff should have a chance to replead her discrimination claim based upon this new theory and be provided with an opportunity to set forth in an amended complaint what facts support her conclusory claim that she was the victim of discrimination based on her pregnancy and familial status. Plaintiff shall have thirty days from the date of this Order to file an amended complaint to assert a valid claim under the FHA. Plaintiff is cautioned that her failure to file an amended complaint within the time allowed will lead to the dismissal of her federal claims with prejudice.

### V. CONCLUSION

For the foregoing reasons, the Court adopts the portion of the R & R dismissing plaintiff's complaint; however, the Court shall grant plaintiff leave to amend her FHA claim. Plaintiff shall have thirty days from the date of this Order to file an amended complaint. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore in forma pauperis status is denied for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated: September 23, 2016.

2016 WL 5338542

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5338542

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

2017 WL 5508814
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Ms. Vickie Dianne BYRD, Plaintiff,

v.

MAZZOLA INSURANCE CORP, Mrs.
Linda Marshal, Sales Rep., Defendants.

No. 6:17–cv–06178(MAT)
|
Signed 04/05/2017

**Attorneys and Law Firms**

Vickie Dianne Byrd, Rochester, NY, pro se.

**DECISION AND ORDER**

MICHAEL A. TELESCA, United States District Judge

**I. Introduction**

 *1 Proceeding pro se, Vickie Dianne Byrd ("Plaintiff") instituted this action by filing a complaint (Dkt #1) dated March 20, 2017, referencing alleged "violations of the U.S.C. #375 [sic]/U.S.C. #110 [sic]/U.S.C. #470 [sic]/U.S.C. #190 [sic]" against "Mazzola Insurance Corp" ("Mazzola") and "Mrs. Linda Marshal, Sales Rep." ("Marshal") (collectively, "Defendants"). Before the Court is Plaintiff's motion to proceed in forma pauperis under 28 U.S.C. § 1915(a). The Court finds that Plaintiff's supporting affirmation sufficiently establishes her inability to pay for the prosecution of her case. Accordingly, Plaintiff's motion for in forma pauperis status (Dkt #2) is granted. The Court has also reviewed the complaint as required by 28 U.S.C. § 1915(e)(2) ("Section 1915(e)(2)"). As discussed below, Plaintiff has failed to state a cause of action for which relief may be granted. Because Plaintiff's purported claims against Defendants are substantive in nature, and extend well beyond the mere insufficiency of her allegations, the Court declines to permit amendment of the complaint. Therefore, the complaint will be dismissed with prejudice.

**II. Screening of the Complaint under Section 1915(e)(2)**

Under Section 1915(e)(2), the Court must conduct an initial screening of a pro se litigant's complaint and must it it if it is "frivolous or malicious"; "fails to state a claim upon which

relief may be granted"; or "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)–(iii). "An action is 'frivolous' for § 1915(e) purposes if it has no arguable basis in law or fact, as is the case if it is based on an 'indisputably meritless legal theory.' " Montero v. Travis, 171 F.3d 757, 759 (2d Cir. 1999) (quoting Neitzke v. Williams, 490 U.S. 319, 325 (1989)).

**A. Federal Law Relied upon by Plaintiff**

Here, as her first claim for relief, Plaintiff alleges "violations of the U.S.C. #375 [sic]/U.S.C. #110 [sic]/U.S.C. #470 [sic]/ U.S.C. #190 [sic]" against Mazzola and Marshal. As her second claim for relief, Plaintiff again alleges "violations of the U.S.C. #375 [sic]/U.S.C. #110 [sic]/U.S.C. #470 [sic]/U.S.C. #190 [sic]," this time against Mazzola and an unnamed sales representative. Plaintiff's purported references to "the U.S.C." do not identify any actual sections of the United States Code, however. In light of Plaintiff's allegations against Defendants, the Court has deduced that the numerals preceded by "#" represent various "Nature of Suit" codes used by the Court for classifying the types of claims raised in lawsuits. That is, "375" refers to "Other Statutes: False Claims Act"; "110" refers to "Insurance"; "470" refers to "Racketeer/Corrupt Organization"; and "190" refers to "Contract Other." However, there is no federal "breach of contract" or "breach of insurance policy" statute; rather, these causes of action generally are governed by state law. The Court accordingly has examined the complaint's allegations to determine if they state a claim under the Racketeer Influence and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(a)–(d), and the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq.

**1. RICO**

 *2 "To establish a RICO claim, a plaintiff must show: '(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962.' " DeFalco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001) (quoting Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 183 (2d Cir. 2008); further quotation omitted). "Section 1962 of RICO outlaws (a) the use of income derived ... from a pattern of racketeering activity to acquire an interest in, establish, or operate an enterprise engaged in or affecting interstate commerce; (b) the acquisition of any interest in or control of such an enterprise through a pattern of racketeering activity; (c) the conduct or

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.    1

Byrd v. Mazza Insurance Corp, Not Reported in Fed. Supp. (2017)

2017 WL 5508814

Case 6:19-cv-01412-GTS-TWD    Document 10    Filed 01/14/20    Page 43 of 91

participation in the conduct of such an enterprise's affairs through a pattern of racketeering activity; and (d) conspiring to do any of the above." GICC Capital Corp. v. Technology Fin. Grp., Inc., 67 F.3d 463, 465 (2d Cir. 1995) (internal quotation marks omitted).

"Under any prong of § 1962, a plaintiff in a civil RICO suit must establish a 'pattern of racketeering activity.' " GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 465 (2d Cir. 1995) (quotation omitted). To withstand dismissal for failure to state a claim, this pattern of racketeering activity must be adequately alleged in the complaint. Spool, 520 F.3d at 183. To that end, a RICO plaintiff "must plead at least two predicate acts, see [18 U.S.C.] § 1961(5), and must show that the predicate acts are related and that they amount to, or pose a threat of, continuing criminal activity," GICC Capital Corp., 67 F.3d at 465 (citing H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989)).

As factual support for her first claim, Plaintiff alleges that on September 29, 2015, Marshal "sold her some insurance at a stated rate" and said that the "rate would go down after a 6–month period." However, Plaintiff asserts, the rate "did not go down as the contract stated," but instead "the rates stayed the same." (Dkt #1, p. 4 of 6). Plaintiff does not allege a second date or incident under the heading for the first claim for relief. Under the second claim for relief, Plaintiff alleges that on August 18, 2016, a "sales representative [at] Mazzola Insurance [at] Main Office" "sold [her] some insurance [and] stated a price[,]" and said that at the end of 6 months, the rate would go down to a "new low rate." (Id.). However, the rate did not decrease after 6 months. (Id.).

The Court will assume that Plaintiff intends the above-referenced incidents that allegedly occurred on September 29, 2015, and August 18, 2016, to be the "predicate acts" required under RICO. However, "both the Supreme Court and Second Circuit have held that an allegation of two acts of 'racketeering activity,' without more, is not sufficient to establish a pattern." Spoto v. Herkimer Cty. Trust, No. 99–CV–1476, 2000 WL 533293, at *4 (N.D.N.Y. Apr. 27, 2000) (citing H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 238–44 (1989); United States v. Indelicato, 865 F.2d 1370, 1381 (2d Cir.) (en banc), cert. denied, 493 U.S. 811 (1989)). Despite this arguably fatal defect in the complaint, the Court, in light of Plaintiff's pro se status, will continue with the analysis of whether Plaintiff has fulfilled any of subsections (a) through (d) of Section 1962.

Section 1962(a) requires allegations "(1) that the defendant used or invested racketeering income to acquire or maintain an interest in the alleged enterprise, and (2) injury [to the plaintiff] by reason of defendants' investment of racketeering income in an enterprise, as distinct from injury traceable simply to the predicate acts of racketeering alone or to the conduct of business of the enterprise." Moses v. Martin, 360 F. Supp.2d 533, 544 (S.D.N.Y. 2004) (internal quotation marks and citations omitted). Reading Plaintiff's allegations as broadly as possible, the Court infers that she is accusing Defendants of using the income derived from the policies sold to Plaintiff, either for Marshal's personal use or to benefit the company (Mazzola). Neither of these are sufficient. "Using funds for personal purposes ... is not using or investing racketeering income to acquire or maintain an interest in the alleged enterprise." Id. "Nor are allegations of reinvestment of racketeering proceeds in the enterprise sufficient to make out a claim for Section 1962(a) purposes." Fischbein v. Sayers, No. 04 CIV. 6589 LTS AJP, 2009 WL 2170349, at *4 (S.D.N.Y. July 16, 2009) (citations omitted). Because Plaintiff does not plead any facts that could plausibly be relevant to, much less fulfill, the requirements of Section 1962(a), Plaintiff has failed to state a cause of action under this subsection.

**\*3** To state a cause of action under Section 1962(b), a plaintiff "must allege an 'acquisition' injury, analogous to the 'use or investment injury' required under § 1962(a) to show injury by reason of a § 1962(b) violation." Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1063 (2d Cir. 1996) (internal quotation marks and citations omitted), vacated on other grounds, 525 U.S. 128 (1998). Here, Plaintiff does "not allege any injury arising from the acquisition or maintenance of an enterprise, but instead merely alleges injuries indistinct from those arising from the commission of alleged predicate acts." Fischbein, 2009 WL 2170349, at *5. Plaintiff has pled "no facts that would suggest, even under the broadest reading," that Defendants "participated in any activity to 'acquire an interest or maintain control of' an enterprise." Malester v. Adamo, No. 09 CIV.9347(GBD), 2010 WL 5065865, at *3 (S.D.N.Y. Dec. 8, 2010). Without a distinct "acquisition injury," Plaintiff cannot state a cause of action under Section 1962(b). Fischbein, 2009 WL 2170349, at *5 (citing Discon, 93 F.3d at 1063).

"[T]o establish a violation of 18 U.S.C. § 1962(c), a plaintiff must establish that a defendant, through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in [the conduct

Byrd v. Mazzola Insurance Corp, Not Reported in Fed. Supp. (2017)

Case 6:19-cv-01412-GTS-TWD Document 10 Filed 01/14/20 Page 44 of 91

2017 WL 5508814

of the business of] an enterprise, the activities of which affected interstate or foreign commerce." DeFalco, 244 F.3d at 306. "Liability under § 1962(c) requires a showing that each defendant employed by or associated with the enterprise 'conduct or participate, directly or indirectly, in the conduct of [the] enterprise's affairs[.]' " Goldfine v. Sichenzia, 118 F. Supp. 2d 392, 402 (S.D.N.Y. 2000) (quotation omitted). "[T]o conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs", § 1962(c), one must participate in the operation or management of the enterprise itself." Reves v. Ernst & Young, 507 U.S. 170, 185 (1993). Even assuming arguendo that Mazzola qualifies as an enterprise which is "separate and distinct from the alleged pattern of racketeering activity[,]" Black Radio Network, Inc. v. NYNEX Corp., 44 F. Supp. 2d 565 at 580 (S.D.N.Y. 1999), Plaintiff has failed to make any allegations whatsoever that would satisfy Reve's "operation and management" test as to Marshal. See Goldfine, 118 F. Supp. 2d at 403 ("[T]he mere fact that a defendant may have aided in the alleged scheme to defraud, even if that aid was intentional, does not give rise to liability under § 1962(c).") (citing Biofeedtrac, Inc. v. Kolinor Optical Enterprises & Consultants, S.R.L., 832 F. Supp. 585, 592 (E.D.N.Y. 1993)); see also Black Radio Network, Inc., 44 F. Supp. 2d at 580 ("[T]he 'person' and the 'enterprise' must be distinct, that is, a corporate entity may be both the enterprise and the person who conducts the affairs of the enterprise through racketeering. This distinctiveness requirement cannot be met merely by alleging that a RICO enterprise consists of a corporate defendant in association with its own employees who carry out the corporate defendant's regular affairs.") (internal and other citations omitted).

Finally, Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)." 18 U.S.C. § 1962(d). Because Plaintiff has failed to state a cause of action under Sections 1962(a), (b) or (c), any claim for a RICO conspiracy under Section 1962(d) cannot stand as a matter of law. Malester, 2010 WL 5065865, at *4 (citing Discon, Inc., 93 F.3d at 1064 ("Since we have held that the prior claims do not state a cause of action for substantive violations of RICO, the present claim does not set forth a conspiracy to commit such violations.") (citing Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1191 (3d Cir. 1993) ("Any claim under § 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.")); other citation omitted).

### 2. The FCA

**\*4** The FCA "is intended to recover damages from those who defraud the federal government," and it "imposes liability on those who knowingly present, or cause to be presented, false or fraudulent claims for payment, or knowingly make, use, or cause to be used, false records or statements to get false claims paid or approved." United States v. Empire Educ. Corp., 959 F. Supp. 2d 248, 253 (N.D.N.Y. 2013) (citing 31 U.S.C. § 3729(a)(1)(A), (B)). Private persons, known as "relators," may file qui tam actions (i.e., actions on behalf of the government) based on alleged violations of Section 3729. See 31 U.S.C. § 3730(c)(3).

As an initial matter, it is clear that Plaintiff is not seeking to vindicate any rights belonging to any federal government agency. Rather, she is seeking redress for injury caused by Defendants to *herself*. In any event, "[t]he law in this Circuit is clear that pro se litigants may not pursue qui tam actions under the False Claims Act." Palmer v. Fannie Mae, No. 14CV4083JFBAYS, 2016 WL 5338542, at *4 (E.D.N.Y. Sept. 23, 2016) (citing United States ex rel. Mergent Servs. v. Flaherty, 540 F.3d 89, 93 (2d Cir. 2008)). Even if Plaintiff were seeking to vindicate a right belonging to a federal government agency, which she plainly is not, she could not maintain an FCA claim because is unrepresented. See id.

### III. Leave to Replead is Inappropriate

Generally speaking, the law in this Circuit is that a district court should not dismiss a complaint filed by a pro se litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." Branum v. Clark, 927 F.2d 698, 704–05 (2d Cir. 1991); see also FED. R. CIV. P. 15(a) ("The court should freely give leave when justice so requires."). Permitting amendment is not required, however, where "the problem with [the litigant's] causes of action is substantive" such that "better pleading will not cure it." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993). In this instance, the deficiencies in Plaintiff's claims against Defendants are substantive in nature, and extend well beyond the insufficiency of her allegations, even when they "are construed with the utmost of special liberality[.]" Mercer v. Schneiderman, No. 1:11–CV–0490

Byrd v. Mazda Insurance Corp, Not Reported in Fed. Supp. (2017)

2017 WL 5508814

Case 6:19-cv-01412-GTS-TWD   Document 10   Filed 01/14/20   Page 45 of 91

GTS/DRH, 2011 WL 3652322, at *3 (N.D.N.Y. Aug. 18, 2011) (dismissing pro se complaint with prejudice pursuant to 28 U.S.C. § 1915(e) for failure to state a claim upon which relief can be granted, where, even "construed with the utmost of special liberality, the defects in [the plaintiff's] claims are substantive rather than merely formal, such that any amendment would be futile") (citations omitted).

For purposes of Section 1915(e)(2), "[a] claim is based on an 'indisputably meritless legal theory' when either the claim lacks an arguable basis in law, Benitez v. Wolff, 907 F.2d 1293, 1295 (2d Cir. 1990) (per curiam), or a dispositive defense clearly exists on the face of the complaint." Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998) (citing Pino v. Ryan, 49 F.3d 51, 53 (2d Cir. 1995)). As discussed above, the FCA claim lacks an arguable basis in fact or law. Such is the case with the RICO claims, as well. Plaintiff is "simply 'attempt[ing] to dress a common law breach of contract... claim as a RICO claim[,]' " Goldfine, 118 F. Supp.2d at 405 (quoting Spoto, 2000 WL 533293, at *5), which is improper.

## IV. Subject Matter Jurisdiction

**\*5** Lack of subject matter jurisdiction may be raised at any time, either sua sponte by the court, or by a party. Durant, Nichols, Houston, Hodgson & Cortese–Costa P.C. v. Dupont, 565 F.3d 56, 62 (2d Cir. 2009). Indeed, it is a court's "obligation to raise the matter of subject matter jurisdiction '*whenever* it appears from the pleadings or otherwise that jurisdiction is lacking.' " Id. (quoting John Birch Society v. National Broadcasting Co., 377 F.2d 194, 199 (2d Cir. 1967); emphasis in original). When a court finds that it lacks subject matter jurisdiction, it must dismiss the complaint in its entirety. Id. (citing FED. R. CIV. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.")).

While federal district courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States[ ,]" 28 U.S.C. § 1331, a lawsuit premised on state law "is not transformed into a suit 'arising under' federal law merely because, to resolve it, the court may need to interpret federal law." Sullivan v. Am. Airlines, Inc., 424 F.3d 267, 271 (2d Cir. 2005). Thus, under the "well-pleaded complaint" rule, "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 12 (2003) (quoting Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987)).

Here, under the form complaint's heading, "Statement of Jurisdiction, Venue, and Nature of Suit," Plaintiff states that the case "presents a Federal question." (Dkt #1, p. 1 of 6). As discussed above, Plaintiff's purported causes of action under federal law have been found to lack an arguable basis in law or fact, and accordingly have been dismissed with prejudice. Despite a liberal reading of the complaint, Plaintiff's claims regarding Defendants' alleged fraudulent representations and breach of two insurance policies [1] are based solely on state common law or statutory law. [2] The Court may not exercise federal question jurisdiction over the complaint as currently pled. E.g., Adames v. Taju, 80 F. Supp.3d 465, 468 (E.D.N.Y. 2015).

[1]  There is no indication that the insurance policy at issue is subject to a federal statute, such as the Employee Retirement Income Security Act of 1974, §§ 3(1), 502(a), 29 U.S.C. §§ 1002(1), 1132(a), which would provide a basis for federal question jurisdiction.

[2]  See, e.g., N.Y. INS. LAW § 4226 (prohibiting misrepresentations and misleading statements as to the terms and benefits of insurance contracts) (McKinney's 2017); N.Y. GEN. BUS. LAW §§ 349, 350 (prohibiting unfair and deceptive business practices).

**\*6** Finally, the Court notes that the only other potential basis for subject matter jurisdiction—diversity jurisdiction—is lacking here. Diversity jurisdiction gives federal district courts jurisdiction over suits where the plaintiff and the defendant are of diverse citizenship. See Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 48 (2d Cir. 2012) (stating that diversity jurisdiction exists "between, inter alia, 'citizens of a State and citizens or subjects of a foreign state' ") (quoting 28 U.S.C. § 1332(a)). Here, however, Plaintiff's complaint indicates that she and Defendants are all New York domiciliaries, and therefore they are not of diverse citizenship. The Court accordingly has no basis on which to retain jurisdiction over Plaintiff's complaint. See, e.g., Adames v. Taju, 80 F. Supp.3d 465, 468 (E.D.N.Y. 2015) (court lacked diversity jurisdiction over state-law breach of contract claim by pro se litigant, where both parties resided in the same state).

## V. Conclusion

For the foregoing reasons, Plaintiff's motion for in pauperis status is granted, and Plaintiff's complaint is dismissed with

prejudice, without leave to re-plead. The Clerk of Court is directed to close this case.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 5508814

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1586857
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Russell BOWENS, Plaintiff,

v.

The CORRECTIONAL ASSOCIATION OF
NEW YORK, and Soffiyah Elijah, Former
Executive Director of the Correctional
Association of New York, Defendants.

19-CV-1523 (PKC) (CLP)
|
Signed 04/12/2019

**Attorneys and Law Firms**

Russell Bowens, Brooklyn, NY, pro se.

### MEMORANDUM & ORDER

Pamela K. Chen, United States District Judge

**\*1** On March 12, 2019, Plaintiff filed this *pro se* action against his former employer, the Correctional Association of New York ("CANY"), and its former Executive Director, Soffiyah Elijah ("Elijah" or "Defendant Elijah") (collectively, "Defendants"), for alleged violations of various federal statutes and 42 U.S.C. § 1983. (*See* Complaint ("Compl."), Dkt. 1.) This action—Plaintiff's second federal lawsuit against Defendants—involves claims under the Whistleblower Protection Act of 1989 ("WPA"), the Americans with Disabilities Act of 1990 ("ADA"), the Age Discrimination in Employment Act of 1967 ("ADEA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the False Claims Act ("FCA"), and "any and all rights afforded employees to prohibit retaliation guaranteed by the First Amendment of the United States Constitution." (Compl. ¶ 1.) Plaintiff's request to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915(a) is granted. The Court dismisses Plaintiff's WPA, FCA, and § 1983 claims, but grants him thirty (30) days to file an amended complaint setting forth any plausible employment discrimination claims.

### BACKGROUND

On March 7, 2016, Plaintiff filed the complaint in *Bowens v. Elijah* (*Bowens I*), No. 16-CV-1220 (PKC) (CLP), a *pro se* action brought against Defendants for alleged violations of the Fair Labor Standards Act ("FLSA") and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. (*See generally Bowens I*, No. 16-CV-1220 (PKC) (CLP), Dkt. 1.) By Order dated June 8, 2016, the Court dismissed the *Bowens I* complaint for failure to state a claim on which relief may be granted, but granted Plaintiff 30 days to file an amended complaint. When Plaintiff failed to file an amended complaint, his action was dismissed without prejudice. This action is based on the same facts alleged in *Bowens I*. (*Compare* Compl., Dkt. 1, *with Bowens I*, No. 16-CV-1220 (PKC) (CLP), Dkt. 1.)

On approximately April 3, 2012, Plaintiff, a formerly incarcerated person, was hired by CANY [1] on a temporary basis "to work in the Prison Visiting Project Department" and "to help with data entry." (Compl. ¶ 7.) Plaintiff expected his employment to last between 60 to 90 days. (*Id.*) Plaintiff was paid $ 20.00 per hour and worked 20 hours per week, but he was not given benefits or a salary. (*Id.* ¶ 8.) Subsequently, CANY extended Plaintiff's temporary employment status to last a full year. (*Id.* ¶ 9.) On July 1, 2013, Plaintiff became an official part-time employee of CANY. (*Id.* ¶ 10.) Plaintiff later received a slight pay increase to $ 20.61 per hour, though he remained ineligible for benefits. (*Id.*)

[1] CANY is a private, nonprofit corporation that is registered with the New York State Department of State, Division of Corporations. *See* NYS Department of State, Division of Corporations, Entity Information, http://www.dos.ny.gov/corps/bus_entity_search.html (last visited April 8, 2019). The Association describes itself as "the only independent organization in New York with authority under state law to monitor prisons and report [its] findings to the legislature and the broader public." Correctional Association of New York, *Who We Are*, https://www.correctionalassociation.org/about-cany (last visited April 8, 2019).

**\*2** Around the same time that he was hired as an official part-time employee, Plaintiff met with Defendant Elijah, who sought to convince Plaintiff not to leave CANY. (*Id.* ¶ 11.) At this meeting, Elijah promised to secure more hours and health benefits for Plaintiff. (*Id.*) While at least eight other employees were hired as full-time staff with benefits over the next two years, Elijah did not follow through on her promises to Plaintiff. (*Id.* ¶¶ 11–12.)

In September 2013, Defendant Elijah suggested that another CANY employee, Judy Yu ("Yu"), should travel with Plaintiff on a series of multi-day offsite visits to various facilities operated by the New York State Office of Children and Family Services ("OCFS"). (*Id.* ¶¶ 13–14.) Yu conveyed this suggestion to Plaintiff and told him that, in lieu of his normal hourly wage, he would receive a $ 50 daily stipend as compensation for his work on these visits. (*Id.* ¶ 15.) As a result, Plaintiff would work longer hours yet receive significantly less compensation. (*Id.*)

Plaintiff agreed to accompany Yu on the offsite visits to OCFS facilities, but he complained about the compensation structure to other CANY staff, including his immediate supervisor, Jack Beck, and CANY's Chief Financial Officer, Gordon Miller ("Miller"). (*Id.* ¶¶ 15–16.) These colleagues "conceded that [P]laintiff should be paid his regular wages" while participating in OCFS facility visits. (*Id.* ¶ 16.) Miller spoke with Defendant Elijah about Plaintiff's concerns, but she took no action to address them. (*Id.* ¶ 17.) Miller also discussed Plaintiff's compensation with CANY's Director of Operations and Human Resources, Laura Davidson, who told him that CANY had an unofficial practice of giving part-time workers a $ 50 daily stipend in lieu of a regular hourly wage for performing work during an offsite visit. (*Id.* ¶¶ 18–19.) Volunteers were also given a $ 50 stipend for participating in offsite visits with CANY. (*Id.* ¶ 24.) CANY's full-time employees, however, continued to receive their regular salaries while performing offsite visits. (*Id.* ¶¶ 22–23.) Plaintiff believed that this practice was discriminatory and exploitative, but he continued to perform the requested work. (*Id.* ¶ 21.)

On June 21, 2014, CANY sent Plaintiff to attend a five-day conference held by the International Committee of the Red Cross in Baltimore, Maryland ("the Red Cross Conference"). (*Id.* ¶ 27.) Plaintiff was the sole representative sent by CANY to the Red Cross Conference, and he attended conference workshops from 9:00 AM to 5:00 PM each day. (*Id.* ¶¶ 27–29.) When Plaintiff returned from Baltimore, he was informed that he would only be paid for two and one-half days of work. (*Id.* ¶ 30.) At subsequent staff meetings, Plaintiff complained about CANY's failure to pay him for the full five workdays that he spent attending conference workshops, as well as his travel time to and from Baltimore. (*Id.* ¶ 31.) Plaintiff also complained about CANY's failure to publish a report about conditions in New York state court detention facilities, which

had been a topic of discussion at the Red Cross Conference. (*Id.* ¶¶ 33–38.)

At an organization-wide retreat in 2015, Plaintiff continued to raise concerns about CANY's failure to publish the report on detention facility conditions and asserted that CANY was discriminating against him based on his part-time employee status. (*Id.* ¶¶ 39–42.) Elijah warned Plaintiff that his employment would be terminated if he disseminated the report. (*Id.* ¶ 42.)

**\*3** On April 1, 2015, Plaintiff again confronted Elijah about the report at a staff meeting. (*Id.* ¶ 43.) After the staff meeting, Plaintiff attempted to demand "back pay" from Elijah, but she told him that she no longer intended to give him back pay due to his actions during the meeting. (*Id.* ¶ 43.) At some point later, Elijah met with Plaintiff and all other formerly incarcerated CANY employees, ostensibly to explain how CANY's budget worked. (*Id.* ¶¶ 45–46.) At the meeting, however, Elijah harangued Plaintiff and his co-workers, stating that "if they didn't have her back against their co-workers they were ['] just heads in the room.[']" (*Id.* ¶ 47.)

On June 1, 2015, Plaintiff gave notice that he would be leaving CANY in three months due to his frustrations with Elijah. (*Id.* ¶ 48.) After he provided notice of his upcoming departure, Plaintiff participated in offsite visits to Great Meadow Correctional Facility and Dannemora Correctional Facility and was paid regular wages for his work. [2] (*Id.* ¶ 49.)

[2]    Although the complaint does not state when Plaintiff left CANY, the Court infers based on the three months' notice that Plaintiff gave on June 1, 2015 that he left CANY in or about September 2015.

Plaintiff seeks $ 2,000,000 in damages in this case. (*Id.* ¶ 50.)

*Bowens I*, in which Plaintiff sought relief based on substantially similar allegations, was dismissed without prejudice on August 15, 2016. (*Id.* at ECF [3] 21.) In 2018, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"). (*See id.* at ECF 24 (referencing Charge No. 520-2018-05874).) On August 30, 2018, Plaintiff submitted a letter to the EEOC requesting a Notice of Right to Sue Letter ("Right to Sue Letter"). (*Id.* ¶ 52; *id.* at ECF 22–23.) The EEOC issued a Right to Sue Letter to Plaintiff on December 13, 2018. (*Id.* ¶ 53; *id.* at ECF 25.)

3     Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

## STANDARD OF REVIEW

Pursuant to the *in forma pauperis* statute, this Court must dismiss a case if the Court determines that the complaint "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). An action is frivolous when the claim is based on an "indisputably meritless legal theory, such as when a dispositive defense clearly exists on the face of the complaint." *Newton v. Handleman*, 53 F. App'x 151, 152 (2d Cir. 2002) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ) (internal quotation marks omitted).

To avoid dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will be considered plausible on its face "when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "detailed factual allegations" are not required, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555). Similarly, a complaint is insufficient to state a claim "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly*, 550 U.S. at 557).

At the same time, "document[s] filed *pro se* [are] to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks and citations omitted). If a liberal reading of the complaint "gives any indication that a valid claim might be stated," this Court must grant leave to amend the complaint. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## DISCUSSION

### I. Section 1983 Claims

**\*4** Plaintiff seeks recovery under § 1983 for the deprivation of certain federal statutory and constitutional rights, including the right to be free from retaliation for the exercise of First Amendment rights. (*Id.* ¶ 1.) Plaintiff's § 1983 claims must be dismissed.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988) ). Private conduct, no matter how discriminatory or wrongful, is generally beyond the reach of § 1983 unless "there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.' " *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 264 (2d Cir. 2014) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) ).

Here, the complaint contains no allegations establishing that Defendants acted under color of state law within the meaning of § 1983. First, Defendants are clearly private actors. *See Ames v. Stevens*, No. 12-CV-1487 (MAD) (RFT), 2015 WL 5513021, at \*7–8 (N.D.N.Y. Sept. 17, 2015) (holding that CANY is a private entity, and that its reports are therefore not public records); *see also Ames v. Stevens*, 669 F. App'x 41, 42 (2d Cir. 2016) (characterizing CANY as "a private, nonprofit advocacy organization with permissive powers to visit prisons and prepare reports on their conditions"). Second, the facts alleged in the complaint do not reveal a nexus, much less a "close nexus," between Defendants' conduct and the State, as there is no indication that the Defendants' actions "received the imprimatur of the State." *Sykes v. Bank of Am.*, 723 F.3d 399, 406 (2d Cir. 2013). Because Plaintiff has not plausibly alleged that Defendants acted under color of state law, Plaintiff's claims under § 1983 are dismissed for failure to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

### II. Whistleblower Protection Act Claims

Plaintiff also asserts that this Court may grant him relief under the WPA. (Compl. ¶ 1 (citing 5 U.S.C. § 2302(b)(8)–(9) ).) Plaintiff's WPA claims appear to be based on various allegations in the complaint that Elijah failed to disseminate a report on the appalling conditions of certain state detention facilities in Brooklyn. (*See id.* at ¶¶ 33–38, 41–42.) The

complaint does not, however, connect this alleged conduct with any adverse employment action or other injury to him.

In any event, even if a causal connection could be plausibly inferred from the complaint, Plaintiff's WPA claims would still fail. The WPA only protects *federal government employees* from threatened or actual retaliatory action based on the disclosure of information about dishonest or illegal activities occurring within a federal government entity. *See* 5 U.S.C. § 2302(b)(8)–(9); *Rivera v. Emerging Health Info. Tech.*, No. 10-CV-8522 (VB), 2011 WL 5346097, at *2 (S.D.N.Y. Nov. 7, 2011) (WPA "only applies to federal employees"). Plaintiff is not a federal government employee, and CANY is not a federal government agency.

**\*5** Accordingly, Plaintiff's claims under the WPA are dismissed for failure to state a claim. *See* 28 U.S.C. § 1915(e) (2)(B)(ii).

### III. False Claims Act Claims

Plaintiff also seeks recovery under the FCA. (Compl. ¶ 1.) The FCA imposes civil liability upon "any person" who, *inter alia,* "knowingly presents, or causes to be presented, ... a false or fraudulent claim for payment or approval ... to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(a)–(b). Liability may also be imposed if a person presents a fraudulent claim for payment to a recipient of federal funds, such as a grantee, if that payment will be made from federal funds that are to be used on the federal government's behalf or to advance a federal government interest. 31 U.S.C. § 3729(b)(2)(A).

Plaintiff's FCA claims fail because he may not proceed *pro se* under the FCA. In order to proceed *pro se* in federal court as allowed by 28 U.S.C. § 1654, "[a] person must be litigating an interest personal to him." *Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998) (citing *Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir. 1997) ); *see also L.A. v. Granby Bd. of Educ.*, 227 F. App'x 47, 49–50 (2d Cir. 2007) ("We decide if a party is permitted to appear *pro se* by determining if this is the party's 'own case or one that belongs to another.' " (quoting *Iannaccone*, 142 F.3d at 558) ). The FCA permits an action to be commenced by either the federal government or a private person who sues in the name of the federal government through a *qui tam* action. 31 U.S.C. § 3730(a)–(b). While these private persons may sue in the name of the federal government, "the Government remains the real party in interest in any such action." *United States ex rel. Mergent Services v. Flaherty*, 540 F.3d 89, 93 (2d Cir.

2008) (quoting *Minotti v. Lensink*, 895 F.2d 100, 104 (2d Cir. 1990) ). Thus, a private party seeking to litigate FCA claims is "not entitled to proceed *pro se*" because that party is not litigating his or her own interest, but rather, the interest of the government. *United States ex rel. Mergent Services*, 540 F.3d at 93.

Accordingly, Plaintiff's FCA claims are dismissed for failure to state a claim. *See* 28 U.S.C. § 1915 (e)(2)(B)(ii).

### IV. Claims under Federal Employment Discrimination Statutes

Plaintiff also seeks to bring claims under Title VII, the ADA, and the ADEA for employment discrimination. (Compl. ¶ 1.) Plaintiff has attached a Right to Sue Letter dated December 13, 2018 regarding his ADA and Title VII charges of discrimination. He does not, however, allege any facts in the complaint supporting claims under those statutes. Furthermore, the Right to Sue Letter does not indicate that Plaintiff has exhausted administrative remedies for his ADEA claims, and his claims under all three statutes appear to be untimely.

Generally, a plaintiff may only sue under Title VII, the ADA, and the ADEA if he has filed a timely complaint with the EEOC or a similar state authority. *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) ("As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC." (quoting *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003) ) ); *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 158 (2d Cir. 2008) ("Before bringing a suit under the ADEA, a plaintiff must file a timely complaint with the EEOC."); *McInerney v. Rensselaer Polytechnic Inst.*, 505 F.3d 135, 138 (2d Cir. 2007) (stating that Title I of the ADA, which prohibits employment discrimination against disabled employees, "requires a claimant to file a charge of employment discrimination with the EEOC"). To be deemed timely, an administrative claim must be filed with the EEOC within 180 days of the alleged discriminatory conduct, though an administrative claim filed with a state agency is timely if it is filed within 300 days of the alleged discriminatory conduct. 42 U.S.C. § 2000e-5(e); 29 U.S.C. § 626(d)(1).

**\*6** The failure to file a timely complaint with the EEOC is not necessarily fatal. A plaintiff may overcome this deficiency by showing that he is entitled to equitable tolling. *See, e.g., Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 385–86 (2d

Cir. 2015) (stating that Title VII's exhaustion requirement may be subject to equitable defenses). To warrant equitable tolling, a plaintiff must demonstrate that he has pursued his claims with "reasonable diligence" and that "extraordinary" circumstances beyond his control prevented him from filing his administrative claims. *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003).

In this case, Plaintiff filed ADA and/or Title VII charges with the EEOC, but he did not file an ADEA charge. (Compl. at ECF 24 (indicating a right to sue under Title VII and/or the ADA but not the ADEA).) Furthermore, the charges that Plaintiff filed with the EEOC were untimely. According to the complaint, on June 1, 2015, Plaintiff gave three months' notice before leaving CANY. (Compl. ¶ 48.) Therefore, a charge filed with the EEOC in 2018 could not have been filed within 300 days after Plaintiff suffered any discriminatory employment action by Defendants—which, at the latest, would have run in 2016. It is now too late for Plaintiff to pursue his unexhausted claims because his last day of work was more than three years ago. And though the exhaustion period for Plaintiff's claims could be equitably tolled, Plaintiff has demonstrated no extraordinary circumstances beyond his control that could excuse his failure to file a timely complaint. *See Zerilli-Edelglass*, 333 F.3d at 80.

Regardless of whether Plaintiff is able to demonstrate circumstances that would justify equitable tolling, the Court further finds that Plaintiff has failed to allege sufficient facts to state a cause of action for employment discrimination under Title VII, the ADA, or the ADEA. Beyond identifying himself as a formerly incarcerated person and a part-time employee of CANY—neither of which is a protected category under the relevant statutes—Plaintiff has failed to allege any facts that plausibly support his Title VII,[4] ADA,[5] or ADEA[6] claims. (*See* Compl. ¶¶ 20–21, 39, 45.) Rather, Plaintiff has made conclusory allegations that the adverse employment actions he suffered were taken on the basis of "blatant discrimination." (*See id.* ¶ 21; *see also id.* ¶¶ 20, 39.) Even under the most liberal construction of Plaintiff's allegations, the Court cannot identify any facts that plausibly connect an adverse employment action to a protected status. *See Littlejohn v. City of New York, 795 F.3d 297, 309–10 (2d Cir. 2015)* (an employment discrimination complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face). Accordingly, the complaint fails to state a claim of discrimination on which relief may be granted under Title VII, the ADA, or the ADEA. *Cf. Vega v.*

*Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86–87 (2d Cir. 2015).

4    Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In order to state a claim for relief under Title VII, Plaintiff must plausibly allege facts that "provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.' " *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting *Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015)* ).

5    To establish a *prima facie* claim of disability discrimination case under the ADA, Plaintiff "must show[: (1) ] that his employer is subject to the ADA; [ (2) ] that he is disabled within the meaning of the ADA or perceived to be so by his employer; [ (3) ] that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and [ (4) ] that he suffered an adverse employment action because of his disability." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008).

6    To establish a *prima facie* claim of age discrimination under the ADEA, Plaintiff must demonstrate that: (1) he was within the protected age group (*i.e.*, at least 40 years of age); (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) the adverse action "occurred under circumstances giving rise to an inference of discrimination, such as the fact that [Plaintiff] was replaced by someone 'substantially younger.' " *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) ).

## CONCLUSION

**\*7** For the reasons stated, Plaintiff's claims are dismissed for failure to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith, and therefore, *in forma pauperis* status is denied for the purpose of any appeal. *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

In light of this Court's duty to liberally construe *pro se* complaints, *Cruz v. Gomez*, 202 F.3d 593 (2d Cir.

2000), the Court grants Plaintiff thirty (30) days to file an amended complaint. If Plaintiff has a genuine basis for a claim of employment discrimination, he should provide facts in support of that claim, submit a copy of the charge of discrimination filed with the EEOC, and demonstrate circumstances that justify equitable tolling. All further proceedings shall be stayed for thirty (30) days or until further Order of the Court. If Plaintiff fails to file an amended complaint within the time allowed, the Court will enter judgment dismissing this action.

SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 1586857

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:19-cv-01412-GTS-TWD   Document 10   Filed 01/14/20   Page 53 of 91

Pantalone ex rel. Pantalone v. County of Fulton, Not Reported in F.Supp.2d (2011)

2011 WL 1457935

2011 WL 1457935
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

DanieL J. PANTALONE, by and
through his attorneys in fact, Danny J.
PANTALONE and Therese Howard, Plaintiff,
v.
COUNTY OF FULTON and Fulton County
Residential Health Care Facility, Defendants.

No. 6:10–CV–913.
|
April 15, 2011.

**Attorneys and Law Firms**

Office of Elmer R. Keach, III, Brett A. Engel, Esq., of
Counsel, Amsterdam, NY, for Plaintiff.

Murphy, Burns Law Firm, Thomas J. Higgs, Esq., of Counsel,
Albany, NY, for Defendants.

### *MEMORANDUM–DECISION AND ORDER*

DAVID N. HURD, District Judge.

**I. *INTRODUCTION***

*1 Plaintiff Daniel J. Pantalone ("plaintiff" or "Pantalone")
by and through his attorneys in fact, Danny J. Pantalone and
Therese Howard, brings this action pursuant to 42 U.S.C.
§ 1983 and alleges that defendants Fulton County and the
Fulton County Residential Health Care Facility (collectively
"defendants") violated rights guaranteed to him under the
Federal Nursing Home Reform Amendments ("FNHRA"), 42
U.S.C. § 1396r *et seq.* Plaintiff also brings a pendent state
claim for negligence. Defendants have moved to dismiss the
complaint pursuant to Federal Rule of Civil Procedure 12(b)
(6), arguing that the FNHRA does not provide a federal right
enforceable under § 1983.[1] Plaintiff opposes the motion.

---

[1]   Defendants' sole argument for dismissal is that the
FNHRA does not provide an enforceable federal
right. Defendants do not seek dismissal based on the
sufficiency of plaintiff's substantive claims.

Oral argument was heard on April 1, 2011, in Utica, New
York. Decision was reserved.

**II. *FACTUAL BACKGROUND***
The following facts, taken from the complaint, are accepted
as true for purposes of this motion to dismiss.

Plaintiff became a resident of the Fulton County Residential
Health Care Facility (the "Facility") in December 2004. On
August 3, 2009, two employees of the Facility were helping
plaintiff—who is wheelchair bound—into the shower by
placing him on a lift. A belt intended to hold plaintiff on
the lift was not properly secured, and he fell to the shower
floor. Plaintiff heard a loud "pop" when he hit the floor. On a
subsequent "Transfer to Acute Care Facility" form, a nurse's
aide noted: "heard knee pop while giving resident shower on
8/3/09." For two days after his fall, Pantalone remained in
bed and suffered from severe pain in his leg. Plaintiff was not
provided with any medical treatment until August 5, 2009,
when his left leg was x-rayed, and he was diagnosed with a
non-displaced fracture of the left femur. During his follow-up
care, an unexplained left ankle fracture was also discovered.

**III. *DISCUSSION***

**A. *Motion to Dismiss—Legal Standard***
To survive a 12(b)(6) motion to dismiss, the "[f]actual
allegations must be enough to raise a right to relief above the
speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544,
555, 127 S.Ct. 1955, 1965 (2007). Although a complaint need
only contain "a short and plain statement of the claim showing
the pleader is entitled to relief" (Fed.R.Civ.P. 8(a)(2)), more
than mere conclusions are required. Indeed, "[w]hile legal
conclusions can provide the framework of a complaint, they
must be supported by factual allegations." *Ashcroft v. Iqbal,*
—— U.S. ——, 129 S.Ct. 1937, 1950 (2009).

Dismissal is appropriate only where plaintiff fails to provide
some basis for the allegations that support the elements of
his claims. *See Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974
(requiring "only enough facts to state a claim to relief that is
plausible on its face"). When considering a motion to dismiss,
the complaint is to be construed liberally, and all reasonable
inferences must be drawn in the plaintiff's favor. *Chambers v.
Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002).

**B. *Issue and Parties' Contentions***

**\*2** Plaintiff claims that defendants violated the following two provisions of the FNHRA:

> A nursing facility must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident. 42 U.S.C. § 1396r(b)(1)(A).

> To the extent needed to fulfill all plans of care described [above], a nursing facility must provide (or arrange for the provision of) nursing and related services and specialized rehabilitative services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident. 42 U.S.C. § 1396r(b)(4)(A)(i).

It is undisputed that the FNHRA does not provide a private cause of action to be brought under the statute directly. However, a statute can create a right, enforceable through § 1983, by evidencing an "unambiguous" intent to confer such a right upon a class of beneficiaries. *Gonzaga Univ. v. Doe,* 536 U.S. 273, 283, 122 S.Ct. 2268, 2275 (2002). While the distinction between these two avenues for judicial redress has historically caused confusion, its impact on this matter is relatively minor as the guiding factor behind both is congressional intent. As the Supreme Court has clarified:

> We have recognized that whether a statutory violation may be enforced through § 1983 is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute. But the inquiries overlap in one meaningful respect—in either case we must first determine whether Congress *intended to create a federal right....* [A] plaintiff suing under an implied right of action still must show that the statute manifests an intent to create not just a private *right* but also a private *remedy*.

> Plaintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes.

*Id.* at 283–84, 122 S.Ct. at 2275–76 (internal quotation marks, citations, and alterations omitted).

Defendants maintain that the FNHRA was not intended to provide nursing home residents with enforceable rights. Pantalone points to First and Third Circuit cases finding sufficient "rights-creating" language in the FNHRA to permit suit under § 1983. *See Grammer v. John J. Kane Reg'l Ctrs.- Glen Hazel,* 570 F.3d 520, 531 (3d Cir.2009), *cert. denied,* 130 S.Ct. 1524 (2010); *Rolland v. Romney,* 318 F.3d 42, 52

(1st Cir.2003). Defendants counter with non-binding case law from the Second Circuit holding that the FNHRA does not confer a right to sue. *See Prince v. Dicker,* 29 F. App'x 52, 54 (2d Cir.2002) (summary order); *Baum v. N. Dutchess Hosp.,* —— F.Supp.2d ——, 2011 WL 240196, at \*10 (N.D.N.Y. Jan. 24, 2011) (Treece, M.J.). Defendants maintain that these cases suggest the Second Circuit is in conflict with the First and Third Circuits.

In addition to not being precedential, the *Prince* summary order provides little insight into how the Second Circuit may ultimately rule on this issue. Indeed, the Court's consideration of the FNHRA amounted to a single sentence noting that "the Nursing Home Reform Act's provisions do not confer a right of action on Prince that can be enforced against a private nursing home." *Prince,* 29 F. App'x at 54. To support this assertion, the Court cited a decision from the Northern District of Georgia. *Id.* (citing *Brogdon ex rel. Cline v. Nat'l Healthcare Corp.,* 103 F.Supp.2d 1322, 1330– 32 (N.D.Ga.2000)). However, *Brogdon* was decided before the Supreme Court clarified the standard to be applied when considering whether Congress intended to confer an enforceable right. *See Gonzaga Univ.,* 536 U.S. at 280–85, 122 S.Ct. at 2273–76. It is also respectfully noted that *Baum* is not binding and is balanced by *Joseph S. v. Hogan,* in which certain provisions of the FNHRA were found to confer enforceable rights. 561 F.Supp.2d 280, 303 (E.D.N.Y.2008).

**\*3** Therefore, this issue is one of first impression as the Court of Appeals for the Second Circuit has not analyzed and conclusively ruled on whether the FNHRA confers a federal right upon nursing home residents that can be enforced through § 1983.

### C. *42 U.S.C. § 1983 and the FNHRA*

To establish a prima facie case under § 1983 a plaintiff must allege (1) the violation of a right secured by the Constitution or federal law, and (2) that the alleged deprivation was committed under color of state law. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254–55 (1988). The second prong is clearly met as the defendants include Fulton County and a county-run facility. As alluded to above, this matter turns on the first prong.

Section 1983 "safeguards certain rights conferred by federal statutes." *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 1359 (1997). To be able to recover under this provision, however, "a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law." Id.* Indeed,

"where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit." *Id.* at 286, 122 S.Ct. at 2277. A mere reference to "rights" that has an aggregate, not an individual, focus does not give rise to a statute's enforceability under § 1983. *Id.* at 289–90, 122 S.Ct. at 2278–79.

When determining whether Congress intended to create a federal right, courts are guided by three factors: (1) the provision in question must have been intended to benefit the plaintiff; (2) the asserted right cannot be so "vague and amorphous" as to strain judicial competence through enforcement; and (3) "the statute must unambiguously impose a binding obligation on the States." *Blessing,* 520 U.S. at 340–41, 117 S.Ct. at 1359; *Torraco v. Port Auth. of N.Y. & N.J.,* 615 F.3d 129, 136 (2d Cir.2010). If a plaintiff shows that the statute meets these three requirements, "the right is presumptively enforceable by § 1983." *Gonzaga Univ.,* 536 U.S. at 284, 122 S.Ct. 2276. "[Defendants] may rebut this presumption by showing that Congress specifically foreclosed a remedy under § 1983." *Id.* at 285 n. 4, 122 S.Ct. at 2276 n. 4 (internal quotation marks omitted).

### 1. First *Blessing* Factor

The first factor is easily established as the Second Circuit has held that § 1396r "is obviously intended to benefit Medicaid beneficiaries." *Concourse Rehab. & Nursing Ctr. Inc. v. Whalen,* 249 F.3d 136, 143–44 (2d Cir.2001). The Court noted that § 1396r was not meant to benefit nursing home facilities, but rather their residents. *See id.* Indeed, § 1396r repeatedly refers to "residents" and details the level of care that a facility must provide to its "residents." 42 U.S.C. §§ 1396r(b)(1)(A), (b)(4) (A)(i). Although the complaint does not allege that Pantalone is a Medicaid recipient, it is undisputed that he was a resident at the Facility at the time of his injury. As such, he is an intended beneficiary of the FNHRA.

**\*4** Moreover, the statutory language indicates that the FNHRA has an individual, not an aggregate, focus. The specific provisions in question evidence a concern that the needs of particular persons—nursing home residents—are satisfied. Section 1396r(b) (1)(A) instructs facilities to promote "the quality of life of *each resident"* while § 1396r(b)(4)(A)(i) requires the provision of service to attain the "well-being of *each resident." Id.* (emphasis added). In contrast, the statutes considered in *Blessing* and *Gonzaga* were couched in terms of institutional policy and required merely substantial, not complete, compliance. *Gonzaga Univ.,* 536 U.S. at 288, 122 S.Ct. at 2278; *Blessing,* 520 U.S. at 343, 117 S.Ct.

at 1361. Such statutory language was found to provide only a "yardstick" against which to measure systemwide performance, not a means to gauge whether the needs of particular persons were met. *Blessing,* 520 U.S. at 343, 117 S.Ct. at 1361. By requiring facilities to provide a certain level of care to improve the quality of life and well-being of each resident, the FNHRA focuses on the individual residents rather than systemwide policies.

Accordingly, the first factor is established.

### 2. Second *Blessing* Factor

The provisions under consideration make clear what level of service nursing facilities are required to provide to their residents. Courts are capable of enforcing such provisions, which instruct that a facility *"must"* care" for its residents in a manner that promotes the residents' quality of life and *"must* provide" services to attain the highest practicable well-being of each resident. 42 U.S.C. §§ 1396r(b)(4)(A)(i), (b)(1)(A) (emphasis added). The use of these mandatory terms leaves little room for debate as to what is required of the facilities. Courts can competently consider and decide whether or not a facility has provided adequate care and services. Such a determination is arguably less complex than considering whether a state failed to "take into account" a required factor when designing a system of reimbursement—a question the Second Circuit found to be within judicial competence. *See Concourse Rehab.,* 249 F.3d at 144.

In addition, the statute states that "[t]he services provided or arranged by the facility *must* meet professional standards of quality." 42 U.S.C. § 1396r(b)(4)(A) (emphasis added). Federal courts are well-versed in evaluating such measures of quality and are often guided by industry standards and expert opinions. Moreover, the FNHRA requires the facility to create a written plan of care for each resident and then provide services as necessary to accomplish the plan. *Id.* §§ 1396r(b)(2), (b)(4)(A). It does not strain judicial competence to evaluate whether a facility has adequately provided services to achieve the goals set forth in a written plan.

Accordingly, the second factor is established.

### 3. Third *Blessing* Factor

**\*5** The third factor is also established. The repeated use of "must" indicates that the obligations outlined in the FNHRA are binding on the states and nursing facilities. For example, a facility *"must* care" for its residents in a manner that

promotes the residents' quality of life and *"must* provide" services to ensure the highest practicable well-being of each resident. *Id.* §§ 1396r(b)(4)(A)(i), (b)(1)(A) (emphasis added). This language makes the provisions mandatory, not advisory. This conclusion is further evidenced by the title of § 1396r—"Requirements for Nursing Facilities"—and the accompanying penalties that may be imposed for failure to implement the FNHRA's obligations.

### 4. The FNHRA Does Not Specifically Foreclose a Remedy Under § 1983

As all three *Blessing* factors are met, the rights conferred by the FNHRA are presumably enforceable through § 1983 unless Congress specifically foreclosed such a remedy. There is no express language in the FNHRA barring a nursing home resident from seeking a remedy through § 1983. In fact, the statute specifically states that *"[t]he remedies* provided under this subsection *are in addition to* those otherwise available under State or Federal law and shall not be construed as limiting such other remedies, including *any* remedy available to an individual *at common law." Id.* § 1396r(h)(8) (emphasis added). This is exactly what plaintiff has done in this case; seeking damages under the FNHRA in addition to damages under common law negligence.

Defendants argue that this provision proves Congress did not intend to create a separate cause of action. However, the only reasonable conclusion to be drawn from this provision is that Congress did not intend to foreclose the use of any available remedy. As § 1983 "supplies a remedy for the vindication of rights secured by federal statutes," plaintiff is not barred from using it as a vehicle to seek redress for alleged violations of his federal rights. *Gonzaga Univ.,* at 283–84, 122 S.Ct. at 2275– 76. Moreover, Congress clearly stated that any common law remedies were not foreclosed. It could also have clearly stated that § 1983 remedies were foreclosed. It did not.

Accordingly, Congress did not specifically foreclose the use of § 1983 to enforce rights conferred by the FNHRA. However, this does not end the analysis.

### 5. The FNHRA's Remedial Scheme and Legislative Intent

The Second Circuit has cautioned that "courts should not find a federal right based on a rigid or superficial application of the *Blessing* factors where other considerations show that Congress did not intend to create federal rights actionable under § 1983." *Wachovia Bank, N.A. v. Burke,* 414 F.3d 305,

322 (2d Cir.2005). Further, while specific statutory provisions must be considered when deciding if an enforceable right has been conferred, courts often consider the entire statute when determining congressional intent. *See Blessing,* 520 U.S. at 342–43, 117 S.Ct. at 1360 (focusing on specific terms and provisions of the Social Security Act); *Wilder v. Va. Hosp. Ass'n,* 496 U.S. 498, 515–16, 110 S.Ct. 2510, 2520 (considering the legislative history of the entire Boren Amendment).

**\*6** In the absence of an express provision precluding enforcement through § 1983, such a suit is foreclosed only when the statute creates "a remedial scheme that is sufficiently comprehensive to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Blessing,* 520 U.S. at 346, 117 S.Ct. at 1362 (internal quotation marks and alterations omitted). This requires defendant to make a "difficult showing" that permitting a suit under § 1983 "would be inconsistent with Congress' carefully tailored scheme." *Id.* (internal quotation marks omitted). The Supreme Court has cautioned courts not to "lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right." *Wright v. Roanoke Redevelopment & Hous. Auth.,* 479 U.S. 418, 423–24, 107 S.Ct. 766, 770 (1987) (internal quotation marks omitted). The Court has found only three statutes to include a remedial scheme comprehensive enough to foreclose a § 1983 action. *Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S. 246, ——, 129 S.Ct. 788, 793 (2009). These three statutes "required plaintiffs to comply with particular procedures and/or exhaust particular administrative remedies prior to filing suit." *Id.* at 795.

In *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* the Court noted the "elaborate enforcement provisions" in the Federal Water Pollution Control Act ("FWPCA") which provided the Environmental Protection Agency with numerous enforcement options such as compliance orders, fines, and criminal sanctions. 453 U.S. 1, 13, 101 S.Ct. 2615, 2623 (1981). The Court also stressed the inclusion of citizen suit provisions in the FWPCA permitting "any interested person" to seek judicial review and injunctive relief. *Id.* at 13–14, 101 S.Ct. at 2623. This statutory scheme was held to evidence a congressional intent to foreclose parallel claims under § 1983. *Id.* at 14, 101 S.Ct. at 2623.

In *Smith v. Robinson,* the Court considered provisions in the Education of the Handicapped Act ("EHA"). 468 U.S. 992, 104 S.Ct. 3457 (1984). This statute provided

specific administrative procedures for aggrieved individuals to exhaust before seeking judicial review in federal court. *Id.* at 1011–12, 104 S.Ct. at 3468. The Court determined that such a "carefully tailored scheme" indicated that Congress intended the EHA to be the exclusive remedy for qualified handicapped students to pursue a claim. *Id.* at 1012–13, 104 S.Ct. at 3469.

Most recently, the Court analyzed the Telecommunications Act's ("TCA") detailed provisions allowing for restrictive administrative and judicial remedies. *City of Rancho Palos Verdes v. Abrams,* 544 U.S. 113, 125 S.Ct. 1453 (2005). The Court pointed out that "in *all* of the cases in which we have held that § 1983 *is* available for violation of a federal statute, we have emphasized that the statute ... *did not* provide a private judicial remedy (or, in most of the cases, even a private administrative remedy) for the rights violated." *Id.* at 121, 125 S.Ct. at 1459. The TCA not only provided for specific remedies, it restricted the available relief "in ways that § 1983 does not." *Id.* at 122, 125 S.Ct. at 1459. The Court concluded that these "deliberate" limitations on available remedies were "not to be evaded through § 1983." *Id.* at 124, 125 S.Ct. at 1460.

**\*7** The FNHRA dictates that states shall establish a process for the investigation of alleged abuse and/or neglect in nursing home facilities. 42 U.S.C. §§ 1396r(g)(1)(C), (g)(4). If an investigation reveals noncompliance with the statute's requirements, the FNHRA's enforcement provisions allow the state and/or the Secretary of Health and Human Services (the "Secretary") to take remedial actions including the imposition of civil fines, denial of payment [2], appointment of temporary management, closure of the facility, and transfer of residents to a different facility. *Id.* §§ 1396r(h)(2)(A)(i)-(iv), (h)(3)(A)-(C). The only references to administrative appeals are provisions requiring states to provide fair processes to hear appeals from (1) residents concerning transfers and discharges, and (2) mentally ill individuals adversely affected by determinations made at preadmission screening. *Id.* §§ 1396r(e)(3), (e)(7)(F).

[2]     The Secretary's authority to withhold federal funds is insufficient to preclude a finding that a statute provides an enforceable federal right. *See Wilder,* 496 U.S. at 521–22, 110 S.Ct. at 2524 (noting that the Medicaid Act does not explicitly prohibit private actions and holding that the Secretary's ability to curtail funding did not evidence an intent to bar individual enforcement).

Although this scheme allows for an array of enforcement options, nothing in these provisions can be said to bar individuals from also enforcing rights through § 1983. There is no citizen suit provision to indicate that a § 1983 action is unnecessary as in *Sea Clammers* . There is no administrative exhaustion requirement as in *Smith.* Nor is there an available administrative or judicial remedy to address residents' complaints of inadequate or negligent care—much less a restrictive remedy like that in *Rancho Palos Verdes.* Indeed, the FNHRA specifically states that its provisions do not limit available remedies. *Id.* § 1396r(h)(8). While states are required to investigate allegations of abuse and/or neglect, the FNHRA does not characterize this as the exclusive avenue for residents to seek redress for violations of the statute. This remedy complements, rather than supplants, § 1983. Indeed, the state's investigation is intended to address negligent care and prevent future abuse, not provide damages or other relief available only through judicial action. In short, the FNHRA's enforcement procedures are not sufficiently comprehensive to obviate the need for a § 1983 action. [3]

[3]     One of the cases on which defendants rely acknowledged that "[i]n light of Congress' unambiguous desire to promote the standard of care provided to nursing home residents, and the statutory acknowledgment that other remedies may remain available, the Court is unconvinced that a private remedy would be inconsistent with the underlying legislative scheme." *Brogdon,* 103 F.Supp.2d at 1332.

As repeatedly noted above, the overarching principle guiding this analysis is congressional intent. A review of the well-documented legislative history buttresses a finding that Congress intended to confer an enforceable federal right under the FNHRA. Congress passed the FNHRA in 1987 in response to widespread instances of abuse, neglect, and inadequate care that was occurring in nursing homes and mental health facilities across the country. *See* H.R.Rep. No. 100–391, pt. 1, at 452 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2313, 2313–272.

[I]n many ... nursing homes, individuals who are admitted receive very inadequate—sometimes shockingly deficient—care that is likely to hasten the deterioration of their physical, mental, and emotional health. The IOM Committee concluded that the "poor-quality homes outnumber the very good homes."

**\*8** The Committee is deeply troubled that the Federal government, through the Medicaid program, continues to

Case 6:19-cv-01412-GTS-TWD   Document 10   Filed 01/14/20   Page 58 of 91
Pantalone v. Pantalone v. County of Fulton, Not Reported in F.Supp.2d (2011)
2011 WL 1457935

pay nursing facilities for providing poor quality care to vulnerable elderly and disabled beneficiaries.

*Id.* The main purpose of the FNHRA was to improve the quality of care that nursing home residents receive. *Id.* By enacting this statute, Congress sought to protect nursing home residents—many of whom could not protect themselves—from the very type of negligence alleged by Pantalone. To prevent residents from enforcing the rights afforded to them by the FNHRA would be contrary to legislative intent.

Accordingly, the individual rights conferred by the FNHRA are enforceable through § 1983.

## IV. *CONCLUSION*

Plaintiff has sufficiently alleged that defendants violated §§ 1396r(b)(1)(A) and (b)(4)(A)(i) of the FNHRA, which confers individual rights enforceable through § 1983. As a result of the above, it is

ORDERED that

    1. Defendants' motion to dismiss is DENIED; and

    2. The defendants shall file an answer to the complaint on or before April 29, 2011.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1457935

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2873364
United States District Court,
N.D. New York.

Susan KESICK, Plaintiff,

v.

Richard Enrique ULLOA, Luis Wilfredo
Rivera, and John Doe, Defendants.

No. 1:10–CV–1248.
|
July 12, 2012.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

*1 Plaintiff Susan Kesick commenced this action asserting claims pursuant to the civil Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), and New York State common law.[1] Plaintiff moves for summary judgment on her RICO claims, or, in the alternative, for default judgment against Defendants for failing to provide any discovery. *See* dkt. # 13. Defendant Richard Enrique Ulloa's request for permission to file late opposition papers to Plaintiff's motion for summary judgment, *see* dkt. # 26, was denied. *See* 5/4/12 by Dec. & Ord., dkt. # 28. Defendant Rivera filed no response to the motion, and Defendant Doe has not been identified. For the reasons that follow, Plaintiff's motion for summary judgment is granted in part as against Defendants Ulloa and Rivera. The claims against defendant John Doe are dismissed for failure to name and serve the individual.

---

[1] The state common law claims are for abuse of process and prima facie tort.

**II. STANDARD OF REVIEW**

On a motion for summary judgment the Court must construe the properly disputed facts in the light most favorable to the non-moving party, *see Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see O'Hara v. National Union Fire Ins. Co. of Pittsburgh, PA,* 642 F.3d 110, 116 (2d

Cir.2011) ("Summary judgment is appropriate only if, after drawing all permissible factual inferences in favor of the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."). Even though the motion is unopposed, the Court may not grant summary judgment unless it determines that the moving party is entitled to judgment as a matter of law. *Vermont Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 242 (2d Cir.2004); *see also D.H. Blair & Co., Inc. v. Gottdiener,* 462 F.3d 95, 110 (2d Cir.2006) ("Even unopposed motions for summary judgment must fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law.") (internal quotation marks omitted).

**III. BACKGROUND**

Due to Defendants' failures to file proper opposition to the pending motion despite being served with the motion papers and the Northern District's "NOTIFICATION OF THE CONSEQUENCES OF FAILING TO RESPOND TO A SUMMARY JUDGMENT MOTION," *see* dkt. # 19, the supported factual allegations in Plaintiff's papers are deemed admitted for purposes of this motion. *See* Fed.R.Civ.P. 56(e)(2); N.D.N.Y. L.R. 7.1(a)(3); *see also Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 2541 n. 46, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Edwards v. INS,* 59 F.3d 5, 8 (2nd Cir.1995) ("While a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them."); *N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 648–49 (2d Cir.2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1(a)(3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations."); *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998) (*per curiam* ) (accepting as true material facts contained in unopposed local rule statement of material facts). These facts are as follows.

*2 On March 1, 2009, as the result of a traffic stop, a criminal complaint was sworn out against Defendant Ulloa by Ulster County Deputy Sheriff George F. Goodwin. The criminal complaint accused Ulloa of Aggravated Unlicensed Operation of a Motor Vehicle ("AUO"), a misdemeanor violation of Section 511 of the New York Motor Vehicle and Traffic Law. In connection therewith, Ulloa was issued an

appearance ticket directing him to appear before the Ulster
Town Court at 2:30 p.m. on March 4, 2009. Ulloa failed to
appear in Town Court on the designated return date.

On March 5, 2009, Plaintiff Susan Kesick, a Justice of the
Ulster Town Court reviewed and signed an Arrest Warrant
for Ulloa on his misdemeanor AUO charge and for his
failure to appear in Town Court the previous day. Ulloa was
subsequently arrested, appeared before the Town Court, and
released on bail on April 8, 2009. At the time of his release,
Kesick signed an Order for Ulloa to undergo a psychological
evaluation pursuant to Criminal Procedure Law Article 730
to determine if he possessed the capacity to understand the
proceedings against him. Plaintiff asserts that, thereafter and
as part of a pattern of racketeering activity by a criminal
enterprise and furtherance of a scheme to defraud, extort,
and otherwise damage Kesick, Defendants Ulloa, Rivera and
Doe, with the assistance of others, began sending and filing
fraudulent notices, liens and UCC Financing Statements as
set forth below.

On April 21, 2009, Ulloa commenced an action against
Kesick by filing with the Ulster County Clerk's Office
and mailing Kesick an "Order" and "Criminal Complaint"
together with two additional nonsensical documents
identified as: "Notice and Demand: Writ of Error Coram
Nobis Demand For Reversal of Order Due to Lack of
Jurisdiction" ("Writ of Error") and "Petition for Writ of
Mandamus for an Order to Cease and Desist the Action
in 'Town of Ulster Court', 'Ulster Town Court' " ("Writ
of Mandamus"). Defendant Rivera assisted Defendant Ulloa
with these documents and attested to their accuracy. Ulloa
also sent, by registered United States Mail, the "Order"
and "Criminal Complaint" to Eric Dinallo, Superintendent
of the New York State Insurance Commissioner's Office.
Ulloa also mailed his "criminal complaint" to numerous other
persons, including Deputy Chief Administrative Judge Jan
Plummadore, Ulster County Executive Michael Hein, New
York State Attorney General Andrew Cuomo, and New York
State Comptroller Thomas DiNapoli.

In his "criminal complaint", Ulloa falsely accused Kesick,
Deputy Goodwin and Assistant Ulster County District
Attorney David Boole of kidnaping, conspiracy, racketeering,
perjury, money laundering and mail fraud, among other
crimes. Included as an exhibit to Defendant's "criminal
complaint" was an "Invoice" in the amount of $8,820,750.00
for some unknown purpose. Despite having failed to
personally serve Kesick or any of the other defendants named

in the action, on June 4, 2009, Ulloa filed an "Order for
Summary Judgment" which the Court deemed a notice of
motion seeking a default judgment.

*3 On June 17, 2009, Kesick served Answers to Defendant's
"Criminal Complaint", "Writ of Error," and "Writ of
Mandamus." Thereafter, Kesick and the other named
defendants cross-moved for various forms of relief, including
dismissal of the action. On July 28, 2009, Ulloa filed
with the Town of Ulster Justice Court Clerk and mailed
an "Affidavit of Negative Averment, Opportunity to Cure,
and Counterclaim" ("Negative Averment"). Ulloa's Negative
Averment was a purportedly self executing document in
which he claims to be owed several million dollars for
"crimes," fraud, racketeering and theft of public funds, plus
interest, treble and punitive damages.

On August 24, 2009, Ulloa filed with the Town of Ulster
Justice Court and mailed a "Demand for Payment", "Invoice"
and "Affidavit of Notary Presentment" (hereinafter "Notary
Presentment") falsely claiming that Kesick owed him the
sum of $176,000,000.00. Ulloa's "Demand for Payment",
"Invoice" and "Notary Presentment" falsely accuse Kesick
of committing numerous civil and criminal wrongs including,
*inter alia*, fraud, racketeering, theft of public funds and
continuing trespass. Ulloa's fraudulent papers were also sent
via United States Mail to the numerous individuals listed in
the Notary Presentment.

On September 20, 2009, Defendants filed with the Town of
Ulster Justice Court Clerk and mailed a "Second Demand for
Payment", "Invoice" and "Notary Presentment" again falsely
claiming Kesick owed Ulloa the sum of $176,000,000.00.
Defendants' "Second Demand for Payment", "Invoice"
and "Notary Presentment" again falsely accuse Kesick of
committing various civil and criminal wrongs including, *inter
alia*, fraud, racketeering, theft of public funds and continuing
trespass. Plaintiff believes that Defendants' "Second Demand
for Payment", "Invoice" and "Notary Presentment" were sent
via United States Mail to the numerous individuals listed in
the Notary Presentment.

On October 23, 2009, Defendants filed with the Town of
Ulster Justice Court Clerk a "Final Demand for Payment",
"Invoice" and "Notary Presentment", again reasserting
the false claim that Kesick owed Ulloa the sum of
$176,000,000.00. Defendants' "Final Demand for Payment",
"Invoice" and "Notary Presentment" again falsely accuse
Kesick of committing various civil and criminal wrongs

Kesick v. Ulloa, Not Reported in F.Supp.2d (2012)
Case 6:19-cv-01412-GTS-TWD   Document 10   Filed 01/14/20   Page 61 of 91
2012 WL 2873364, RICO Bus.Disp.Guide 12,252

including, *inter alia*, fraud, racketeering, theft of public funds and continuing trespass. Plaintiff believes that Defendants' "Final Demand for Payment", "Invoice" and "Notary Presentment" were sent via United States Mail to the numerous individuals listed in the Notary Presentment.

On November 10, 2009, Defendants filed with the Town of Ulster Justice Court Clerk and the Ulster County Clerk and mailed a bogus "Notice of Final Determination and Judgment in Nihil Dicit" (hereinafter "Judgment"), signed by Ulloa, falsely purporting to be a final judgment in the amount of $176,000,000, and indicating that it was a "self executing power of attorney to file liens and encumbrances against any and all property" owned by Kesick.

 **\*4** On January 7, 2010, New York Acting Supreme Court Justice Kimberly A. O'Conner issued a Decision and Order dismissing the action against Kesick based upon lack of personal jurisdiction. Despite the fact the action against Kesick had been dismissed, on February 12, 2010, Defendants mailed UCC–1 Financing Statement No.: 201002120082030 and a "Notice of Claim of Maritime Lien" to the New York State Department of State for purposes of filing those documents. In the UCC–1 filing, Ulloa falsely claimed an interest in virtually all of Kesick's personal and real property to satisfy an alleged lien in the sum of $5,280,000,000.00 (or $176,000,000.00 in silver).

The New York State Department of State records reflect that Ulloa has filed no less than 35 similar liens and UCC–1 Financing Statements in New York as against various government entities, public servants, judges, banks, law firms and private individuals on nearly identical fraudulent grounds. Moreover, Ulloa filed dozens of similarly false liens and UCC–1 financing statements against other government entities, public servants, judges, banks, law firms and private individuals in the State of Washington. Although Kesick has thus far been unable to locate or discover additional liens filed against her in other states, she believes that, given Ulloa's pattern of harassment and fraudulent filings as against others (including actions for which he has been convicted of multiple felonies), Ulloa has filed (or will file in the future) similar liens and financing statements against her personal and real property.

There never has been any contract or agreement between Kesick and Ulloa that would give rise to any lien or security interest in any of Kesick's real or personal property in favor of Ulloa. In fact, Kesick did not know who Ulloa was until he was brought before her Court on the misdemeanor Vehicle and Traffic Law charge. There is no truth to the statements contained in the documents filed by Defendants in the New York State Courts and Office of the Secretary of State which purportedly perfect a security interest in Kesick's real and personal property.

Defendants have also caused false information regarding Kesick's creditworthiness to be filed in the permanent records of the State of New York, and these cannot be erased. Further, Ulloa has demonstrated his willingness to initiate lawsuits against Kesick without any basis in law or fact, in an attempt to maliciously harass, intimidate and extort money or other benefits from her and other government employees. Plaintiff asserts that Ulloa's frivolous lawsuits and proceedings have already caused immeasurable harm to her name, reputation and mental health.

Kesick was also called as a victim/witness by the Ulster County District Attorney to give testimony to a grand jury that indicted Ulloa on state criminal charges. As a direct result of giving this testimony, Kesick has fears about what Ulloa and/or his associates may do to her or her family. Kesick points to a "summons" (a copy of which was filed in Ulloa's federal criminal case) showing that a dozen people convened a "de jure" court in Ulster County calling for their "County Rangers" to arrest Kesick and seize her assets to cover a purported $176,000,000 debt. *See United States v. Ulloa,* Case No. 1:10–cr–00321 (N.D.N.Y.), dkt. # 62. Kesick viewed this summons as a threat. The Ulster Police Department issued a security bulletin concerning Ulloa and published it to all Town Court and Town Hall employees warning of the "credible concern" to Kesick's safety posed by Defendants and their conspirators. Due to security concerns caused by Defendants, bullet proof glass was installed inside the Ulster Town Hall building and security has otherwise been tightened in the Town Hall, Town Court courtroom and the Court Clerk's Office.

 **\*5** Kesick was partially successful in an action in New York State Supreme Court against Ulloa. On February 9, 2011, New York State Acting Supreme Court Justice Melkonian, recognizing the "obvious frivolity" of Ulloa's filings against Kesick, issued an injunction prohibiting Ulloa from filing any further *pro se* actions or proceedings against Kesick without prior court approval. That injunction is only valid with regard to New York State courts, and does not extend to the federal system.

On December 30, 2010, after a three day jury trial, Ulloa was found guilty of all seven counts of a Superseding Indictment that charged him with Mail Fraud, in violation of 18 U.S.C. §§ 1341, 1349 and 2. The conduct in that case is the same fraudulent actions complained of herein and which included conduct directed at numerous victim, including Kesick. *See United States v. Ulloa,* Case No. 1:10–cr–00321, dkt. # 103, Trial Tr. at 26–27. On December 14, 2011, Defendant Ulloa was sentenced to 60 months imprisonment by this Court.

Plaintiff commenced this action asserting RICO claims pursuant to 18 U.S.C. § 1964(c) (First, Second, and Third Claims), state common law abuse of process (Fourth Claim), and state common law prima facie tort (Fifth Claim). On this motion, Kesick seeks a judgment in her favor on the First, Second and Third Claims; an inquest on the amount of damages that should be awarded; [2] and an Order that:

[2]   Plaintiff seeks an award of treble compensatory damages, punitive damages, costs, and attorneys' fees.

(1) Defendant Ulloa be enjoined and restrained from filing or participating, directly or indirectly, in any future lawsuits in the Federal courts, pro se, as against Justice Kesick, her family or her property without first obtaining approval of a Judge of this Court;

(2) Defendants be enjoined and restrained from associating with the Tri–Republic Assembly, or any of its members, for any commercial purpose;

(3) Defendants be prohibited from filing any liens or other purported interest in Justice Kesick's personal or real property; and

(4) Defendants be directed to refrain from any contact with Justice Kesick or members of her family and to remain no less than 1000 feet from her or any members of her family, their places of work and property.

Pl. MOL p. 9.

## IV. DISCUSSION

### a. Doe Defendant

The John Doe defendant has not been identified or served with process. The time to do so has expired. Consequently, all claims against John Doe are dismissed for failure to prosecute.

### b. Summary Judgment on RICO Claims

To establish a RICO claim, a plaintiff must show: "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of § 1962." *De Falco v. Bernas,* 244 F.3d 286, 305 (2d Cir.2001); *see also* 18 U.S.C. § 1964(c) (to have a remedy under RICO, a plaintiff must be "injured in his business or property by reason of a violation of section 1962"). To prevail on a claim under § 1962(c), a plaintiff must demonstrate: (1) that the defendant is a person who (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly ... participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *see also DeFalco,* 244 F.3d at 306 (A civil RICO violation consists of the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.") (citing *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). The Court will address these elements seriatim.

### 1. The Defendants are persons covered by RICO.

**\*6** A "person" for RICO purposes "includes any individual capable of holding a legal or beneficial interest in property". 18 U.S.C. § 1961(3). Defendants, both citizens and residents of New York and the United States, are individuals capable of owning property.

### 2. The Defendants committed two or more acts constituting a pattern of racketeering activity.

In order to recover under RICO, Plaintiff must also establish that the defendants committed two or more acts constituting a "pattern of racketeering activity". 18 U.S.C. § 1962(5). A pattern of racketeering activity requires "at least two acts of racketeering activity" occurring within ten years of each other. 18 U.S.C. § 1961(5). RICO defines "racketeering activity" as "any act or threat" involving a number of crimes and offenses, including mail fraud. 18 U.S.C. § 1961(1). "To establish a pattern, a plaintiff must [ ] make a showing that the predicate acts of racketeering activity by a defendant are 'related, and that they amount to or pose a threat of continued criminal activity.' " *DeFalco v. Bernas,* 244 F.3d 286, 321 (2d Cir.2001) (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)); *see United States v. Indelicato,* 865 F.2d 1370, 1382 (2d Cir.1989). A plaintiff can establish that acts are related by proof of temporal proximity, common goals, similarity of

methods, or repetition. There must also be some relationship between the acts and the alleged enterprise. *Indelicato,* 865 F.2d at 1384.

"The ... so-called 'continuity' requirement can be satisfied either by showing a 'closed-ended' pattern—a series of related predicate acts extending over a substantial period of time—or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Spool v. World Child Intern. Adoption Agency,* 520 F.3d 178, 183 (2d Cir.2008) (citations omitted). To satisfy closed-ended continuity, Plaintiff must generally demonstrate that the RICO predicate activity occurred over a period of two or more years. *See id.* at 184 ("Since the Supreme Court decided *H.J. Inc.,* we have never held a period of less than two years to constitute a 'substantial period of time.') (citations omitted); *see also id.* ("Although we have not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity, particularly where, as here, ... the activities alleged involved only a handful of participants and do not involve a complex, multi-faceted conspiracy.") (internal quotation marks and citations omitted). "To satisfy open-ended continuity, the plaintiff ... must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 243 (2d Cir.1999). This threat is generally presumed when the enterprise's business is primarily or inherently unlawful. *Id.* at 242–43.

**\*7** As indicated above, Defendant Ulloa was convicted by a jury of multiple counts of mail fraud for the conduct underlying this action. Moreover, Plaintiff has demonstrated that Defendants used the U.S. mail to further their scheme against her on at least nine separate occasions over a period of approximately a year and a half. [3] In this regard, Defendants utilized the United States mails in conjunction with their filing of frivolous lawsuits and "criminal complaints," fake court orders, bogus liens, as well as threatening and dunning collection demands seeking sums ranging from $8 Million to over $5.8 Billion dollars against Kesick and numerous other victims. Defendants' acts are related inasmuch as they share a common purpose to defraud others and to serve as a weapon of retribution, both of which are directly related to the purpose of the enterprise which was to defraud others and seek retribution against individuals and entities that Defendants felt had displeased them. The enterprise did not

engage in a legitimate business, and Plaintiff has presented proof of Ulloa's intent to continue such unlawful activity against Kesick and other Ulster County officials.

[3]    These mailings are:

1) Defendants sent, by registered United States Mail, the "Order" and "Criminal Complaint" to Eric Dinallo, Superintendent of the New York State Insurance Commissioner's Office. (*See* Kesick Dec., Exhibit "E" and "F").

2) On July 28, 2009, Defendants filed with the Town of Ulster Justice Court Clerk and mailed an "Affidavit of Negative Averment, Opportunity to Cure, and Counterclaim" ("Negative Averment"), (*See* Kesick Dec., Exhibit "L").

3) On August 24, 2009, Defendants filed with the Town of Ulster Justice Court and mailed a "Demand for Payment", "Invoice" and "Affidavit of Notary Presentment" (hereinafter "Notary Presentment") falsely claiming Justice Kesick owed Uolla the sum of One Hundred Seventy Six Million and 00/100 Dollars ($176,000,000.00). (*See* Kesick Dec., Exhibit "M").

4) On September 20, 2009, Defendants filed with the Town of Ulster Justice Court Clerk and mailed a "Second Demand for Payment", "Invoice" and "Notary Presentment" again falsely claiming Justice Kesick owed Ulloa the sum of One Hundred Seventy Six Million and 00/100 Dollars ($176,000,000.00). (*See* Kesick Dec., Exhibit "N").

5) On October 23, 2009, Defendants filed with the Town of Ulster Justice Court Clerk a "Final Demand for Payment", "Invoice" and "Notary Presentment", again reasserting the false claim that Justice Kesick owed Ulloa the sum of One Hundred Seventy Six Million and 00/100 Dollars ($176,000,000.00). (*See* Kesick Dec., Exhibit "O").

6) On November 10, 2009, Defendants mailed and filed with the Town of Ulster Justice Court Clerk and the Ulster County Clerk a bogus "Notice of Final Determination and Judgment in Nihil Dicit" (hereinafter "Judgment"), signed by Defendant, falsely purporting to be a final judgment in the amount of $176,000,000, and indicating that it was a "self executing power of attorney to file liens and encumbrances against any and all property" owned by Justice Kesick. (*See* Kesick Dec., Exhibit "P").

7) On February 12, 2010, Defendants mailed and filed UCC–1 Financing Statement No.: 201002120082030 and a "Notice of Claim of Maritime Lien" (together with copies of Exhibits L–O) with the New York State Department of State. (*See* Kesick Dec., Exhibit "R").

Kesick v. Ulloa, Not Reported in F.Supp.2d (2012)
Case 6:19-cv-01412-GTS-TWD    Document 10    Filed 01/14/20    Page 64 of 91
2012 WL 2873364, RICO Bus.Disp.Guide 12,252

8) Defendant Ulloa filed dozens of similarly false liens and UCC–1 financing statements against other government entities, public servants, judges, banks, law firms and private individuals in the State of Washington, acts for which he was ultimately convicted and sentenced to 60 months in prison by this Court. (*See* Kesick Dec ., Exhibit "T").

9) On November 22, 2010, Defendant Ulloa filed a "summons" in his Federal criminal case showing a dozen other people convened a "de jure" court in Ulster County calling for their "county Rangers" to arrest Justice Kesick and seize her assets to cover a purported $176,000,000 debt. (*See* Case No. 1:10–cr–00321, dkt # 62).

Plaintiff's proof establishes that Defendants engaged in a pattern of racketeering activity through acts of mail fraud that are temporally proximate to each other, evince a common goal, are similar in their methods, are repetitive, and which constitutes a threat of continuing criminal activity beyond the period during which the predicate acts were performed. Defendants' racketeering activity consisted of a series of related predicate acts that are committed over a substantial period of time, and satisfies the "pattern of racketeering activity" element of the Act under the open-ended continuity theory.

### 3. Defendants were participants in a RICO enterprise the activities of which affected interstate commerce.

Plaintiff must also establish that Defendants were participants in a RICO enterprise the activities of which affected interstate commerce. An enterprise for RICO purposes includes "any union or group of individuals associated in fact." 18 U.S.C. § 1961(4); *Pahmer v. Greenberg,* 926 F.Supp. 287, 300 (E.D.N.Y.1996) *aff'd sub nom. Shapiro v. Cantor,* 123 F.3d 717 (2d Cir.1997). "For an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 174 (2d Cir.2004) (citation and internal quotation marks omitted). The enterprise, however, must be distinct from the pattern of activity in which it engages. *Kottler v. Deutsche Bank AG,* 607 F.Supp.2d 447, 458 (S.D.N.Y.2009). The enterprise must also have a "longevity sufficient to permit these associates to pursue the enterprise's purpose," *Boyle v. United States,* 556 U.S. 938, 129 S.Ct. 2237, 2243–44, 173 L.Ed.2d 1265 (2009), and the enterprise's purpose must affect interstate commerce.

**\*8** Plaintiff has established that Defendants were participants in the "TriRepublic Assembly," which is a

group of persons subscribing to the "sovereign citizen" movement. *See United States v. Ulloa,* Case No. 1:10–CR–00321, dkt # 103, Trial Tr. at 61–62. The Tri–Republic Assembly is comprised of individuals from the states of New York, New Jersey and Vermont. *Id.* at 61. Defendant Ulloa personally appeared before a "de jure" court of this group in Ulster County which called for their "county Rangers" to arrest Kesick and/or seize her assets to cover a purported $176,000,000 debt. *Id.; see also United States v. Ulloa,* Case No. 1:10–CR–00321, dkt # 62 (a "summons" from the "Assembly" purporting to order certain individuals, including Plaintiff, to appear before the "Judicial Department of the Assembly"); Kesick Dec. at ¶ 45.

Defendants, acting in concert with each other and purportedly with members of the Tri–Republic Assembly, mailed to Kesick and others, and filed with the New York State Supreme Court, "Demands", "Orders", "Writs" and "Criminal Complaints" falsely claiming to be owed $176,000,000 from Plaintiff. *See* Kesick Dec. at ¶¶ 9–14, Ex. E, F, G and H; *United States v. Ulloa,* Case No. 1:10–CR–00321, dkt 103, Trial Tr. at 103–115. This enterprise consisted of a number of individuals acting in concert, and the enterprise itself was distinct from the pattern of mail fraud activity in which it engaged. Further, the enterprise existed for a sufficient period of time to pursue its purpose of, *inter alia,* defrauding and inflicting retribution upon multiple individuals and entities as demonstrated by Ulloa's conduct in his criminal trial and in the instant case. These facts satisfy the enterprise requirement of a RICO claim.

Finally, the mail fraud predicate crimes satisfy the interstate commerce element for civil RICO claims. *See Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983); *see also DeFalco,* 244 F.3d at 309; *Tavakoli–Azar v. Crescent Mgmt. Inc.,* 1999 WL 1052016 (S.D.N.Y.1999); *Khaimi v. Schonberger,* 664 F.Supp. 54, 60 (E.D.N.Y.), aff'd, 838 F.2d 1203 (2d Cir.1987). Based on the foregoing, Plaintiff has established that Defendants directly or indirectly participated in an enterprise the activities of which affected interstate commerce thereby satisfying prongs 5–7 of the of the RICO test

### 4. RICO injury and Causation

A RICO plaintiff "can only recover to the extent that ... [s]he has been injured in h[er] business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985). Thus, Plaintiff must show injury to "business or property," and demonstrate that such injury was

"by reason of" the substantive RICO violation under both factual and proximate causation. *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 120 (2d Cir.) (quoting 18 U.S.C. § 1964(c)), *cert. denied,* 540 U.S. 1012, 124 S.Ct. 532, 157 L.Ed.2d 424 (2003); *see Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 457, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006); *Holmes v. Sec. Inv. Protection Corp.,* 503 U.S. 258, 259, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Breslin Realty Dev. Corp. v. Schackner,* 457 F Supp 2d 132, 136–37 (E.D.N.Y.2006).

**\*9** Proximate cause, in this context, refers not to the foreseeability of harm to a plaintiff, but instead to the directness of the relationship between the purported enterprise's alleged criminal acts and the plaintiff's injuries. *McBrearty v. Vanguard Group, Inc.,* 353 Fed. Appx. 640, 641–42 & n. 1 (2d Cir.2009). Acts that merely "furthered, facilitated, permitted or concealed an injury which happened or could have happened independently of the act" do not directly cause that injury, and thus do not proximately cause it. *DeSilva v. North Shore–Long Island Jewish Health Sys., Inc.,* 770 F.Supp.2d 497, 524 (E.D.N.Y.2011) (quoting *Red Ball Interior Demolition Corp. v. Palmadessa,* 874 F.Supp. 576, 587 (S.D.N.Y.1995)).

*Picard v. Kohn,* —— F.Supp.2d ——, 2012 WL 566298, at \*3 (S.D.N.Y. Feb.12, 2012).

Defendants' actions plainly caused Kesick to incur legal expenses in defending against the bogus lawsuits and fraudulent liens. In this regard, Kesick has established a RICO injury proximately caused by the racketeering activity. *See Sykes v. Mel Harris and Associates, LLC,* 757 F.Supp.2d 413, 427–28 (S.D.N.Y.2010).[4]

[4] (Finding a RICO injury sufficient to confer standing where "defendants' pursuit of default judgments and attempts to enforce them against plaintiffs proximately caused [plaintiffs] injuries, ... which include the freezing of personal bank accounts and incurring of legal costs to challenge those default judgm ents.") (citing *Baisch v. Gallina,* 346 F.3d 366, 373–74 (2d Cir.2003)).

While the existence of the false liens surely damaged Kesick's creditworthiness rating which, in turn, could have caused damage to her business or property interests, Plaintiff has not presented evidence of actual damage in this regard. Without this evidence, summary judgment cannot be granted on the portion of Plaintiff's claims seeking to recover for the damages arising from the negative impact on her credit

rating. *See Elsevier Inc. v. W.H.P.R., Inc.,* 692 F.Supp.2d 297, 310 (S.D.N.Y.2010) (A plaintiff can adequately plead RICO damages by alleging lost profits where they constitute an injury to plaintiff's business, were proximately caused by the alleged racketeering, and are not merely speculative.); *cf. McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215, 228–29 (2d Cir.2008) (reasoning that a RICO plaintiff cannot recover benefit of the bargain or "expectancy" damages in "fraud in the inducement" cases because RICO "compensates only for injury to 'business or property,' " not for injury to an expectation interest that would not have existed absent the alleged RICO violation) (*quoting* 18 U.S.C. § 1964(c)).

Further, although Kesick avers that Defendants' racketeering activities caused her mental strain and distress arising from her fear of Defendants and their co-conspirators in the TriRepublic Assembly, "RICO provides recovery for injury to business and property; it does not provide recovery for physical and emotional injuries." *Williams v. Dow Chemical Co.,* 255 F.Supp.2d 219, 225 (S.D.N.Y.2003) (citing cases). Thus, RICO damages are not available for this portion of her claims.

Based on the foregoing, summary judgment is granted on Plaintiff's First, Second and Third Claims to the extent she seeks to recover for legal expenses in defending against the bogus lawsuits and fraudulent liens, and the expenses incurred in this regard will be tripled. The motion is denied as to other sought after damages. Kesick is directed to submit proof of her expenses incurred in defending against Defendants' racketeering activities, and Defendants will then have the opportunity to submit opposition. The Court will then determine whether a genuine question of material fact exists as to the expenses incurred such to require a trial on this issue.

### 5. Injunctive Relief

**\*10** As indicated above, Plaintiff seeks various forms of injunctive relief. Section 1964(a) authorizes the district courts to:

> prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ... imposing reasonable restrictions on the future activities ... of any person, including, but not

Kesick v. Ulster Not Reported in F.Supp.2d (2012)
Case 6:19-cv-01412-GTS-TWD    Document 10    Filed 01/14/20    Page 66 of 91
2012 WL 2873364, RICO Bus.Disp.Guide 12,252

limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce ....

18 U.S.C. § 1964(a).

"The Court thus has the power under RICO to enter reasonable injunctions against RICO violators restricting their future business activities. Congress intended the courts to grant injunctive relief to prevent RICO violators from returning to a particular type of organization or certain lines of business 'to corrupt anew.' " *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 683 F.Supp. 1411, 1441 (E.D.N.Y.1988), *aff'd,* 879 F.2d 20 (2d Cir.1989) (quoting 116 Cong. Rec. 592 (1970) (remarks of Sen. McClellan); 115 Cong.Rec. 9568 (1969) (remarks of Sen. McClellan); Senate Report at 82).

Due to the nature of the RICO violations established here, the Court will permanently enjoin and retrain Defendants from:

(1) filing or participating, directly or indirectly, in any future lawsuits in the Federal Courts as against Plaintiff Susan Kesick, her family or her property without first obtaining approval of a Judge of this Court; and

(2) from filing any liens or other purported interest on Plaintiff Susan Kesick's personal or real property.

Plaintiff has not, however, established entitlement under § 1964(a) to the injunctive relief she seeks which would prohibit Defendants from associating with the Tri–Republic Assembly, or any of its members, for any commercial purpose; or that would grant Plaintiff and members of her family orders of protection. This relief appears beyond the authority granted by § 1964(a) in that it does not prevent Defendants from returning to the particular type of organization that formed the basis of the RICO violations.

### c. Default Judgment

Plaintiff also seeks default judgment against Defendants on the non-RICO claims pursuant to Rule 37(b) and (c). Rule 37(b) provides that when a party fails to comply with a discovery order, a court may impose sanctions, including "striking pleadings in whole or in part" and "rendering a default judgment against the disobedient party." Fed.R.Civ.P.

37(b)(2)(A)(iii), (vi). Rule 37(c)(1) (C) provides that, when a party fails to provide Rule 26 disclosures, the Court may, *inter alia,* "impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)."

Rule 37 sanctions maybe imposed in the discretion of the court. *S. New England Tel. Co. v. Global NAPs Inc.,* 624 F.3d 123, 143 (2d Cir.2010). However, the Second Circuit has "consistently recognized that Rule 37 sanctions are applicable in 'extreme circumstances,' where 'a party fails to comply with the court's discovery orders willfully, in bad faith, or through fault.' " *Robertson v. Dowbenko,* 443 Fed. Appx. 659, 660 (2d Cir.2011) (quoting *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.,* 845 F.2d 1172, 1176 (2d Cir.1988) (internal quotation marks omitted)); *see also Bobal v. Rensselaer Polytechnic Inst.,* 916 F.2d 759, 764 (2d Cir.1990).

**\*11** In "evaluating a district court's exercise of discretion" to impose Rule 37 sanctions, we have relied upon factors including: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of ... noncompliance." *Agiwal v. Mid Island Mortg. Corp.,* 555 F.3d 298, 302 (2d Cir.2009) (internal quotation marks omitted). Rule 37 sanctions, including the most severe, "may be imposed ... against a plaintiff who is proceeding pro se, so long as a warning has been given that noncompliance can result" in a sanction. *Valentine v. Museum of Modern Art,* 29 F.3d 47, 50 (2d Cir.1994) (affirming dismissal sanction after a pro se plaintiff failed to appear for his deposition); *see also Bobal,* 916 F.2d at 764 (explaining that, before the district court dismissed a case as a Rule 37 sanction, the district court should have informed pro se litigant that violation of a court order would result in such a dismissal).

*Robertson,* 443 Fed. Appx. at 660–61.

Plaintiff asserts that Defendants failed to provide any discovery despite that the magistrate judge "carefully explained to the Defendants their duties to supply ... their Rule 26(a) disclosures at the Rule 16 conference," and despite that Defendants acknowledged receiving Plaintiff's Interrogatories and Document Requests. *See* Pl. MOL, p. 11. Nevertheless, Plaintiffs have failed to establish that Defendants failed to comply with a discovery order. Even assuming that the magistrate judge's explanation of the dictates of Rule 26(a) could be considered a discovery order,

Kesick v. Ulloa, Not Reported in F.Supp.2d (2012)
Case 6:19-cv-01412-GTS-TWD   Document 10   Filed 01/14/20   Page 67 of 91
2012 WL 2873364, RICO Bus.Disp.Guide 12,252

Plaintiff has failed to establish that Defendants were warned of the sanction of a default judgment being taken against them if they did not respond. Moreover, there is no indication that Plaintiff sought to enforce its discovery rights by seeking a compliance order. Under these circumstances, the Court does not find that this case constitutes an extreme circumstance where a default is required. However, and to move this case to finality, Plaintiff is granted leave to file, within sixty (60) days, a second summary judgment motion addressed to the state common law claims. [5]

[5]       The instant motion neither addresses the merits of these claims, nor does it put Defendants on notice that a substantive determination would be sought on such claims.

## V. CONCLUSION

For the reasons discussed above, Plaintiff's motion for summary judgment [dkt. # 13] is **granted in part and denied in part.**

The motion is granted on Plaintiff's behalf and against Defendants Richard Enrique Ulloa and Luis Wilfredo Rivera as to liability on the First, Second, and Third Claims to the extent Plaintiff seeks to recover treble damages arising from the legal costs and expenses incurred defending against the bogus lawsuits and fraudulent liens by Defendants Ulloa and Rivera. The motion is denied as to other sought after damages. Kesick is directed to submit proof within sixty (60) days of her expenses incurred in the defending against Defendants' racketeering activities, and Defendants will then have an additional sixty (60) days to submit opposition, if any, to the sought after damages. The Court will then determine whether

a genuine question of material fact exists as to the expenses incurred such to require a trial on any such issues.

 **\*12**  Due to the nature of the RICO violations established here, Defendants Richard Enrique Ulloa and Luis Wilfredo Rivera are **permanently enjoined and retrained from:**

(1) filing or participating, directly or indirectly, in any future lawsuits in the Federal Courts against Plaintiff Susan Kesick, her family, or her property without first obtaining approval of a Judge of this Court; and

(2) filing any liens or other purported interest on Plaintiff Susan Kesick's personal or real property.

The motion for other forms of injunctive relief is **denied.**

The motion for a default judgment on the state common law claims is **denied.** Plaintiff is granted leave to file, within sixty (60) days of the date of this Decision and Order, a second summary judgment motion on the state common law claims. [6]

[6]       The instant motion does not address the merits of these claims, nor does it put Defendants on notice that a substantive determination would be sought on such claims.

All claims against John Doe are dismissed without prejudice.

### IT IS SO ORDERED

### All Citations

Not Reported in F.Supp.2d, 2012 WL 2873364, RICO Bus.Disp.Guide 12,252

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4458956
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jon D. GRUBER, individually and on behalf
of all others similarly situated, Plaintiffs,
v.
Ryan R. GILBERTSON, et al., Defendants.

16cv9727
|
Signed 09/17/2019

**Attorneys and Law Firms**

Phillip C. Kim, The Rosen Law Firm P.A., New York, NY, for
Plaintiff Steven Deardeuff.

Louis Andrew Kessler, Pamela A. Markert, Solomon B.
Cera, Cera LLP, San Francisco, CA, Jeffrey Simon Abraham,
Abraham Fruchter & Twersky LLP, New York, NY, for
Plaintiff Jon D. & Linda W. Gruber Trust.

Karl Jon Breyer, Pro Hac Vice, Kutak Rock LLP,
Minneapolis, MN, Marjorie Joan Peerce, Ballard Spahr LLP,
New York, NY, for Defendants Craig M. McKenzie, Terry H.
Rust, Paul M. Cownie, David J. Fellon, Gary L. Alvord, James
L. Thornton.

Carrie Baker Anderson, Allen & Overy, LLP, Oksana Gaussy
Wright, Fox Rothschild, LLP, New York, NY, Ranelle A.
Leier, Fox Rothschild LLP, Minneapolis, MN, for Defendant
Timothy R. Brady.

Victoria Peng, Morgan Lewis & Bockius, LLP, New York,
NY, Jane E. Dudzinski, Kenneth Michael Kliebard, Morgan,
Lewis & Bockius LLP, Chicago, IL, for Defendant Gabriel G.
Claypool.

David Anthony Scheffel, Dorsey & Whitney LLP, New York,
NY, Caitlin L. D. Hull, James K. Langdon, Michael E. Rowe,
III, Dorsey & Whitney LLP, Minneapolis, MN, for Defendant
Michael L. Reger.

Amy S. Conners, John A. Sullivan, Best & Flanagan LLP,
Minneapolis, MN, for Defendant Ryan R. Gilbertson.

OPINION & ORDER

WILLIAM H. PAULEY III, Senior United States District
Judge:

**\*1** By Opinion & Order dated March 20, 2018 (the
"Opinion & Order"), this Court granted in part and denied
in part Defendants' motion to dismiss the Second Amended
Complaint. See Gruber v. Gilbertson, 2018 WL 1418188
(S.D.N.Y. Mar. 20, 2018). Specifically, this Court dismissed
the § 20A claim against Ryan Gilbertson ("Gilbertson")
for failure to properly allege contemporaneousness between
Gilbertson and Gruber's trades, but it denied the motion with
respect to Gruber's § 10(b), Rule 10b-5, and § 20(a) claims.
Thereafter, the parties engaged in discovery, culminating in
a Third Amended Class Action Complaint (the "Complaint")
which asserts several new claims. (Third Am. Class Action
Compl., ECF No. 175 ("TAC").) First, it asserts new § 20A
claims against Michael Reger ("Reger"), as well as family
members of Gilbertson and Reger—namely, Defendants
Jessica Gilbertson, Weldon Gilbertson, James Randall Reger,
Joseph Reger, and Kellie Tasto (collectively, the "Nominee
Defendants"). Second, it reasserts a § 20A claim against
Gilbertson and adds a Racketeer Influenced and Corrupt Organizations Act
("RICO") claim against Gilbertson. Third, it asserts a § 20A
claim against Reger.

The Nominee Defendants, Gilbertson, and Reger move to
dismiss these new claims. (ECF Nos. 189, 191, 194, and 206.)
In addition, Reger moves to strike certain portions of the
Complaint. (ECF No. 194.) For the following reasons, the
Nominee Defendants' motion is granted, Gilbertson's motion
is granted in part and denied in part, Reger's motion to dismiss
is denied, and Reger's motion to strike is granted in part and
denied in part.

BACKGROUND

This Court assumes familiarity with the facts of this
case and addresses only those necessary to decide this
motion. See generally Gruber, 2018 WL 1418188 at *1–
6. Relevant to this motion, Gruber alleges that, in an
attempt to hide their beneficial ownership of Dakota
Plains, Gilbertson and Reger set up "nominee accounts"
in the Nominee Defendants' names. Gilbertson and Reger
purportedly directed transactions from and made insider sales
to plaintiffs through these nominee accounts.

Although Gruber argues on this motion that the Nominee
Defendants knowingly allowed Reger and Gilbertson to

hide their beneficial ownership from investors through the nominee accounts, the Complaint is replete with allegations that Gilbertson and Reger had complete control over the nominee accounts and that the Nominee Defendants were not involved with any account activity or trading. (See, e.g., TAC ¶ 11 ("Gilbertson and Reger hid their beneficial ownership and control of the Company from the inception by spreading their holdings across a number of nominee accounts they exclusively controlled." (emphasis added)).) For instance, Gruber alleges that Gilbertson or Reger traded from each nominee account, and no allegations indicate that a Nominee Defendant made a trade or received any proceeds from trades. (See TAC ¶¶ 58–60, 62, 67, 70, 79, 86.) Indeed, Gruber alleges that, "[b]y virtue of their control over Dakota Plains, Gilbertson, Reger, and by extension the Gilbertson Nominees and the Reger Nominees, were in possession of material, non-public information about Dakota Plains at the time of their selling Dakota Plains stock, and profited by $30 million liquidating Dakota Plains stock during the class period." (TAC ¶ 269 (emphasis added).) But Gruber fails to allege why or how this "extension" should be assumed.

 **\*2**  With respect to the RICO claim, Gruber avers that Gilbertson helmed an enterprise created "to enrich the members of the enterprise and/or their immediate families using Dakota Plains cash and/or its common stock." (TAC ¶ 276.) While Gruber claims the enterprise operated from 2008 through 2015, his RICO allegations are hazy and lacking in specificity. In particular, Gruber does little to detail the purported racketeering activity. Rather, Gruber makes broad legal conclusions, leaving it to this Court to scour his sprawling 158-page Complaint in search of a RICO claim.

## DISCUSSION

### I. Standard
On a motion to dismiss, a court must accept the facts alleged as true and construe all reasonable inferences in plaintiff's favor. See ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009). Nevertheless, a complaint must "contain sufficient factual matter ... to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,'

but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.

### II. Section 20A Claims
As a threshold matter, claims brought under § 20A must comply with the heightened pleading standards of [Rule] 9(b) and the [Private Securities Litigation Reform Act ('PSLRA') ]. In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 487 (S.D.N.Y. 2011). Specifically, "since insider trading is a species of fraud, the facts comprising the fraud must be pleaded with particularity." SEC v. Conradt, 947 F. Supp. 2d 406, 407 (S.D.N.Y. 2013).

To establish such a claim, Gruber must "(1) plead a predicate insider trading violation of the Exchange Act, and (2) allege sufficient facts showing that the defendant traded the security at issue contemporaneously with the plaintiff." In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 309 (S.D.N.Y. 2008) (quotation marks and citations omitted); Gruber, 2018 WL 1418188, at \*17.

To satisfy the first element, Gruber must allege "unlawful trading in securities based on material non-public information." SEC v. Obus, 693 F.3d 276, 284 (2d Cir. 2012). This can be established in two ways. First, "[u]nder the [traditional or] classical theory of insider trading, a corporate insider is prohibited from trading shares of that corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders." Obus, 693 F.3d at 284. Gruber relies on the classical theory for his claims against Gilbertson and Reger, who do not contest that this element is established.

The "second theory, grounded in misappropriation, targets persons who are not corporate insiders but to whom material non-public information has been entrusted in confidence and who breach a fiduciary duty to the source of the information to gain personal profit in the securities market." Obus, 693 F.3d at 284. "A lynchpin of misappropriation liability therefore is the existence of a fiduciary duty or similar relationship of trust and confidence between the tipper and tippee." Conradt, 947 F. Supp. 2d at 410 (quotation marks omitted). Gruber relies on the misappropriation theory for his claims against the Nominee Defendants, specifically claiming they are liable as tippees.

To satisfy the second element of a § 20A claim, "a plaintiff must allege the dates on which a defendant sold

his stock to establish that the parties' trades occurred contemporaneously." Gruber, 2018 WL 1418188, at *18. In other words, "[t]here must be enough of a factual basis —even if it is on information and belief—from which this Court can infer that, based on the Second Circuit's non-restrictive definition of contemporaneousness, Gruber's trades coincided with [defendants'] sales." Gruber, 2018 WL 1418188, at *19. Typically, plaintiffs must allege that shares were bought and sold by plaintiffs and defendants "within a reasonable time period, usually limited to a few days, of each other." Take-Two, 551 F. Supp. 2d at 311 n.51.

### A. Nominee Defendants

**\*3** The Nominee Defendants advance three arguments they claim warrant dismissal. First, they argue that Gruber's failure to assert a § 10(b) claim against them is per se fatal to his § 20A claim. Specifically, they rely on Take-Two, in which a judge in this district explained that the fact that plaintiffs did not assert § 10(b) claims against defendants "cast substantial doubt upon the sufficiency of their predicate insider trading claim under Section 10(b) and Rule 10b–5." Take-Two, 551 F. Supp. 2d at 310. However, there is no case law expressly requiring the pleading of a § 10(b) claim to assert a § 20A claim. Rather, § 20A merely requires that an underlying violation of § 10(b) occurred. For instance, in a case in this district, a defendant argued that a § 20A claim against him was not viable because the underlying § 10(b) violation was time-barred. But the court held that § 20A requires only an underlying violation of the Exchange Act—it does not require the underlying violation to be "viable, actionable, or timely." Kaplan v. S.A.C. Capital Advisors, L.P., 40 F. Supp. 3d 332, 343 (S.D.N.Y. 2014) (quotation marks omitted). Therefore, a plaintiff may state a § 20A claim without pleading a § 10(b) claim, so long as there are factual allegations supporting a reasonable inference of a § 10(b) violation.

Second, the Nominee Defendants argue that Gruber fails to properly allege a predicate violation under the misappropriation theory. To do so, Gruber must allege that "(1) the tipper breached a duty by tipping confidential information; (2) the tippee knew or had reason to know that the tippee improperly obtained the information (i.e., that the information was obtained through the tipper's breach); and (3) the tippee, while in knowing possession of the material non-public information, used the information by trading or by tipping for his own benefit." Obus, 693 F.3d at 289. Thus, the Nominee Defendants must have had "material non-public information ... entrusted in confidence [to them]" and "breach[ed] a fiduciary duty to the source of the information

to gain personal profit in the securities market." Obus, 693 F.3d at 284; Salman v. United States, 137 S. Ct. 420, 423 (2016). "[A] jury can infer a personal benefit—and thus a breach of the tipper's duty—where the tipper receives something of value in exchange for the tip or makes a gift of confidential information to a trading relative or friend." Salman, 137 S. Ct. at 423 (quotation marks omitted).

Gruber's claims founder because he fails to account for the key consideration of tippee liability—namely, that the confidential information is given to "a trading" tippee. Salman, 137 S. Ct. at 423 (emphasis added). Gruber fails to allege that the Nominee Defendants traded on or tipped any inside information or that they received any of the proceeds from purported insider sales. (Cf. TAC ¶¶ 11, 58– 60, 62, 67, 70, 79, 86.) In fact, the Complaint is riddled with allegations that Gilbertson and Reger—not the Nominee Defendants—traded out of the nominee accounts. (See, e.g., TAC ¶ 79 ("Michael Reger sold ... stock from Randy Reger's account....").) This deficiency is especially problematic, given that Gruber must allege the Nominee Defendants traded with scienter. See Obus, 693 F.3d at 285 ("When an unlawful tip occurs, the tippee is also liable if he knows or should know that the information was received from one who breached a fiduciary duty (such as an insider or a misappropriator) and the tippee trades or tips for personal benefit with the requisite scienter.") He cannot do so where he fails to allege that they traded.

Moreover, Gruber does not allege that the Nominee Defendants knew "that the [inside] information was obtained through the tipper's breach." See Obus, 693 F.3d at 285. Specifically, the Complaint lacks any allegations that the Nominee Defendants knew Reger and Gilbertson were hiding their ownership or that they owned more than 5% of the Company. Further, he fails to allege that any Nominee Defendants knew that Gilbertson or Reger held accounts under the name of another Nominee Defendant, making it implausible that they knew Gilbertson and Reger owned more than 5% of the Company. Accordingly, the § 20A claims against the Nominee Defendants are dismissed.

### B. Reger

**\*4** Reger argues that because he disgorged $6.5 million of his Dakota Plains gains to the SEC "with respect to his role in the scheme underlying this action," (TAC ¶ 74), Gruber's § 20A claim against him must fail. However, he concedes that if the § 20A claims against his nominees are dismissed, his potential liability would exceed his disgorgement. (See Oral

Arg. Tr. at 32:24–33:10 ("We think the father and the [brother] should be out, which means Michael is in.").) Because the Nominee Defendant claims have been dismissed, Reger's motion to dismiss the § 20A claim is denied.

### C. Gilbertson

Finally, Gilbertson argues that the § 20A claim against him should be dismissed because of a lack of allegations regarding contemporaneousness. He argues that the three days on which Gruber and Gilbertson both traded are insufficient to satisfy the contemporaneousness requirement. He fails to cite any authority supporting his position that three days of trading are insufficient to state a claim. Gilbertson also argues that Gruber fails to allege that the timing and amount of Gilbertson's sales were unusual. However, this Court previously rejected that argument. See Gruber, 2018 WL 1418188, at *18 ("But this Court fails to see how the timing and size of stock sales—factors that are more relevant to the scienter inquiry—have any bearing on whether Gruber made his trades within a reasonable period of time of Gilbertson's own transactions." (quotation marks omitted)).

Ultimately, this Court finds that Gruber adequately pled that there were contemporaneous trades between Gilbertson and Gruber. (See Compl. ¶ 52) (alleging contemporaneous trades between Gilbertson and Gruber.) Accordingly, Gilbertson's motion to dismiss the § 20A claim against him is denied.

### III. RICO Claim

A major addition to the Complaint is the RICO claim against Gilbertson. Gruber claims that Gilbertson ran a RICO enterprise with Dakota Plains, Reger, various Dakota Plains officers and directors, and the Nominee Defendants. (TAC ¶ 276.) He avers that the purpose of the enterprise was "to enrich the members of the enterprise and/or their immediate families using Dakota Plains cash and/or its common stock" and that the members of the enterprise had "longstanding relationships." (TAC ¶ 276.) Gruber claims that the predicate acts of "wire and securities fraud began as early as 2008 and continued through the end of [Gilbertson's] insider stock sales in 2015." (TAC ¶ 278.)

He further claims that the pattern of racketeering activity began "when [Gilbertson] initiated the process of hiding his ownership and control of Dakota Plains by paying for the Dakota Plains founders' shares he put in the name of his father ... and by appointing his and Reger's fathers as their nominee officers and directors. This pattern of fraud activity

continued, aided by a large number of accomplices, through Gilbertson's many sales and transfers of his founders' shares to his nominee accounts." (TAC ¶ 46.) The fraud purportedly continued when Gilbertson and Reger caused the Company to enter into fraudulent consulting contracts. (TAC ¶ 47.) The pattern also allegedly included the stock manipulation scheme Gilbertson orchestrated during the first 20 days of public trading of Dakota Plains stock. (TAC ¶ 48.) In sum, the pattern of racketeering purportedly includes (1) the concealment of Gilbertson and Reger's ownership, (2) the execution of sham consulting contracts, (3) the issuance of an illegal dividend in 2011, and (4) the 20-day stock manipulation scheme. (See TAC ¶¶ 46–48, 121–22.)

Gilbertson argues that the RICO claim should be dismissed because (1) a civil RICO claim is impermissible where the underlying racketeering activity sounds in securities fraud and (2) Gruber fails to adequately allege a pattern of racketeering activity or the existence of an enterprise.

**\*5** As a threshold matter, "[c]ivil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device. Because the mere assertion of a RICO claim ... has an almost inevitable stigmatizing effect on those named as defendants, ... courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." Katzman v. Victoria's Secret Catalogue, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (quotation marks omitted) (ellipses in original). Accordingly, courts "express[ ] skepticism toward civil RICO claims," and "plaintiffs wielding RICO almost always miss the mark." Flexborrow LLC v. TD Auto Fin. LLC, 255 F. Supp. 3d 406, 414 (E.D.N.Y. 2017); see Gross v. Waywell, 628 F. Supp. 2d 475, 479–83 (S.D.N.Y. 2009) (surveying civil RICO cases and finding they overwhelmingly fail). Indeed, "[m]any courts have noted that the allure of treble damages, attorney's fees, and federal jurisdiction presents a powerful incentive for plaintiffs to attempt to fit 'garden variety fraud' claims within the standard of civil RICO." Rosenson v. Mordowitz, 2012 WL 3631308, at *4 (S.D.N.Y. Aug. 23, 2012); see Gross, 628 F. Supp. 2d at 479 (holding that "RICO's enchantment, like the siren's song, has again drawn another crew of spellbound plaintiffs foundering against the rocks").

### A. Criminal Conviction Exception

Civil RICO actions are generally not permissible when the predicate acts sound in securities fraud. See 18 U.S.C. § 1964(c) ("[N]o person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of

securities...."). But the securities fraud bar "does not apply to an action against any person that is criminally convicted in connection with the fraud." 18 U.S.C. § 1964(c). On June 26, 2018, Gilbertson was convicted of wire fraud, conspiracy to commit securities fraud, and securities fraud in the District of Minnesota for conduct related to this action. (Compl. ¶¶ 195–96.)

Gilbertson advances two arguments for why the criminal conviction exception does not apply. First, he argues that the criminal conviction exception requires the plaintiff bringing the civil suit to have been specifically named in the criminal action, and Gruber was not. Gruber counters that Gilbertson was convicted of defrauding the "investing public," which he claims includes Gruber and the putative class. Second, Gilbertson argues that he was convicted of committing securities fraud only over a 20-day period, so the exception—to the extent it applies at all—would be limited in scope to that 20-day period. As such, he argues that conduct limited to a 20-day period cannot satisfy RICO's substantive requirements. This Court addresses the first argument in this section and the second argument in its substantive discussion of the RICO claim.

The bar against securities fraud as a predicate act was added as part of the PSLRA. See Estate of Gottdiener v. Sater, 35 F. Supp. 3d 386, 393 (S.D.N.Y. 2014). Congress's intent for the securities fraud bar was "to prevent litigants from using artful pleading to boot-strap securities fraud cases into RICO cases, with their threat of treble damages." MLSMK Inv. Co. v. JP Morgan Chase & Co., 651 F.3d 268, 274 (2d Cir. 2011) (quotation marks omitted). Specifically, Congress feared that "[t]he treble damage blunderbuss of RICO [would] undermine[ ]" the efficient operation of America's capital markets, which are key to our economy's health. Krear v. Malek, 961 F. Supp. 1065, 1075 (E.D. Mich. 1997) (quoting 141 Cong. Rec. H2773); see Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC, 286 F. Supp. 3d 634, 643 (S.D.N.Y. 2017).

"Only a few courts have examined the scope of RICO's criminal conviction exception." Kaplan v. S.A.C. Capital Advisors, L.P., 104 F. Supp. 3d 384, 387 (S.D.N.Y. 2015). The case providing the most extensive analysis is Krear. There, a judge in the Eastern District of Michigan explained that Congress created the bar to correct the misapplication of RICO in the securities fraud context, specifically because it was wary of the susceptibility of civil RICO to abuses. See Krear, 961 F. Supp. at 1076. Accordingly, the court

held that it should "interpret the 'conviction exception' ... as narrowly as possible so that the exception is only available to those plaintiffs against whom a defendant has specifically been convicted of criminal fraud." Krear, 961 F. Supp. at 1076. Thus, it held that plaintiffs could not rely on the criminal conviction exception "[u]nless the plaintiffs are named victims of the scheme to defraud in the information [to which a defendant pled guilty]." Krear, 961 F. Supp. at 1077. "If th[e] court were to find otherwise, plaintiffs who were not found to have been criminally defrauded would be allowed to 'bootstrap' their RICO claims to the claims of those plaintiffs who were found to have been criminally defrauded. This would necessarily cause the 'conviction exception' to swallow the rule which prohibits civil RICO claims for securities fraud." Krear, 961 F. Supp. at 1076.

**\*6** Notably, the criminal information to which the defendant pled guilty in Krear stated that he committed "a scheme to defraud numerous individuals." Krear, 961 F. Supp. at 1077. However, the information also specifically named some defrauded individuals, without naming the plaintiffs bringing the civil RICO suit. Krear, 961 F. Supp. at 1077. In addition, the Krear court noted that although its result may be "seemingly inequitable," because the individuals a person is convicted of defrauding could be arbitrarily selected by a prosecutor, it "must presume that Congress was sufficiently familiar with the criminal prosecution process, including plea bargaining, so that it understood that a defendant who may have defrauded many plaintiffs could be convicted of defrauding only certain of those plaintiffs." Krear, 961 F. Supp. at 1077.

Courts in this district have echoed Krear. For instance, in Kaplan, the court followed Krear's reasoning and held that the criminal conviction exception is " 'only available to those plaintiffs against whom a defendant has specifically been convicted of criminal fraud.' " Kaplan, 104 F. Supp. 3d at 389 (quoting Krear, 961 F. Supp. at 1076). Thus, "RICO's criminal conviction exception is to be narrowly construed such that a defendant must have been criminally convicted of securities fraud encompassing the specific plaintiffs filing suit and the specific fraudulent conduct to which the defendant's conviction relates." Kaplan, 104 F. Supp. 3d at 391. And in Gottdiener, the court held that the criminal conviction exception did not apply because the investor plaintiffs were not specifically named in the charging instrument to which the defendant pled guilty. Indeed, "[t]o hold otherwise could mean that anyone who purchased the five stocks named in Defendants' Information[ ] during the relevant period for

each security ... could bring a substantive RICO claim." Gottdiener, 35 F. Supp. 3d at 395; see also Rogers v. Nacchio, 2006 WL 7997562, at *4 (S.D. Fla. June 6, 2006) (agreeing with the Krear analysis and holding that the exception did not apply where defendants were not convicted of specifically defrauding plaintiffs).

Gruber primarily attempts to distinguish these cases by pointing to the fact that the term "investing public" appears in Gilbertson's sentencing materials and the indictment. Simply put, he argues that because he was a Dakota Plains investor, he was specifically named. The only case that arguably supports this position is Brooks v. Field, 2015 U.S. Dist. LEXIS 33950, at *16–17 (D.S.C. Feb. 20, 2015) report and recommendation adopted by Brooks v. Field, 2015 WL 1292775 (D.S.C. Mar. 18, 2015). There, a magistrate judge in the District of South Carolina held that the criminal conviction exception could apply where an indictment discussed "losses to investors" and named several investors (but not plaintiff) as examples. Brooks, 2015 U.S. Dist. LEXIS 33950, at *16–17. In doing so, the court "decline[d] to read the criminal conviction exception language so narrowly as to require the indictment to name all 1,142 purported class members by name." Brooks, 2015 U.S. Dist. LEXIS 33950, at *17. However, the indictment in Brooks specifically stated that the named individuals were listed only as examples. Brooks, 2015 U.S. Dist. LEXIS 33950, at *17. Moreover, and as discussed above, the Krear line of cases—including cases from this district—suggests that courts should avoid allowing "anyone who purchased" shares "during the relevant period" to "bring a substantive RICO claim." Gottdiener, 35 F. Supp. 3d at 395. Interpreting the "investing public" as specifically naming all investors would fly in the face of these concerns.

In sum, the body of case law suggests that the criminal conviction exception should be interpreted narrowly, such that a plaintiff must be mentioned as a victim by name in the underlying criminal proceeding. Such an interpretation avoids weaponizing RICO to allow all purchasers of a security to bring claims for treble damages against a person convicted of securities fraud. Here, at best, Gilbertson was convicted of defrauding the investing public, not any specific person. Therefore, this Court finds that the criminal conviction exception is not triggered, and Gruber's RICO claim is dismissed. [1]

[1]    To the extent that Gilbertson was convicted of wire fraud, those charges still sound in securities fraud and fall within the bar against RICO claims based on securities

fraud. See 18 U.S.C. § 1964(c) (stating that a plaintiff cannot rely on "conduct that would have been actionable as fraud in the purchase or sale of securities").

**B.** Substantive RICO Claim

**\*7** Even if the criminal conviction exception applied, Gruber's Complaint is still deficient. "To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation...." DeFalco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001) (quotation marks omitted). Only the first element is disputed.

"To establish a violation [of the RICO statute,] ... a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." DeFalco, 244 F.3d at 306. Gilbertson argues that Gruber fails to adequately allege a pattern of racketeering activity and the existence of an enterprise. Because this Court finds that there is no pattern of racketeering activity, it need not reach the question of whether an enterprise existed.

"A 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." DeFalco, 244 F.3d at 306 (quotation marks and citations omitted). "To establish a pattern, a plaintiff must ... make a showing that the predicate acts of racketeering activity by a defendant are related, and that they amount to or pose a threat of continued criminal activity." Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999) (quotation marks omitted). "The continuity necessary to prove a pattern can be either 'closed-ended continuity,' or 'open-ended continuity.' " Cofacredit, 187 F.3d at 242. Gruber claims there was only "closed-ended continuity."

"[C]losed-ended continuity is primarily a temporal concept." Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Archway Ins. Servs. LLC, 2012 WL 1142285, at *4 (S.D.N.Y. Mar. 23, 2012). It is "past criminal conduct 'extending over a substantial period of time,' " compared to open-ended continuity, which is "past criminal conduct coupled with a threat of future criminal conduct." Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 487 (2d Cir. 2014). "To satisfy closed-ended continuity, the plaintiff must prove a series of related predicates extending over a substantial

period of time. Predicate acts extending over a few weeks or months ... do not satisfy this requirement. Since the Supreme Court decided H.J., Inc.[v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989)], this Court has never held a period of less than two years to constitute a substantial period of time." Cofacredit, 187 F.3d at 242 (quotation marks and citations omitted); accord Nat'l Union Fire Ins., 2012 WL 1142285, at *4. "While the two[-]year period is not a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity, particularly where ... the activities alleged involved only a handful of participants and do not involve a complex, multi-faceted conspiracy." Nat'l Union Fire Ins., 2012 WL 1142285, at *4. Moreover, "[t]he relevant period is the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place." Nat'l Union Fire Ins., 2012 WL 1142285, at *4. Nontemporal factors that play into the analysis are "the number and variety of predicate acts and the number of participants." Nat'l Union Fire Ins., 2012 WL 1142285, at *4 (quoting Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 184 (2d Cir. 2008)).

*8  The parties dispute whether Gilbertson was convicted of committing securities fraud over a 20-day period or over several years. That bears on how much of the alleged scheme falls within the criminal conviction exception and is actionable. Thus, this Court must determine the scope of Gilbertson's conviction. Gruber argues that this Court should rely on the indictment and sentencing materials, while Gilbertson argues that this Court should rely on the jury instructions given at trial. Neither party cites relevant case law supporting their positions. However, a judge in this district held that sentencing materials and the indictment are not to be used to determine the scope of a criminal conviction, albeit in the context of a guilty plea. See Kaplan, 104 F. Supp. 3d at 390–91. Specifically, the court explained that indictments merely contain allegations and that, at sentencing, courts are bound to a preponderance of the evidence standard —rather than beyond a reasonable doubt—and may weigh information outside of what is charged. Kaplan, 104 F. Supp. 3d at 390–91. Accordingly, this Court finds it appropriate to rely primarily on the jury instructions, given that those were the roadmap the jury followed to convict Gilbertson beyond a reasonable doubt. See Taylor v. United States, 496 U.S. 575, 603 (1990) (explaining that courts may look to the "statutory definition" of the crime convicted, "or the charging paper and jury instructions" to determine whether a conviction qualifies as a violent felony under the Armed Career Criminal Act).

Here, the jury instructions suggest that Gilbertson was convicted of securities fraud for his activities during the first 20 days of public trading (or, at most, from December 2011 to October 2013, which is still under two years). Counts 16 through 22 of the indictment charged conspiracy to commit securities fraud, and both covered only a brief period in early 2012. (See United States v. Gilbertson, Final Jury Instructions, No. 17-cr-66, ECF No. 214 ("Jury Instructions") at Instruction Nos. 20, 28 (D. Minn. June 22, 2018).) Moreover, the instructions stated: "The central allegation of the government in this case—the allegation to which all of the charges relate—is that Mr. Gilbertson, aided and abetted by Mr. Hoskins, schemed to manipulate the price of Dakota Plains stock during the first 20 days of public trading following the reverse merger." (Jury Instructions, Instruction No. 33 (emphasis added).) Moreover, even though the indictment alleged that a securities fraud scheme occurred between 2011 and April 2013, it specifically explained that the object of the conspiracy was to manipulate prices within the first 20 days of trading. (Gilbertson, No. 17-cr-66, Superseding Indictment, ECF No. 133 ("Superseding Indictment"), ¶¶ 31–32, 36 (D. Minn. Mar. 20, 2018).) And under the "overt acts" section of the indictment, the Government set forth events spanning only from December 2011 to April 2012. (Superseding Indictment, ¶¶ 34, 37.)

For Counts 1 through 15 of the indictment, the jury instructions stated that one of the elements for wire fraud was that Gilbertson "manipulated the price of shares of Dakota Plains stock during the first 20 days of trading following the reverse merger." (Jury Instructions, Instruction No. 16.) Moreover, the instructions set forth the wire communications in furtherance of the scheme, almost all of which occurred between March and May of 2012. And while the indictment alleges that a scheme occurred between 2008 and 2012, the instances of wire fraud spanned only from late March 2012 to October 2013, corresponding with the jury instructions. (Superseding Indictment, ¶ 29.) Because the convicted conduct spanned less than two years and related to one contained scheme at Dakota Plains, there is no closed-ended continuity and the RICO claim is dismissed.

## IV. Motion to Strike

Reger moves under Rule 12(f) to strike portions of four paragraphs in the Complaint which accuse him of fraudulent conduct at other companies as "immaterial, impertinent, and scandalous." (See TAC ¶¶ 10, 32, 49, 178.) Many of these allegations, according to Reger, come from letters to the SEC

which accused Reger of wrongdoing at Dakota Plains similar to perceived wrongdoing at the companies Voyager and Northern Oil & Gas Inc. ("NOG"). Notably, Reger is currently an officer at NOG. Gruber argues that Reger's conduct at other companies—especially if fraudulent—would have been material for investors and, had Reger and Gilbertson disclosed their ownership in Dakota Plains, investors would have been alerted to the negative press they received regarding related-party transactions made at Voyager and NOG. (TAC ¶ 32.)

 **\*9** Paragraph 10 of the Complaint alleges that Thomas Howells set up a shell company to merge with Dakota Plains, like he purportedly did with Voyager and NOG. Paragraph 32 states that, had Reger disclosed his beneficial ownership of Dakota Plains, investors would have seen negative press related to Voyager and NOG. It further avers that these companies exhibited patterns of fraud similar to what Reger and Gilbertson did at Dakota Plains. Paragraph 49 summarizes a Dakota Plains letter to the SEC and a shareholder's letter to the SEC. Paragraph 178 summarizes a 2015 letter from two Dakota Plains shareholders to the SEC.

"[M]otions to strike are [generally] viewed with disfavor and infrequently granted." In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 218 F.R.D. 76, 78 (S.D.N.Y. 2003). A motion to strike "will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976). "Resolution of a Rule 12(f) motion is left to the district court's discretion." In re Platinum & Palladium Commodities Litig., 828 F. Supp. 2d 588, 593 (S.D.N.Y. 2011).

Reger primarily argues that "Second Circuit case law makes it clear that references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f)." In re Merrill Lynch, 218 F.R.D. at 78; Lipsky, 551

F.2d at 893 (holding that references to a complaint in a separate action against the defendant by the SEC were properly stricken from the plaintiff's complaint where the case was not actually adjudicated). In Platinum & Palladium, this Court struck references to a CFTC order instituting an administrative proceeding, in which the CFTC made factual findings, because the proceeding settled and there was no adjudication on the merits. See Platinum & Palladium, 828 F. Supp. 2d at 593.

Accordingly, because Paragraphs 49 and 178 stem from SEC letters, they should be stricken. However, Paragraphs 10 and 32 relate to news articles about Reger, Voyager, and NOG. Accordingly, they are in the public domain and are not based on confidential preliminary steps in litigations and administrative proceedings. Thus, the application to strike them is denied.

### CONCLUSION

For the foregoing reasons, the Nominee Defendants' motions are granted, Gilbertson's motion is denied, Reger's motion to dismiss is denied, and Reger's motion to strike is granted in part. The Clerk of Court is directed to terminate Defendants James Randall Reger, Joseph Clark Reger, Weldon Gilbertson, Jessica Gilbertson, and Kellie Tasto from the docket, and to place ECF No. 175 under seal. Gruber is directed to file a redacted version of the Complaint forthwith which strikes ¶¶ 49 and 178 but maintains the same paragraph enumeration as the unredacted Complaint. The Clerk of Court is further directed to terminate the motions pending at ECF Nos. 189, 191, 194, and 206.

SO ORDERED.

### All Citations

Slip Copy, 2019 WL 4458956

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1763230
United States District Court, S.D. New York.

Andrew WANG and Shou-Kung Wang,
individually and derivatively on behalf of the
Chi-Chuan Wang Revocable Trust, Plaintiffs,
v.
YIEN-KOO KING, Kenneth King,
Raymond King, Lynn King, Joseph Shih-
Fan King, and Does 1-10, Defendants.

No. 18 Civ. 8948 (JFK)
|
Signed 04/22/2019

**Attorneys and Law Firms**

FOR PLAINTIFFS ANDREW WANG AND SHOU-KUNG
WANG: Mark P. Ressler, Kim Conroy, Thomas B. Kelly,
KASOWITZ BENSON TORRES LLP.

FOR DEFENDANTS YIEN-KOO KING, KENNETH
KING, AND RAYMOND KING: Sam P. Israel, Timothy
Savitsky, SAM P. ISRAEL, P.C.

**OPINION & ORDER**

John F. Keenan, United States District Judge

**\*1** Before the Court is a motion by Defendants Yien-
Koo King ("Y.K. King"), Kenneth King ("K. King"), and
Raymond King ("R. King") to dismiss the amended complaint
filed by Plaintiffs Andrew Wang ("A. Wang") and Shou-Kung
Wang ("S.K. Wang"). For the reasons set forth below, the
Court grants Defendants' motion to dismiss.

**I. Background**

The Court takes the following relevant facts from the
allegations in the amended complaint and, for the purposes of
this motion, assumes they are true.

This action concerns a purported scheme to misappropriate
artwork and assets belonging to S.K. Wang and the estate of
the artist and collector Chi-Chuan Wang ("C.C. Wang"). (Am.
Compl. ¶¶ 1, 16.) Plaintiffs are A. Wang, the grandson of C.C.
Wang, and S.K. Wang, the son of C.C. Wang. (Id. ¶¶ 9-10.)

Defendants are Y.K. King, the daughter of C.C. Wang; K.
King, her husband; and R. King, Lynn King, and Joseph Shih-
Fan King -- Y.K. King and K. King's children. (Id. ¶¶ 11-13.)

A. Wang and S.K. Wang are citizens of New York. (Id. ¶¶
9-10.) Y.K. King and K. King are citizens of the United
States domiciled in China. (Id. ¶¶ 11-12.) R. King is a citizen
and resident of Oregon. (Id. ¶ 13.) The amended complaint
contains no jurisdictional facts relating to Y.K. King and K.
King's other children, and they have not appeared in this
action.

Between 1979 and 1997, S.K. Wang assisted C.C. Wang
in managing his business and assets, which included a
world-class collection of ancient Chinese art (the "Classical
Collection"). (Id. ¶¶ 15-16.) The Classical Collection
included artworks that C.C. Wang owned. It also, however,
included artworks belonging to S.K. Wang and a non-party in
this action, Hui Chen. (Id. ¶ 16.)

In 1997, Y.K. King objected to S.K. Wang acting as C.C.
Wang's primary assistant. (Id. ¶ 15.) As a result, C.C. Wang
relieved S.K. Wang from the role and installed Y.K. King.
(Id.) Y.K. King used this newfound access to C.C. Wang's
assets and the Classical Collection to defraud and loot, with
the help of her family, C.C. Wang's estate (the "Estate"). (Id. ¶
33.) Specifically, Plaintiffs claim that Defendants perpetrated
the following offenses, which the Court will outline.

1. The Transfer of Assets. Between 1997 and 2003 when she
managed C.C. Wang's affairs, Y.K. King, acting alone or in
concert with her husband, orchestrated a series of fraudulent
transactions in which a significant portion of C.C. Wang's
financial assets were transferred to corporate entities she and
her husband had formed. (Id. ¶¶ 19-21.) Some funds were then
distributed from these entities to K. King directly. (Id. at ¶¶
20-21.) Y.K. King, K. King, and R. King are alleged to have
used interstate wire transfers, telephone calls, and mailings
to further their scheme to siphon off C.C. Wang's monetary
assets and to protect certain assets to their corporate entities.
(Id. ¶¶ 23-24.)

2. The Purchase of C.C. Wang's Artwork. Between March
31, 1998 and September 6, 2000, Y.K. King and K. King
used the financial assets they fraudulently obtained from C.C.
Wang to purchase art from him, specifically forty-five pieces
of classical Chinese art, at artificially low prices. (Id. ¶ 22.)

**\*2** 3. <u>The Classical Collection Theft.</u> From 1997 until 2003, Y.K. King transferred artwork from the Classical Collection from a safe deposit box in C.C. Wang's apartment building to storage spaces at Day & Meyer, Murray & Young Corp. ("Day & Meyer"). (<u>Id.</u> ¶ 28.) She then prohibited C.C. Wang from accessing those storage spaces. (<u>Id.</u> ¶¶ 27-28.)

4. <u>The Northwich Bearer-Share Theft.</u> Y.K. King, in 2002, stole the bearer-share certificate to Northwich Investments, Ltd. ("Northwich"), a company holding certain assets belonging to C.C. Wang. (<u>Id.</u> ¶ 30.) She had the share certificate ultimately re-issued in her name. (<u>Id.</u> ¶¶ 30-33).

5. <u>Will and Surrogate's Court Manipulation.</u> Y.K. King manipulated C.C. Wang to execute a will in June 2000 (the "2000 Will") that provided Y.K. King with an outsize portion of the Estate relative to her siblings. (<u>Id.</u> ¶ 25.) In late 2002, C.C. Wang purportedly discovered Y.K. King's "misconduct in managing his affairs" and re-engaged S.K. Wang. (<u>Id.</u> ¶ 34.) C.C. Wang then modified the 2000 Will to disinherit Y.K. King. (<u>Id.</u> ¶ 35.) In 2003, he executed a new will (the "2003 Will") reinstating the testamentary scheme he had employed in his wills prior to 2000 and disinheriting Y.K. King. (<u>Id.</u>)

After C.C. Wang passed away in July 2004, S.K. Wang and A. Wang submitted the 2003 Will to Surrogate's Court in New York County for probate, an action which Y.K. King immediately challenged. (<u>Id.</u> ¶ 38.) Y.K. King contended that the 2003 Will was invalid because C.C. Wang lacked capacity at the time of execution. (<u>Id.</u> ¶ 49.) In an effort to invalidate the 2003 Will, Y.K. King (1) made false representations to a medical expert, Dr. Goldstein, who testified in Surrogate's Court about C.C. Wang's mental state at the time of the execution of the 2003 Will, and (2) forged a document that purported to show a settlement between A. Wang and Defendants by which Defendants returned forty-six artworks to A. Wang in exchange for an agreement, on the part of the Estate, to allow Defendants to retain certain other paintings already in their possession. (<u>Id.</u> ¶ 57-58.) In May 2017, the Surrogate's Court invalidated the 2003 Will, removed A. Wang as executor of the Estate, and replaced him with Y.K. King. (<u>Id.</u> ¶ 58.)

6. <u>The Sale of Restrained Artwork.</u> Upon commencement of its proceedings, the Surrogate's Court issued a restraining order (the "Restraining Order"), which prohibited A. Wang, S.K. Wang, Y.K. King, and K. King from selling any artwork that "is property of the Estate" or was "formerly owned by" C.C. Wang. (<u>Id.</u> ¶ 43.) A. Wang and an attorney for the New York State Office of the Public Administrator (the "Public Administrator") had compiled a list of such artwork (the "Appel Inventory") during the time they served as executors of the Estate. (<u>Id.</u> ¶ 39.) Defendants sold numerous artworks listed on the Appel Inventory that were subject to the Restraining Order in private sales in China, including six paintings collectively worth over $ 30 million. (<u>Id.</u> ¶ 45.) Plaintiffs, on December 8, 2018, discovered that a seventh artwork from the Appel Inventory was to be sold at an auction scheduled for late December 2018 in Beijing. (<u>Id.</u> ¶ 46.) They believe it sold for around $ 600,000. (<u>Id.</u>) They further believe Defendants funneled the funds derived from the sales of the restrained artwork through R.K. King's bank accounts. (<u>Id.</u> ¶ 48.)

**\*3** 7. <u>The Theft of S.K. Wang's Assets.</u> Defendants, in addition to "stealing assets of the Estate," stole a number of paintings personally owned by S.K. Wang. (<u>Id.</u> ¶ 59.) Defendants admitted in the Appel Inventory that they sold one of S.K. Wang's paintings and were in possession of two. (<u>Id.</u> ¶¶ 61-62.) Defendants attempted to sell a fourth painting at a private sale in China, although the amended complaint does not state when this sale occurred. (<u>Id.</u> ¶ 63.)

8. <u>The Fraudulent Bankruptcy.</u> Y.K. King and K. King committed fraud on the bankruptcy court when, in 2007, they declared bankruptcy and failed to disclose the full extent of their art holdings, failed to disclose their possession of the proceeds of illicit sales of restrained art, and failed to disclose their interests in their corporate entities. (<u>Id.</u> ¶ 64.) In 2012, based in part on Y.K. King and K. King's representations regarding the scope of their assets, the bankruptcy court issued an order of discharge to the Kings. (<u>Id.</u> ¶ 66.)

9. <u>Fraud on the Court.</u> Y.K. King committed fraud on the Court by filing an amended complaint in 2016 in a related RICO action, which contains false allegations against S.K. Wang and A. Wang. (<u>Id.</u> ¶ 67.) <u>See</u> First Am. Compl., <u>King v. Wang</u>, 14-cv-8948 (JFK) (S.D.N.Y. Sept. 27, 2016) (the "King Action"). Specifically, Y.K. King falsely alleged in her amended complaint that she did not discover the purported "straw men scheme" -- a scheme through which S.K. Wang and A. Wang allegedly re-sold artwork belonging to the Estate -- until 2013, when, in fact, she had discovered it in early November 200 9 as she admitted in a 2010 affidavit. (Am. Compl. ¶ 68.)

Based on the aforementioned offenses, Plaintiffs in the amended complaint assert two claims premised on federal

law: (1) violation of the Racketeer Influence and Corrupt Organizations Act ("RICO") and (2) conspiracy to commit a RICO violation. They also assert two state law claims for (1) breach of fiduciary duty against Y.K. King and (2) conversion. Plaintiffs contend that, pursuant to 28 U.S.C. § 1331, the Court has federal-question jurisdiction over their claims arising under RICO. (Id. ¶ 7.) They also ask that, pursuant to 28 U.S.C. § 1367(a), the Court exercise supplemental jurisdiction over their state law claims. (Id.) In response to Plaintiffs' amended complaint, Defendants have filed the instant motion to dismiss.

## II. 12(b)(6) Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Matson v. Bd. of Educ., 631 F.3d 57, 63 (2d Cir. 2011). On a motion to dismiss, the Court must accept the factual allegations in the complaint as true and draw reasonable inferences in the plaintiff's favor. Tsirelman v. Daines, 794 F.3d 310, 313 (2d Cir. 2015). The Court will not credit, however, " 'naked assertions' devoid of 'further factual enhancement.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557).

On a motion to dismiss, "the Court limits consideration to: (1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as an exhibit or incorporated in it by reference; (3) matters of which judicial notice may be taken ...; and (4) documents upon whose terms and effect the complaint relies heavily, i.e., documents that are 'integral' to the complaint." Calcutti v. SBU, Inc., 273 F. Supp. 2d 488, 498 (S.D.N.Y. 2003) (citing Brass v. American Film Techs, 987 F.2d 142, 150 (2d Cir. 1993)).

## III. Discussion

**\*4** Plaintiffs assert RICO claims against all Defendants pursuant to 18 U.S.C. § 1962 (substantive RICO claim) and § 1962(d) (RICO conspiracy claim). The Court will address these claims before deciding whether to exercise supplemental jurisdiction over Plaintiffs' state law claims.

## A. Plaintiffs' Substantive RICO Claim

### 1. Applicable Law

RICO confers a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation" of the RICO statute. 18 U.S.C. § 1964(c); see also Bridge v. Phx. Bond & Indem. Co., 553 U.S. 639, 647 (2008). The RICO statute, in relevant part, makes it unlawful, "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Thus, to state a claim for a substantive RICO violation, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001) (citing Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)). In addition, to establish standing under § 1962(c), a plaintiff must show that "she suffered an injury to her 'business or property,' [and] ... that her injury was caused 'by reason of the RICO violation -- a standard ... equated to the familiar 'proximate cause' standard." D'Addario v. D'Addario, 901 F.3d 80, 96 (2d Cir. 2018) (quoting 18 U.S.C. § 1964(c)).

The RICO statute defines "racketeering activity" to "encompass dozens of state and federal offenses, known in RICO parlance as predicates." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2096 (2016). "These predicates include any act 'indictable' under specified federal statutes, §§ 1961(1)(B)-(C), (E)-(G), as well as certain crimes 'chargeable' under state law, § 1961(1)(A), and any offense involving bankruptcy or securities fraud or drug-related activity that is 'punishable' under federal law, § 1961(1)(D)." Id. at 2096. A court will scrutinize closely RICO claims premised on the predicate acts of mail and wire fraud in light of "the routine use of mail and wire communications in business operations," Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 489 (2d Cir. 2014) (citation omitted), and "the attendant ease with which a plaintiff may attempt to fashion a RICO claim based on allegations that may turn out to be insufficient to plausibly support one." Yarur Bascunan v. Yarur Elsaca, 338 F. Supp. 3d 301, 311 (S.D.N.Y. 2018).

Defendants do not challenge every element of Plaintiffs' RICO claims. Rather, they argue that certain injuries are time-barred, that other injuries were not proximately caused by

the alleged predicate acts, and that Plaintiffs have failed to plead their claims with the required particularity pursuant to Rule 9(b). In addition, they argue that Plaintiffs' claims are barred by the Kings' discharge in bankruptcy court, the Full Faith and Credit Clause, collateral estoppel, and the Rooker-Feldman doctrine. The Court will start its analysis with whether Plaintiffs have alleged injury, and whether the RICO violations were the proximate cause of any injury.

### 2. Injury and Proximate Cause

**\*5** The amended complaint asserts three injuries: (1) loss of art and assets by the Estate and S.K. Wang; (2) removal of A. Wang as preliminary executor of the Estate as a result of the jury decision in Surrogate Court rejecting the 2003 Will; and (3) litigation expenses incurred by A. Wang and S.K. Wang in having to defend against a meritless RICO action in federal court. (Am. Compl. ¶¶ 78-79.) Defendants argue that Plaintiffs have failed to state a civil RICO claim premised on any of these injuries. The Court will address each injury in turn.

### i. Loss of Art and Assets

The first injury for which Plaintiffs seek recovery is "loss of art and assets" to the Estate and S.K. Wang. (Id. ¶ 78.) Defendants argue that any RICO claim based on this injury is time-barred. (Defs.' Mem. of Law in Supp. Mot. to Dismiss at 15-16 (Mar. 29, 2019), ECF No. 51 [hereinafter "Mem."].) For the reasons set forth below, the Court agrees.

"RICO claims are governed by a four-year statute of limitations which 'begins to run when the plaintiff discovers or should have discovered the RICO injury.' " King v. Wang, No. 14 CIV. 7694 (JFK), 2017 WL 2656451, at \*7 (S.D.N.Y. June 20, 2017) (quoting In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 58 (2d Cir. 1998)). In other words, "[t]he limitations period begins to run when the plaintiff has 'actual or inquiry notice of the injury.' " Id. (quoting Merrill Lynch, 154 F.3d at 60). Accordingly, "[t]he first step in the statute of limitations analysis is to determine when the [parties] sustained the alleged injury for which they seek redress." Merrill Lynch, 154 F.3d at 59. The Court "then determine[s] when they discovered or should have discovered the injury and begins the four-year statute of limitations period at that point." Id.

Defendants argue that, according to the amended complaint, the Estate and S.K. Wang lost their art and assets when Defendants allegedly pilfered paintings and financial assets from C.C. Wang and S.K. Wang sometime between 1997 and 2003 when Y.K. King managed C.C. Wang's affairs. (Mem. at 15.) Defendants further argue that Plaintiffs were on notice of this injury either by 2003, when C.C. Wang disinherited Y.K. King, or 2007, when A. Wang compiled the Appel Inventory, listing the paintings over which there is an ownership dispute. (Id. 15-16.) Thus, Plaintiffs' RICO injury premised on the loss of artwork accrued no later than 2007. (Id. at 16.)

Plaintiffs respond that they are seeking recovery for new injuries: the damage to the Estate that occurred when the Kings transported restrained artwork to China and then sold it there in 2018. (Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss at 11 (Mar. 29, 2019), ECF No. 52 [hereinafter "Opp."].) The Second Circuit subscribes to the rule of "separate accrual," which "begins the RICO limitations period afresh" with each new "independent" injury, even if the predicate acts causing that injury fall outside of the statute of limitation. Merrill Lynch, 154 F.3d at 59. Despite this rule, the Court holds that Plaintiffs cannot recover damages based on the alleged recently discovered sales of artwork in China for the reasons that follow.

Plaintiffs acknowledge in the amended complaint that the loss of art and assets occurred between 1997 and 2003, when Y.K. King allegedly stole works and monetary assets from C.C. Wang. (Am. Compl. ¶¶ 22-24.) The amended complaint does indeed make clear that Defendants were on notice of this theft by either 2003, when C.C. Wang grew "suspicious" of Y.K. King and disinherited her from his will (id. ¶¶ 29, 35), or by 2007, when A. Wang compiled the Appel Inventory, listing artwork purportedly belonging to the Estate and S.K. Wang but over which the Kings have claimed ownership (id. ¶ 39). Specifically, many of the restrained artworks that were allegedly sold in China within the four-year statute of limitations period are on that list with accompanying descriptions such as "Kings claim Soon Huat bought it from CC on 9/6/00" and "[b]elieved to be in Kings' possession." (Am. Compl. Ex. A at 10.) Thus, Plaintiffs were on notice that Defendants had taken the Estate's artwork by 2007. As this action was not filed until 2018, any injury related to that loss is time-barred.

**\*6** In addition, the predicate acts of transportation of stolen artwork (an 18 U.S.C. § 2314 violation) and sale of stolen artwork (an 18 U.S.C. § 2315 violation) do not save Plaintiffs'

untimely RICO claim based on the loss of Estate-owned artwork and assets because these new predicate acts did not proximately cause the injury for which Plaintiffs are seeking relief. Had Defendants, and more specifically Y.K. King, not taken the artwork in the first place, there would be no injury here because there would be nothing to transport and sell in China. All these predicate acts did, therefore, was further an "injury that happened or could have happened independently" of them, which is insufficient to create a new and independent injury. Vicon Fiber Optics Corp. v. Scrivo, 201 F. Supp. 2d 216, 219 (S.D.N.Y. 2002). Plaintiffs "cannot use ... independent, new predicate act[s] as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." Klehr v. A.O. Smith Corp., 521 U.S. 179, 190 (1997). Therefore, any injury derived from the loss of Estate- or S.K. Wang- owned art or assets is time-barred.

### ii. Removal of A. Wang as Preliminary Executor and Rejection of the 2003 Will

The second injury Plaintiffs claim Defendants' RICO violation caused is the invalidation of the 2003 Will and the removal of A. Wang as preliminary executor of the Estate. (Am. Compl. ¶ 78.) Plaintiffs contend that the predicate acts causing this injury were Defendants' (1) use of mail and wire fraud to procure false testimony from Dr. Goldstein (Opp. at 14; Am. Compl. ¶ 50); and (2) alteration of the settlement document in violation of 18 U.S.C. § 1512(c), which was submitted to the Surrogate's Court, and used by the jury in reaching its final verdict. (Opp. at 14; Am. Compl. ¶¶ 52-58.) Plaintiffs' RICO claim premised on this injury fails for at least two reasons, which the Court will address in turn.

First, Plaintiffs have failed to allege how either Dr. Goldstein's false testimony or the fraudulent settlement document proximately caused the Surrogate's Court to invalidate the 2003 Will and remove A. Wang as preliminary executor. "Proximate cause requires 'some direct relation between the injury asserted and the injurious conduct alleged,' and 'a link that is too remote, purely contingent, or indirect is insufficient.' " Empire Merchants, LLC v. Reliable Churchill LLLP, 902 F.3d 132, 141 (2d Cir. 2018) (quoting Hemi Grp., LLC v. City of New York, N.Y., 599 U.S. 1, 17 (2010) (plurality opinion)). To determine whether there is a "direct relation," a court must evaluate "whether it would difficult to determine how much the tortious conduct injured the defendant, as compared to other factors." Id. Dr.

Goldstein's testimony served as evidence of C.C. Wang's lack of capacity. The Surrogate's Court, however, invalidated the 2003 Will on three grounds: lack of capacity, fraud, and undue influence. (Israel Decl. Ex. A (Mar. 29, 2019), ECF No. 54-1.) Therefore, even if the jury had disregarded Dr. Goldstein's testimony and found that C.C. Wang did not lack capacity when he executed to the 2003 Will, the jury still would have invalidated the will because they found it was procured through fraud and undue influence. Plaintiffs have, therefore, failed to allege that Dr. Goldstein's testimony proximately caused the jury verdict in the Surrogate's Court because they have not alleged "how much the tortious conduct" -- i.e., Dr. Goldstein's fraudulent testimony -- injured Plaintiffs "as compared to other factors" - i.e., the jury's additional findings that the 2003 Will was procured through fraud and undue influence. Empire Merchants, 902 F.3d at 141.

Regarding the fraudulent settlement document, there are no allegations in the amended complaint as to how the jury relied on this document in rendering its verdict. All the amended complaint states is, that the Defendants "have ... used their forged settlement document to challenge the 2003 Will in the probate proceedings in the Surrogate's Court." (Am. Compl. ¶ 57.) Without more information, the allegations in the amended complaint that the fraudulent settlement document proximately caused the jury to find the 2003 Will invalid are merely conclusory. See e.g., Hollander v. Flash Dancers Topless Club, 173 F. App'x 15, 18-19 (2d Cir. 2006) (summary order) (affirming dismissal of a complaint containing "conclusory allegations" of "damages to financial interests" but which did "not specify how racketeering activities caused those damages.").

**\*7** The amended complaint also alleges that the jury relied on Dr. Goldstein's testimony and the settlement document "among other things" in reaching its verdict. (Am. Compl. ¶ 58 ("In May 2017, based on, among other things, the false testimony of Dr. Goldstein and the forged settlement document, Defendants succeeded in invalidating the 2003 Will and removing Andrew as Preliminary Executor....").) Plaintiffs, therefore, have conceded that the fraudulently procured evidence was not the sole basis for -- or even a "but-for" cause of -- the jury's verdict invalidating the 2003 Will, which then resulted in the removal of A. Wang as preliminary executor of the Estate. Hemi Grp., LLC v. City of New York, N.Y., 559 U.S. 1, 9 (2010) ("[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.' " (quoting Holmes v. Sec.

Inv'r Prot. Corp., 503 U.S. 258, 268 (1992))). Accordingly, Plaintiffs' probate-trial injury is too attenuated from the RICO violations for this Court to conclude that it was proximately caused by those violations.[1]

[1]   The Court has received additional letter submissions from the parties addressing the ongoing proceedings in Surrogate's Court. (ECF Nos. 66, 67.) Defendants assert in their letter that the Surrogate's Court has recently agreed to decide whether a codicil executed eight days earlier than the rejected 2003 Will, and which contains the same material terms as the 2003 Will, should be probated. According to Defendants, if this newly-discovered codicil is probated, the amount of damages Plaintiffs can recover in this action would decrease. Thus, Plaintiffs' injury is premature. The Court need not decide this issue as it has dismissed Plaintiffs' RICO claims premised on injuries stemming from the probate trial on other grounds.

### iii. Legal Expenses in Relation to the 2016 RICO Litigation in Federal Court

Plaintiffs assert that they have incurred "significant and ongoing expense in defending against" the King Action, which, according to Plaintiffs, is "a meritless RICO action premised on knowingly false allegations." (Am. Compl. ¶ 79.) Plaintiffs contend that the predicate acts Defendants committed by filing their meritless RICO action were mail fraud (a violation of 18 U.S.C. § 1341) and wire fraud (a violation of 18 U.S.C. § 1343). (Id. ¶ 73.) Defendants argue that Plaintiffs cannot state a RICO claim based on the filing of the King Action because in Kim v. Kimm, the Second Circuit held that "allegations of frivolous, fraudulent, or baseless litigation activities -- without more -- cannot constitute a RICO predicate act." 884 F.3d 98, 104 (2d Cir. 2018).

Plaintiffs argue that they have alleged the "more" required by Kim because they have alleged a scheme by Defendants to defraud the Estate, which involved asset theft, misconduct in the 2009 bankruptcy proceeding, the sale of converted assets, and fraudulent litigation activities in probate court. (Opp. at 14-15.) Although Defendants have not responded to this argument, the Court holds that the filing of the RICO claim in the King Action cannot constitute mail fraud, 18 U.S.C. § 1341, or wire fraud, 18 U.S.C. § 1343.

First, because the Court has held that Plaintiffs have not adequately alleged RICO claims premised on the sale of

restrained artwork or the proceedings in probate court, Plaintiffs' RICO claim would be rooted solely in litigation-related mail or wire fraud predicates -- specifically, the use of mail and wires in filing legal documents in the King Action. The Second Circuit has declared this kind of RICO claim untenable. See Kim, 884 F.3d at 105 ("We conclude only that where, as here, a plaintiff alleges that a defendant engaged in a single frivolous, fraudulent, or baseless lawsuit, such litigation activity alone cannot constitute a viable RICO predicate act.")

Second, Plaintiffs have not alleged enough corrupt conduct in connection with the King Action, such as bribery of witnesses or parties, sufficient to hold that the filing of a fraudulent complaint in of itself can constitute criminal mail or wire fraud. See e.g., Snow Ingredients, Inc. v. SnoWizard, Inc., 833 F.3d 512, 525 (5th Cir. 2016) ("Only in Feld did the court allow litigation activity to sustain a civil-RICO action, but in that case the litigation activity included bribery of parties and witnesses." (citing Feld Entm't Inc. v. Am. Soc. for the Prevention of Cruelty to Animals, 873 F.Supp.2d 288, 318 (D.D.C. 2012))). Thus, Plaintiffs have failed to state a RICO claim premised on Defendants' filing of their competing RICO complaint.

### 3. Defendants' Remaining Arguments

**\*8**  Having dismissed Plaintiffs' RICO claim for the reasons stated above, the Court declines to address Defendants' additional arguments that (1) Plaintiffs cannot recover against the Kings because of the bankruptcy court's discharge (Mem. at 20), and (2) Plaintiffs' RICO claim is barred by the Rooker-Feldman doctrine, the Full Faith and Credit Clause, and collateral estoppel (Mem. at 22).

### B. Conspiracy to Commit Civil RICO

Plaintiffs' amended complaint asserts a claim for conspiracy to violate RICO, in violation of 18 U.S.C. § 1962(d), which states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Plaintiffs' conspiracy claim is premised on the predicate acts and injuries described above. Because Plaintiffs have not adequately pleaded an actionable RICO claim based on those acts and injuries, their conspiracy claim also necessarily fails. See FindTheBest.com, Inc. v. Lumen View Tech. LLC, 20 F. Supp. 3d 451, 461 (S.D.N.Y. 2014) ("FTB's conspiracy claim is predicated on the wire fraud, mail

fraud, and extortion theories described above. Because FTB has not adequately pled a RICO claim under those theories, FTB's conspiracy claim fails as well."); see also Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1064 (2d Cir. 1996) ("Since we have held that the prior claims do not state a cause of action for substantive violations of RICO, the present claim does not set forth a conspiracy to commit such violations."), vacated on other grounds, 525 U.S. 128, 119 (1998).

### C. Supplemental State Law Claims

Having found that dismissal of Plaintiffs' RICO claims appropriate, the Court must now consider whether it should nonetheless exercise supplemental jurisdiction over Plaintiffs' remaining state law claims. A federal court ordinarily has supplemental jurisdiction to hear claims based on state law so, long as they form "part of the same case or controversy under Article III of the United States Constitution" as the asserted federal claims. See 28 U.S.C. § 1367. A federal court may, however, decline to exercise supplemental jurisdiction in cases where it has "has dismissed all claims over which it has original jurisdiction." Id.; see also Castellano v. Bd. of Trustees of Police Officers' Variable Supplements Fund, 937 F.2d 752, 758 (2d Cir. 1991) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966))). Because the Court is dismissing the amended complaint's only federal law claims -- and in the absence of diversity of citizenship -- the Court declines to exercise jurisdiction over Plaintiffs' remaining state law claims.

### IV. Leave to Amend

Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). Amendment is not warranted, however, "absent some indication as to what [a plaintiff] might add to [its] complaint in order to make it viable." Shemian v. Research In Motion Ltd., 570 F. App'x 32, 37 (2d Cir. 2014) (quoting Horoshko v. Citibank, N.A., 373 F.3d 248, 249 (2d Cir. 2004)). Accordingly, should Plaintiffs wish to amend their complaint, they must demonstrate (1) how they will cure the deficiencies in their claims by filing a proposed amended complaint and (2) that justice requires granting leave to amend. The motion for leave to amend shall be filed within 21 days of the date of this Order.

### V. Conclusion

**\*9** For the foregoing reasons, the Court grants Defendants' motion to dismiss the amended complaint. Plaintiffs' claims are dismissed without prejudice. The Clerk of Court is respectfully requested to terminate the motion docketed at ECF No. 50.

### SO ORDERED.

### All Citations

Slip Copy, 2019 WL 1763230, RICO Bus.Disp.Guide 13,169

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Waltz v. Bd. of Educ. of Hoosick Falls Cent. School Dist., Not Reported in F.Supp.2d...

Case 6:19-cv-01412-GTS-TWD Document 10 Filed 01/14/20 Page 83 of 91

2013 WL 4811958, 197 L.R.R.M. (BNA) 2013

2013 WL 4811958
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Mark WALTZ, et al., Plaintiffs,
v.
BD. OF EDUC. OF the HOOSICK FALLS
CENT. SCH. DIST.; Kenneth Facin; Judy
Woodward; Amy Ferullo; and Hoosick
Falls Teachers' Ass'n, Defendants.

No. 1:12−CV−0507 (GTS/CFH).
|
Sept. 10, 2013.

**Attorneys and Law Firms**

Cooper Erving & Savage LLP, Phillip G. Steck, Esq., of Counsel, Albany, NY, for Plaintiffs.

Tabner, Ryan And Keniry, LLP, William Ryan, Jr., Esq., Brian M. Quinn, Esq., of Counsel, Albany, NY, for Sch. Dist. Defendants.

Office of Richard E. Casagrande, Esq., Harold Eisenstein, Esq., of Counsel, Latham, NY, for Teachers' Ass'n Defendants.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this civil rights action are the following motions: (1) a motion to dismiss the complaint for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6) by defendants, the Board of Education of the Hoosick Falls Central School District and Kenneth Facin (collectively, "the School District") (Dkt. No. 13); (2) a motion to dismiss the complaint for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6) by defendants, Judy Woodard, Amy Ferullo and the Hoosick Falls Teachers' Association (collectively, "the Association") (Dkt. No. 14); and (3) a motion to amend the complaint pursuant to Fed.R.Civ.P. 15(a)(2) by plaintiffs,

twenty-seven retirees of the Hoosick Falls Central School District ("Plaintiffs") (Dkt. No. 16). For the reasons set forth below, Defendants' motions to dismiss are granted and Plaintiffs' motion to amend is denied.

**I. RELEVANT BACKGROUND**

**A. Plaintiffs' Claims**

Generally, Plaintiffs' Complaint asserts a claim of conspiracy to violate Plaintiffs' contractual health insurance rights "to an indemnity-type health insurance plan including major medical coverage" in violation of Article 1, Section 10 of the United States Constitution under 42 U.S.C. §§ 1983 and 1985.

Plaintiffs' proposed Amended Complaint reasserts their Contract Clause claim and adds claims that Defendants conspired to violate Plaintiffs' rights under the Takings Clause of the Fifth Amendment and Plaintiffs' procedural due process rights under the Fourteenth Amendment.

**D. Pending Motions**

**1. The School District's Motion to Dismiss**

Generally, in support of its motion to dismiss, the School District argues as follows: (1) Plaintiffs' Complaint fails to state a claim under the Contract Clause because (a) this case does not involve any legislative action, (b) Plaintiffs have not plausibly alleged a contractual impairment, (c) the impairment Plaintiffs allege is insubstantial, and (d) Plaintiffs' cannot recover the monetary damages they seek under the Contract Clause; (2) Plaintiffs' Complaint fails to state a claim under Section 1983 because Plaintiffs have not alleged and cannot prove a deprivation of a constitutional or statutory right; (3) Plaintiffs' Complaint fails to state a claim under Section 1985 because Plaintiffs have not plausibly alleged a conspiracy or that the conspiracy was motivated by racial or other class-based discrimination; and (4) Plaintiffs cannot recover attorneys' fees under 42 U.S.C. § 1988 because they cannot prevail on their claims under Sections 1983 or 1985. (*See generally* Dkt. No. 13–1 [Sch. Dist.'s Mem. of Law].)

**2. The Association's Motion to Dismiss**

Generally, in support of its motion to dismiss, the Association argues as follows: (1) Plaintiffs fail to state a claim for a violation of their rights under the Contract Clause because they do not allege any legislative action; (2) Plaintiffs fail to state a claim for a violation of their due process rights under the Fourteenth Amendment because they do not have

Waltz v. Board of Educ. of Hoosick Falls Cent. School Dist., Not Reported in F.Supp.2d... (2013)

Case 6:19-cv-01412-GTS-TWD Document 10 Filed 01/14/20 Page 84 of 91

2013 WL 4811958, 197 L.R.R.M. (BNA) 2013

a constitutionally protected property interest in a particular level of health care benefits; (3) Plaintiffs fail to state a claim under § 1983 because they do not allege any facts plausibly suggesting that the Association Defendants are state actors; (4) Plaintiffs fail to state a claim under § 1985 because they do not allege any facts plausibly suggesting a conspiracy that was motivated by racial or class-based discrimination; and (5) Plaintiffs' claims arise, if at all, under state, not federal, law and therefore, should be dismissed for lack of subject matter jurisdiction because without any legislative action, Plaintiffs' have actually pleaded either a claim for breach of the duty of fair representation or a claim for a violation of New York's moratorium laws on the diminution of retiree health benefits. (*See generally* Dkt. No. 14–2 [Ass'n Mem. of Law].)

### 3. Plaintiffs' Opposition to Defendants' Motions to Dismiss and Plaintiff's Cross–Motion to Amend Their Complaint

*2 In Plaintiffs' response to Defendants' motions to dismiss, they argue as follows: (1) there was legislative action in this case because, by either authorizing the superintendent to execute the collective bargaining agreement or by adopting the agreement itself, the Board of Education may exercise its legislative authority; (2) Plaintiffs alleged an impairment of a contract because the Defendants re-negotiated the terms of the collective bargaining agreement in contravention of the unambiguous terms of the agreement; (3) under § 1983, a conspiracy may exist between a state actor and a private entity; (4) Plaintiffs have alleged facts plausibly suggesting that the effect of the impairment of the collective bargaining agreement is substantial; and (5) Plaintiffs may bring a Contract Clause claim pursuant to § 1983. (*See generally* Dkt. No. 16–1, at 5–11 [Pls.' Response Mem. of Law].)

Generally, in support of their motion to amend, Plaintiffs argue as follows: (1) Plaintiffs should be allowed to amend their complaint to add a claim under the Takings Clause of the Fifth Amendment pursuant to *Professional Firefighters of Omaha v. Zalewski,* No. 10–CV–198, 2010 WL 2426446 (D. Neb. June 10, 2010); and (2) Plaintiffs should be allowed to amend their complaint to add a procedural due process claim because the collective bargaining agreement created a property interest. (*See generally* Dkt. No. 16–1, at 11–13 [Pls.' Mem. of Law].)

### 4. Defendants' Replies and Opposition to Plaintiff's Motion to Amend

In its reply, the School District essentially reiterates previously advanced arguments regarding Plaintiffs' Contract Clause claim, with the exception of noting Plaintiffs' apparent concession that their § 1985 claim is not viable and should be dismissed. In opposition to Plaintiffs' motion to amend, the School District argues that (1) Plaintiffs' proposed takings claim is futile because (a) Plaintiffs do not have a protected property interest in any specific type of health insurance plan and have failed to allege any actual economic loss and (b) no taking occurred, as Plaintiffs are still afforded health insurance and the School District's participation in collective bargaining negotiations is not the requisite level of government action for a takings claim; and (2) Plaintiffs' proposed procedural due process claim is futile because they have not alleged the denial of any property interest protected by the Due Process Clause. (*See generally* Dkt. No. 17 [Sch. Dist.'s Reply Mem. of Law].)

In its reply, the Association essentially reiterates previously advanced arguments, except that it argues that ratification of a collective bargaining agreement by a Board of Education is not legislative action for purposes of asserting a Contract Clause claim. In opposition to Plaintiffs' motion to amend, the Association argues that Plaintiffs' proposed claims are futile because Plaintiffs do not allege a constitutionally protected property interest. (*See generally* Dkt. No. 18 [Ass'n Reply Mem. of Law].)

### 5. Plaintiffs' Surreply

*3 Generally, in their surreply, Plaintiffs assert the following arguments: (1) there is no caselaw to support the argument that the legislation and ratification of a collective bargaining agreement by a Board of Education is not legislative action as contemplated by the Contract Clause simply because it is not accompanied by a local law or ordinance; (2) the collective bargaining agreement in this case created vested rights that continue after its expiration; (3) whether or not there is a violation of State law is irrelevant to the question of whether Plaintiffs may bring a claim for violations of the United States Constitution; (4) Defendants have cited no caselaw supporting the argument that the Takings Clause is inapplicable to the precise facts of this case where the collective bargaining agreement at issue created long-term property rights; and (5) contract rights are protected under the Due Process Clause. (*See generally* Dkt. No. 19 [Pls.' Surreply Br.].)

In their motion papers, the parties have demonstrated an adequate understanding of the factual allegations asserted in

Case 6:19-cv-01412-GTS-TWD    Document 10    Filed 01/14/20    Page 85 of 91

Waltz v. Board of Educ. of Hoosick Falls Cent. School Dist., Not Reported in F.Supp.2d... (2013)
2013 WL 4811958, 197 L.R.R.M. (BNA) 2013

Plaintiff's Complaint and proposed Amended Complaint. As a result, the Court will not recite that information in its entirety in this Decision and Order, which is intended primarily for the review of the parties. Rather, the Court will do so only where necessary below in Part III of this Decision and Order.

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Dismissal for Failure to State Claim

For the sake of brevity, the Court will not recite, in this Decision and Order, the well-known legal standard governing dismissals for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), but will direct the reader to the Court's decision in *Wade v. Tiffin Motorhomes, Inc.,* 686 F.Supp.2d 174, 181–183 (N.D.N.Y.2009) (Suddaby, J.).

However, a few words are appropriate regarding what documents are considered when deciding whether a complaint must be dismissed under Rule 12(b)(6). The court may consider the following documents without triggering the summary judgment standard: "(1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference into the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which court can take judicial notice for the factual background of the case." *Planck v. Schenectady Cnty.,* No. 12–CV–0336, 2012 WL 1977972, at *5 (N.D.N.Y. June 1, 2012) (Suddaby, J.).

### B. Legal Standard Governing Motions to Dismiss for Lack of Subject Matter Jurisdiction

"It is a fundamental precept that federal courts are courts of limited jurisdiction." *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S. Cit. 2396 (1978). Generally, a claim may be properly dismissed for lack of subject-matter jurisdiction where a district court lacks constitutional or statutory power to adjudicate it. *See Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). A district court may look to evidence outside of the pleadings when resolving whether to dismiss for lack of subject-matter jurisdiction. *Makarova,* 201 F.3d at 113. The plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence. *Makarova,* 201 F.3d at 113 (citing *Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996)). When a court evaluates whether to dismiss for lack of subject-matter jurisdiction, all ambiguities must be resolved and inferences

drawn in favor of the plaintiff. *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir.2005) (citing *Makarova,* 201 F.3d at 113).

### C. Legal Standard Governing Motions for Leave to Amend

**\*4** A motion for leave to amend a complaint is governed by Rule 15 of the Federal Rules of Civil Procedure, which states that leave to amend should be freely given "when justice so requires." Fed.R.Civ.P. 15(a)(2); *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Manson v. Stacescu,* 11 F.3d 1127, 1133 (2d Cir.1993). Pursuant to Fed.R.Civ.P. 15(a)(2), leave to amend a complaint should be freely given in the absence of any apparent or declared reason to not grant leave to amend, such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment. *See Foman,* 371 U.S. at 182; *S.S. Silberblatt, Inc. v. E. Harlem Pilot Block–Bldg. 1 Hous.,* 608 F.2d 28, 42 (2d Cir.1979); *Meyer v. First Franklin Loan Servs., Inc.,* No. 08–CV–1332, 2010 WL 277090, at *1 (N.D.N.Y. Jan. 19, 2010); *Jones v. McMahon,* No. 98–CV–0374, 2007 WL 2027910, at *10 (N.D.N.Y. July 11, 2007).

"An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)." *Annunziato v. Collecto, Inc.,* ––– F.Supp.2d ––––, ––––, 2013 WL 4045810, at *3 (E.D.N.Y.2013) (citing *Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 258 (2d Cir.2002)). Therefore a proposed amendment is not futile if it states a claim upon which relief can be granted. *See id.* (citations omitted).

### D. Legal Standards Governing Plaintiffs' Claim and Proposed Claims

#### 1. 42 U.S.C. § 1983

In order to state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must allege "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (quoting *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) (internal quotations omitted). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) (quoting

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Waltz v. Board of Educ. of Hoosick Falls Cent. School Dist., Not Reported in F.Supp.2d...

Case 6:19-cv-01412-GTS-TWD  Document 10  Filed 01/14/20  Page 86 of 91

2013 WL 4811958, 197 L.R.R.M. (BNA) 2013

*Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).

A municipality may only be liable on a § 1983 claim "if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven,* 691 F.3d 72, 80 (2d Cir.2012) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). In the absence of such a custom or policy, a municipality may not be held liable on a § 1983 claim for the actions of its employees under a theory of vicarious liability. *See Jones,* 691 F.3d at 80 (citing *Monell,* 436 U.S. at 691, 98 S.Ct. 2018, 56 L.Ed.2d 611).

"For purposes of § 1983, school districts are considered to be local governments and are subject to similar liability as local governments under *Monell.*" *Dzugas–Smith v. Southold Union Free Sch. Dist.,* No. 08–CV–1319, 2012 WL 1655540, at *20 (E.D.N.Y. May 9, 2012). "A school district's liability under *Monell* may be premised on any of three theories: (1) that a district employee was acting pursuant to an expressly adopted official policy; (2) that a district employee was acting pursuant to a longstanding practice or custom; or (3) that a district employee was acting as a 'final policymaker.' " *Hurdle v. Bd. of Educ. of City of New York,* 113 F. App'x 423, 424–425 (2d Cir.2004) (quoting *Lytle v. Carl,* 382 F.3d 978, 982 (9th Cir.2004) (internal citations omitted)).

## 2. Conspiracy to Violate Civil Rights

**\*5** In order to survive a motion to dismiss on a conspiracy claim under § 1983 a plaintiff must allege "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–325 (2d Cir.2002). A plaintiff asserting a § 1983 conspiracy claim must first successfully allege a violation of the underlying constitutional right. *See Clark v. City of Oswego,* No. 03–CV–202, 2007 WL 925724, at *7 (N.D.N.Y. Mar. 26, 2007) (citing *Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995)). Further, "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello,* 292 F.3d at 325 (quoting *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993) (citations, internal quotation marks, and

internal alterations omitted)). Finally, under the intracorporate conspiracy doctrine, "[w]here the individual defendants are all employees of the same institutional defendant, a claim of conspiracy will not stand." *Clark,* 2007 WL 925724, at *7 (quoting *Nat'l Congress for Puerto Rican Rights v. City of New York,* 75 F.Supp.2d 154, 168 (S.D.N.Y.1999) (internal quotations and citation omitted)).

In order to survive a motion to dismiss a conspiracy claim under § 1985(3), a plaintiff must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Thomas v. City of New York,* No. 12–CV–5061, 2013 WL 3810217, at *5 (E.D.N.Y. July 23, 2013) (quoting *United Bhd. of Carpenters v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)). In addition, a plaintiff must allege that the conspiracy is "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Thomas,* 2013 WL 3810217, at *5 (quoting *Britt v. Garcia,* 457 F.3d 264, 270, n. 4 (2d Cir.2006) (internal quotation marks omitted)). Because § 1985 has no state action requirement, a claim of conspiracy may be viable against private entities or individuals. *See Thomas,* 2013 WL 3810217, at *5, n. 5.

## 3. Contract Clause

The United States Constitution provides, in relevant part, that "[n]o State shall .... pass any ... Law impairing the Obligation of Contracts...." U.S. Const. art. I, § 10, cl. 1. Although the language of the Contract Clause is seemingly absolute, its language is "necessarily limited by the State's sovereign power to protect the health, safety and welfare of its citizens." *Donohue v. Paterson,* 715 F.Supp.2d 306, 318 (N.D.N.Y.2010) (citing *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978)). Thus, "[a] state may take necessary measures in pursuit of [these] legitimate state goals without bar by the [C]ontract [C]lause even though some contract rights may to some degree be modified or affected." *Eric M. Berman, P.C. v. City of New York,* 895 F.Supp.2d 453, 499 (E.D.N.Y.2012) (quoting *Kirshner v. United States,* 603 F.2d 234, 239 (2d Cir.1978)).

**\*6** As a threshold matter, courts have said that only legislative action can violate the Contract Clause. *See*

Waltz v. Board of Educ. of Hoosick Falls Cent. School Dist., Not Reported in F.Supp.2d...

2013 WL 4811958, 197 L.R.R.M. (BNA) 2013

Case 6:19-cv-01412-GTS-TWD   Document 10   Filed 01/14/20   Page 87 of 91

*Montauk Bus Co., Inc. v. Utica City Sch. Dist.,* 30 F.Supp.2d 313, 319 (N.D.N.Y.1998) (citing *Kinney v. Connecticut Judicial Dep't,* 974 F.2d 313, 314 (2d Cir.1992) (*per curiam* )) (citing *Ogden v. Saunders,* 12 Wheat. 213, 25 U.S. 213, 265–68, 6 L.Ed. 606 (1827))). Thus, the Contract Clause is only violated when a law of the State impairs an obligation of a contract. *See Montauk Bus Co.,* 30 F.Supp.2d at 319 (quoting *New Orleans Water–Works Co. v. Louisiana Sugar Ref. Co.,* 125 U.S. 18, 30, 8 S.Ct. 741, 31 L.Ed. 607 (1888) ("In order to come within the provision of the constitution of the United States which declares that no state shall pass any law impairing the obligation of contracts, not only must the obligation of a contract have been impaired, but it must have been impaired by a law of the state.")). Courts have made clear that State judicial decisions "or the acts of administrative or executive boards or officers, or the doings of corporations or individuals" are not to be deemed legislative action for purposes of applying the Contract Clause. *See Kinney,* 974 F.2d at 314 (citing *New Orleans Water–Works,* 125 U.S. at 30, 8 S.Ct. 741, 31 L.Ed. 607). "Any enactment, such as a by-law or ordinance of a municipal corporation, to which a state gives the force of law, is a statute of the state within the meaning of the Contract Clause." *See Montauk Bus Co.,* 30 F.Supp.2d at 319 (citing *New Orleans Water–Works,* 125 U.S. at 31, 8 S.Ct. 741, 31 L.Ed. 607).

In analyzing the extent to which the Contract Clause limits State power, the court should consider three questions: "(1) whether the contractual impairment is in fact substantial; if so, (2) whether the law serves a significant public purpose, such as remedying a general social or economic problem; and, if such a public purpose is demonstrated, (3) whether the means chosen to accomplish this purpose are reasonable and appropriate." *Donohue,* 715 F.Supp.2d at 318 (quoting *Sanitation and Recycling Indus., Inc. v. City of New York,* 107 F.3d 985, 993 (2d Cir.1997) (citing *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411–13, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983); *Allied Structural Steel,* 438 U.S. at 242–44, 98 S.Ct. 2716, 57 L.Ed.2d 727; *United States Trust Co. of New York v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977))). "The first question—whether the state law has operated as a substantial impairment of a contractual relationship—is a threshold inquiry that, in turn, requires the court to consider three additional sub-questions: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Eric M. Berman, P. C.,* 895 F.Supp.2d at 500 (quoting *General Motors Corp. v. Romein,* 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992)).

**4. Takings Clause**

The Takings Clause of the Fifth Amendment to the United States Constitution states that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. Therefore, to state a claim for a violation of the Takings Clause, a plaintiff must allege facts plausibly suggesting: "(1) a property interest (2) that has been taken under color of state law (3) without just compensation." *West 95 Hous. Corp. v. New York City Dep't of Hous. Pres. and Dev.,* No. 01–CV–1345, 2001 WL 664628, at *9 (S.D.N.Y. June 12, 2001) (quoting *Frooks v. Town of Cortland,* 997 F.Supp. 438, 452 (S.D.N.Y.1998)).

**5. Procedural Due Process Claim**

*7 The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Thus, in order to state a claim for violation of one's rights under the Due Process Clause, a plaintiff must first allege that he or she possesses a liberty or property interest protected by the Constitution or federal statutes. *See Little v. City of New York,* 487 F.Supp.2d 426, 442 (S.D.N.Y.2007) (citing *Ciambriello,* 292 F.3d at 313).

In addition, when challenging the alleged deprivation of one's procedural due process rights, a plaintiff must allege that he or she was deprived of a property or liberty interest without having received notice and an opportunity to be heard regarding the deprivation. *See Ceja v. Vacca,* 503 F. App'x 20 (2d Cir.2012) (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). Where adequate pre-deprivation and post deprivation remedies are available under state law, a party may not prevail on his due process claim. *See Rackley v. City of New York,* 186 F.Supp.2d 466, 481–82 (S.D.N.Y.2002) (citing cases).

**III. ANALYSIS**

**A. Whether the Execution of a Collective Bargaining Agreement is Legislative Action for Purposes of a Contract Clause Claim**

After carefully considering the matter, the Court answers this question in the negative generally for the reasons stated by Defendants in their respective memoranda of law. (Dkt. No. 13–1, at 8–9 [Def. Sch. Dist.'s Mem. of Law]; Dkt. No. 14–

Case 6:19-cv-01412-GTS-TWD Document 10 Filed 01/14/20 Page 88 of 91

Waltz v. Board of Educ. of Hoosick Falls Cent. School Dist., Not Reported in F.Supp.2d...

2013 WL 4811958, 197 L.R.R.M. (BNA) 2013

2, at 5–6 [Def. Ass'n's Mem. of Law].) The Court would add the following analysis.

According to Plaintiffs, the School District's adoption of the 2010–2015 collective bargaining agreement constitutes legislative action as contemplated by the Contract Clause. Defendants argue that instead, the School District's power to approve the 2010–2015 collective bargaining agreement is administrative, not legislative, and therefore does not implicate the Contract Clause.

Plaintiffs point to the allegation in their Complaint and in their proposed Amended Complaint that "the School District is liable for damages under § 1983] because (i) Superintendent Facin was granted authority by the Board of Education to act for the School District with respect to the 2010–2015 collective bargaining agreement and/or (ii) the Board of Education adopted the 2010–2015 collective bargaining agreement as official policy of the School District." (Dkt. No. 1, at ¶ 38 [Pls.' Compl.]; Dkt. No. 16–2, at ¶ 38 [Pls.' proposed Am. Compl.].) For legal support, Plaintiffs cite a New York Court of Appeals opinion, which they contend stands for the conclusion that "[t]he Board of Education may exercise its legislative function either by authorizing the Superintendent of Schools to execute the [collective bargaining] agreement or by adopting the agreement itself." (Dkt. No. 16–1, at 6 [Pls.' Mem. of Law] [citing *Bd. of Educ. for the Buffalo Sch. Dist. v. Buffalo Teachers Fed'n, Inc.,* 675 N.E.2d 1202, 89 N.Y.2d 370, 653 N.Y.S.2d 250 (N.Y.1996)].) That case, however, dealt with the issue of whether a Board of Education is required to approve or fund a collective bargaining agreement it reached with a teachers' union, not, as here, whether such approval is legislative action for purposes of applying the Contract Clause. Moreover, Plaintiffs' reliance on *Board of Education for the Buffalo School District* for the proposition that a School District's approval of a collective bargaining agreement is legislative action is misplaced. In deciding that the Board was required to approve a collective bargaining agreement it reached with the union, the Court rejected the Board's argument that certain compensation features of the agreement were subject to additional legislative approval by the Board, holding that the law does not require this additional step. Specifically, the Court acknowledged that the Board's "authority to expend education funds flows directly from the Legislature's delegation. The power the Board enjoys over its budget is that of spending and allocating money, not one of appropriation. That unique power is possessed solely by the Common Council of the City of Buffalo." *Bd. of Educ. for the Buffalo Sch. Dist.,* 675 N.E.2d at 1205, 89 N.Y.2d at 377, 653

N.Y.S.2d at 253. Following this same line of reasoning, the School District's power to approve the 2010–2015 collective bargaining agreement, like their power to spend and allocate funds, would be administrative, not legislative, as Plaintiffs contend.

**\*8** To be sure, Plaintiffs cite a series of cases where federal courts have held that municipal governments interfered with the contractual health benefits of retirees in violation of the Contract Clause. See *Zalewski,* 2010 WL 2426446; *Am. Fed'n of State, Cnty., & Mun. Emps. v. Benton, Ark.,* No. 04–CV–492, 2007 WL 496760 (E.D.Ark. Feb. 13, 2007); *Mayborg v. City of St. Bernard,* No. 04–CV–00249, 2006 WL 3803393 (S.D.Ohio 2006); *San Diego Police Officers' Ass'n v. Aguirre,* No. 05–CV–1581, 2005 WL 3180000 (S.D.Cal.2005). However, each of those cases involved a municipal ordinance which has the force and effect of law. "[M]unicipal legislation which is passed under supposed legislative authority from the state" is legislative action within the ambit of the Contract Clause. *Ritzie v. City Univ. of New York,* 703 F.Supp. 271, 277 (S.D.N.Y.1989) (citing *Northern Pac. Ry. Co. v. State of Minn. ex rel. City of Duluth,* 208 U.S. 583, 590, 28 S.Ct. 341, 343, 52 L.Ed. 630 (1908)). By contrast, courts have held that actions taken by School Districts through votes of the Board of Education are not legislative actions within the meaning of the Contract Clause. See *Chaffer v. Bd. of Educ. of Long Beach Sch. Dist.,* 229 F.Supp.2d 185, 191 (E.D.N.Y.2002) (finding vote by the Board of Education to terminate plaintiff's employment was not legislative action under the Contract Clause); *Montauk Bus Co.,* 30 F.Supp.2d at 319 (finding that votes by a Board of Education to reject bids or award contracts do not constitute legislative acts for Contract Clause purposes). It follows, therefore, that when, as here, a School District approves a collective bargaining agreement, such action is administrative, not legislative.

Accordingly, because Plaintiffs have failed to allege legislative action, their Contract Clause claim is dismissed.

### B. Whether Plaintiffs Have Alleged Facts Plausibly Suggesting a Conspiracy

After carefully considering the matter, the Court answers this question in the negative generally for the reasons stated by Defendants in their respective memoranda of law. (Dkt. No. 13–1, at 17–19 [Def. Sch. Dist.'s Mem. of Law]; Dkt. No. 14–2, at 6–7 [Def. Ass'n's Mem. of Law].) The Court would add the following analysis.

Waltz v. Board of Educ. of Hoosick Falls Cent. School Dist., Not Reported in F.Supp.2d...

2013 WL 4811958, 197 L.R.R.M. (BNA) 2013

As indicated in Part II.D.2. of this Decision and Order, "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambrello,* 292 F.3d at 325 (quoting *Dwares,* 985 F.2d at 100). In other words, in order to successfully plead a conspiracy claim, under either § 1983 or § 1985, "a plaintiff must allege facts that plausibly suggest a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Bermudez v. City of New York,* No. 11–CV–750, 2013 WL 593791, at *8 (S.D.N.Y. Feb.14, 2013) (citations and internal quotations omitted). *See also Webb v. Goord,* 340 F.3d 105, 111 (2d Cir.2003) (upholding dismissal of conspiracy claim where the plaintiffs did not allege, "except in the most conclusory fashion, that any such meeting of the minds occurred among any or all of the defendants").

**\*9** Here, in their proposed Amended Complaint, Plaintiffs assert that "Defendants have conspired to violate the contractual health insurance rights of retirees to an indemnity-type health insurance plan including major medical coverage." (Dkt. No. 1, at ¶ 28 [Pls.'s Compl.]; Dkt. No. 16–2, at ¶ 28 [Pls.' proposed Am. Compl.].) Plaintiffs further assert, in their proposed Amended Complaint, that Defendants, "acting in concert" deprived them of their rights under the Takings Clause and the Due Process Clause. (Dkt. No. 16–2, at ¶¶ 40, 45.) Plaintiffs' Complaint and proposed Amended Complaint are devoid of any allegations of specific instances of conduct plausibly suggesting a conspiracy or any "meeting of the minds" beyond the fact that the School District Defendants and Association Defendants negotiated the collective bargaining agreement at issue. For this reason, Plaintiffs' conspiracy claims are dismissed.

### C. Whether Plaintiffs Have Alleged Facts Plausibly Suggesting Class–Based Discriminatory Animus

After carefully considering the matter, the Court answers this question in the negative generally for the reasons stated by Defendants in their respective memoranda of law. (Dkt. No. 13–1, at 17–18 [Def. Sch. Dist.'s Mem. of Law]; Dkt. No. 14–2, at 12–13 [Def. Ass'n's Mem. of Law].) The Court would add the following two points.

First, in this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been

lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D .N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at *1, n. 1 (N.D.N.Y. Oct.30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL 2473509, at *2 & n. 3 (N.D.N.Y. Aug .7, 2009) (Suddaby, J.) (collecting cases). Here, Plaintiffs have failed to oppose Defendants' motion to dismiss the § 1985 claim against them on the basis that Plaintiffs have not alleged that Defendants were motivated by some racial or other class-based discriminatory animus. At the very least, Defendants have met the lightened burden that was created by Plaintiffs' failure to respond. For this reason, Defendants' motion to dismiss the § 1985 claim against them is granted.

Second, as indicated in Part II.D.2. of this Decision and Order, in order to survive a motion to dismiss a conspiracy claim under § 1985(3), a plaintiff must allege, among other things, the conspiracy is "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Thomas,* 2013 WL 3810217, at *5 (quoting *Britt,* 457 F.3d at 270, n. 4 (internal quotation marks omitted)). Here, other than having identified themselves as retired teachers formerly employed by the School District and retired members of the Association, Plaintiffs have not identified themselves as members of any class, much less a class of persons protected under § 1985. Plaintiffs have presented no legal support for a finding that retirees are a protected class. Accordingly, for this additional reason, Defendants' motions to dismiss Plaintiffs' § 1985 claim is granted.

### D. Whether Plaintiffs Have Alleged Facts Plausibly Suggesting That They Possess a Property Interest Protected Under the Fifth and Fourteenth Amendments

**\*10** After carefully considering the matter, the Court answers this question in the negative generally for the reasons stated by Defendants in their respective memoranda of law. (Dkt. No. 17, at 5–9 [Def. Sch. Dist.'s Reply Mem. of Law]; Dkt. No. 18, at 9–10 [Def. Ass'n's Reply Mem. of Law].) The Court would add the following analysis.

Waltz v. Board of Educ. of Hoosick Falls Cent. School Dist., Not Reported in F.Supp.2d...

2013 WL 4811958, 197 L.R.R.M. (BNA) 2013

Case 6:19-cv-01412-GTS-TWD   Document 10   Filed 01/14/20   Page 90 of 91

To state a claim under either the Takings Clause of the Fifth Amendment or the Due Process Clause of the Fourteenth Amendment, a plaintiff must allege facts plausibly suggesting that the state action deprives him or her of a protected property interest. *See Escoe v. Shalala,* 842 F.Supp. 646, 651 (N.D.N.Y.1994) (citing *Story v. Green,* 978 F.2d 60, 62 (2d Cir.1992) (citing *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 2708–10, 33 L.Ed.2d 548 (1972) (due process claim)); *West Farms Assoc. v. State Traffic Comm'n,* 951 F.2d 469, 472 (2d Cir.1991) (due process claim); *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1000–04, 104 S.Ct. 2862, 2871–74, 81 L.Ed.2d 815 (1984) (takings claim)).

Here, Plaintiffs' proposed Amended Complaint includes the following allegations in support of their proposed Takings Clause claim:

> Plaintiffs had a legitimate expectation that they would receive the benefits as provided in the 2003–2010 collective bargaining agreement applicable to their entitlements as retired employees of the [ ] School District. The 2010–2015 collective bargaining agreement diminished the vested rights of the plaintiffs, and as such, the defendants violated the [T]akings [C]lause of the [Fifth Amendment].

(Dkt. No. 16–2, at ¶¶ 41–42 [Pls.' proposed Am. Compl.].) In support of their proposed Due Process Clause claim, Plaintiffs allege that they "had a property interest in the 2003–2010 collective bargaining agreement which extended their retiree health benefits at least [five] years beyond the expectation of that agreement," and that, when defendants "repealed the extender provision and adopted the 2010–2015 [collective bargaining agreement], they deprived plaintiffs of due process of law by denying plaintiffs the opportunity to vote on whether or not to approve the 2010–2015 collective bargaining agreement." (*Id.* at ¶¶ 44–45.)

As an initial matter, the Court notes that Plaintiffs' argument in support of their motion to amend their Complaint to add a Takings Clause claim is insufficient. Plaintiffs' argument is limited to one paragraph wherein they assert that it is their intention to amend their Complaint to add a Takings Clause claim "using identical language from the complaint in the Eighth Circuit case[,]" citing a case from the District of Nebraska, which they erroneously contend was affirmed by the Court of Appeals for the Eighth Circuit. [1] (*See* Dkt. No. 16–1, at 11 [Pls.' Mem. of Law] [citing *Zalewski,* 2010 WL 2426446].) Plaintiffs fail to address the viability of such a claim in this case, nor do Plaintiffs identify the language in the complaint in the District of Nebraska case that they intend to use here, which does not appear anywhere in the text of the cited opinion. For this reason alone, the Court may properly deny Plaintiffs' motion to amend their Complaint to add a Takings Clause claim.

[1]    The cited Eighth Circuit case, *Professional Firefighters Ass'n of Omaha v. Zalewski,* 678 F.3d 640 (8th Cir.2012), affirmed a different decision by the District Court in the same case regarding class settlement but did not discuss the plaintiffs' Takings Clause claim.

**\*11** In any event, the cases cited by Plaintiff in support of their argument that they possess a protected property interest in health insurance benefits provided for in a collective bargaining agreement are either distinguishable from the facts of this case or conflict with caselaw from the Second Circuit. For example, in the District of Nebraska case cited by Plaintiffs, the Court there found that the plaintiffs, retired firefighters, police officers and city employees, had a probability of success on the merits of their claims, including a claim under the Takings Clause, because the collective bargaining agreement in that case provided for health insurance substantially similar to that which was provided in the agreement at the time of an employee's retirement. *See Zalewski,* 2010 WL 2426446, at \*3. However, at least one District Court in the Second Circuit granted summary judgment in favor of a defendant town and denied a cross-motion for summary judgment by plaintiffs, retired town employees, on a § 1983 claim for violation of the plaintiffs' rights under the Due Process Clause, on the basis that plaintiffs' contractual right, under a collective bargaining agreement, to a certain level of health insurance benefits for life, is not a constitutionally protected property interest. *See Lawrence v. Town of Irondequoit,* 246 F.Supp.2d 150, 156–158 (W.D.N.Y.2002). *See also Huffman v. Town of La Plata,* No. 04–CV–2833, 2005 WL 1038854, at \*6 (D.Md. May 4, 2005) (reaching same result). Moreover, the Court in *Jackson v. Roslyn Bd. of Educ. .,* 652 F.Supp.2d 332 (E.D.N.Y.2009), cited by Plaintiffs, distinguished *Lawrence* from the facts in its case because in *Lawrence,* as here, the plaintiffs claimed a right to a specific type of health insurance, whereas in *Jackson,* plaintiffs were deprived of any health insurance at

Waltz v. Board of Educ. of Hoosick Falls Cent. School Dist., Not Reported in F.Supp.2d...

Case 6:19-cv-01412-GTS-TWD    Document 10    Filed 01/14/20    Page 91 of 91

2013 WL 4811958, 197 L.R.R.M. (BNA) 2013

all. *See Jackson,* 652 F.Supp.2d at 341–342. Accordingly, Plaintiffs' reliance on *Jackson* is misplaced.

Here, as in *Lawrence,* Plaintiffs claim that their contractual rights under the collective bargaining agreement at issue creates a property interest under the United States Constitution. For the same reasons elucidated by the Court in *Lawrence,* this Court likewise concludes that, even assuming the 2003–2010 collective bargaining agreement created an obligation on the part of the School District to continue to provide Plaintiffs health insurance benefits identical to or better than the health insurance benefits in existence at the time of their retirement, Plaintiffs' rights under that contract do not rise to the level of a constitutionally protected property interest. *See Lawrence,* 246 F.Supp.2d at 156–158. It follows that, there being no constitutionally protected property interest, Plaintiffs' proposed claims under the Takings Clause and Due Process Clause are futile. Therefore, Plaintiffs' motion to amend their Complaint is denied.

**ACCORDINGLY,** it is

**ORDERED** that the motion to dismiss Plaintiffs' Complaint by Defendants, Kenneth Facin and the Board of Education of the Hoosick Falls Central School District, (Dkt. No. 13) is *GRANTED;* and it is further

 **\*12 ORDERED** that the motion to dismiss Plaintiffs' Complaint by Defendants, Judy Woodard, Amy Ferullo and the Hoosick Falls Teachers' Association, (Dkt. No. 14) is *GRANTED;* and it is further

**ORDERED** that Plaintiffs' cross-motion to amend their Complaint, (Dkt. No. 16) is *DENIED.*

The Clerk of the Court is directed to close this case.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4811958, 197 L.R.R.M. (BNA) 2013

---

**End of Document**                © 2020 Thomson Reuters. No claim to original U.S. Government Works.